T.C. Memo. 1996-301

UNITED STATES TAX COURT

INVERWORLD, INC., ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 27089-90, 27090-90,        Filed June 27, 1996.
3441-93,  3442-93,
3443-93,  3444-93.

    <u>Turner P. Smith</u>, <u>Nancy E. Delaney</u>, and <u>Robert D. Whoriskey</u>,

for petitioner in docket No. 27089-90.

    <u>Turner P. Smith</u>, <u>Nancy E. Delaney</u>, <u>T. Barry Kingham</u>, and

<u>Robert D. Whoriskey</u>, for petitioner in docket No. 27090-90.

    <u>Turner P. Smith</u> and <u>Nancy E. Delaney</u>, for petitioners in

docket Nos. 3441-93, 3442-93, 3443-93, and 3444-93.

    <u>Jill Frisch</u>, <u>Peter J. Graziano</u>, and <u>Maria Stabile</u>, for

respondent.

---

[1]

    The following cases are consolidated herewith for purposes
of trial, briefing, and opinion: InverWorld, Inc., docket No.
3441-93; InverWorld, Ltd., docket Nos. 27090-90, 3443-93 and
3444-93; and InverWorld Holdings, Inc., docket No. 3442-93.

CONTENTS

I.   STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . 8
     A.   Issues With Respect to LTD . . . . . . . . . . . . . 8
     B.   Issues With Respect to INC . . . . . . . . . . . . 10
     C.   Issues With Respect to Holdings . . . . . . . . . 11

II.  FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . 11
     A.   Petitioners . . . . . . . . . . . . . . . . . . . . 11
     B.   Petitioners' Returns . . . . . . . . . . . . . . . 12
     C.   Creation of LTD . . . . . . . . . . . . . . . . . . 13
     D.   Creation of INC . . . . . . . . . . . . . . . . . . 15
     E.   Structure and Operation of LTD's
          Promotion, Service, and Sales . . . . . . . . . . . 17
     F.   INC's Consulting Agreement With LTD . . . . . . . . 22
     G.   Research . . . . . . . . . . . . . . . . . . . . . 26
     H.   Financial Accounting and Client Statements for LTD  27
     I.   IRS Audit During Spring 1987 . . . . . . . . . . . 29
     J.   The Transition to MultiValores . . . . . . . . . . 30
     K.   Accounting Firm Audit . . . . . . . . . . . . . . . 31
     L.   LTD's Receipts . . . . . . . . . . . . . . . . . . 31
          1.   Management Fees . . . . . . . . . . . . . . . 31
          2.   Interest Income . . . . . . . . . . . . . . . 33
               a.   U.S. Certificates of Deposit
                    and Bank Deposits . . . . . . . . . . . . 33
               b.   Loans . . . . . . . . . . . . . . . . . . 38
               c.   Non-U.S. Certificates of Deposit
                    and Term Deposits . . . . . . . . . . . . 38
               d.   Pace Investments . . . . . . . . . . . . 40
               e.   MMA II . . . . . . . . . . . . . . . . . 40
          3.   Currency Exchange Transactions Income . . . . 43
               a.   Currency Swaps . . . . . . . . . . . . . 43
               b.   Currency Transactions . . . . . . . . . 43
          4.   Sales Commissions and Fees . . . . . . . . . 46
               a.   Currency Fund . . . . . . . . . . . . . . 46
               b.   FEIM Fund . . . . . . . . . . . . . . . . 47
               c.   Matric Fund . . . . . . . . . . . . . . . 48
               d.   Inversat Fund . . . . . . . . . . . . . . 49
               e.   TVA . . . . . . . . . . . . . . . . . . . 50
               f.   Client Incorporation and Trust Creation . 52
               g.   Legal Advice Income . . . . . . . . . . . 53
               h.   Letters of Credit . . . . . . . . . . . . 53
               i.   Foreign Exchange Investments . . . . . . 54
               j.   Treasury Bills . . . . . . . . . . . . . 54
               k.   Wires and Checks . . . . . . . . . . . . 55
               l.   Gold and Silver Futures . . . . . . . . . 55
               m.   Project Income . . . . . . . . . . . . . 56
               n.   Income From Investments . . . . . . . . . 56

o.   Other Commission Income/
Other Commissions and Fees . . . . . . . 57
p.   Other Income . . . . . . . . . . . . . . 57
M.   Amounts Subject to Withholding Tax . . . . . . . . 59

III.  OPINION . . . . . . . . . . . . . . . . . . . . . . . . . 62
A.   Whether LTD Was Engaged in Trade
or Business Within the United States . . . . . . . 62
1.   Background . . . . . . . . . . . . . . . . . . 64
2.   Section 1.864-4(c)(5)(i), Income Tax Regs.,
Engaged in a Banking Business Test . . . . . . 64
B.   Whether Each Item of LTD's Income
Was Effectively Connected . . . . . . . . . . . . . 104
1.   Character and Source Rules . . . . . . . . . . 104
2.   Application of the Character and Source Rules 106
a.   Management Fees . . . . . . . . . . . . . 107
b.   Service Fees . . . . . . . . . . . . . . 107
(1)  U.S. Certificates of Deposit
and Bank Deposits . . . . . . . . . 107
(2)  Non-U.S. Certificates of Deposit
and Term Deposits . . . . . . . . . 113
(3)  Pace Investments . . . . . . . . . . 114
c.   Interest Income . . . . . . . . . . . . . 116
(1)  Loans . . . . . . . . . . . . . . . 116
(2)  MMA II . . . . . . . . . . . . . . . 116
d.   Currency Exchange Transactions
Income (Currency Swaps
and Currency Transactions) . . . . . . . 117
e.   Sales Commissions and Fees . . . . . . . 118
(1)  Currency Fund, FEIM Fund,
and Matric Fund . . . . . . . . . . 118
(2)  Inversat Fund . . . . . . . . . . . 121
(3)  TVA . . . . . . . . . . . . . . . . 122
(4)  Client Incorporation and Trust
Creation, Legal Advice
Income, and Letters of Credit . . . 124
(5)  Foreign Exchange Investments . . . . 124
(6)  Treasury Bills, Wires and Checks,
Gold and Silver Futures, Project
Income, Income from Investments,
Other Commission Income, Other
Commissions and Fees,
and Other Income . . . . . . . . . 125
3.   Effectively Connected Income Rules . . . . . . 125
a.   Introduction to the Rules . . . . . . . . 125
b.   Section 1.864-4(c)(5), Income
Tax Regs., Banking Activity Test . . . . 127
c.   Section 864(c)(2)(A) Asset-use Test . . . 128

      d.    Section 864(c)(2)(B)
Business-Activities Test . . . . . . . . 129

      e.    Section 864(c)(4)(B) Rules for Income
From Sources Without the United States . 130

  4.  Application of the Effectively
Connected Income Rules . . . . . . . . . . 135

      a.    Management Fees . . . . . . . . . . . . 136

      b.    Service Fees . . . . . . . . . . . . . . 139

         (1)  U.S. Certificates of Deposit
and Bank Deposits . . . . . . . . 139

         (2)  Non-U.S. Certificates of Deposit
and Term Deposits . . . . . . . . 143

         (3)  Pace Investments . . . . . . . . . 146

      c.    Interest Income . . . . . . . . . . . . 149

         (1)  Loans . . . . . . . . . . . . . . 149

         (2)  MMA II . . . . . . . . . . . . . . 157

      d.    Currency Exchange Transactions
Income (Currency Swaps
and Currency Transactions) . . . . . . . 161

      e.    Sales Commissions and Fees . . . . . . . 164

         (1)  Foreign Source TVA Commissions . . . 165

         (2)  All Commissions and Fees Excepting
the Foreign Source TVA Commissions . 166

C.  Whether LTD and INC are Liable
for Withholding Tax . . . . . . . . . . . . . . 170

  1.  Background . . . . . . . . . . . . . . . . 170

  2.  Withholding Tax on Interest . . . . . . . . 171

      a.    Pre-1986 Act Years . . . . . . . . . . . 176

         (1)  Character and Source
Rules for Interest . . . . . . . . 176

         (2)  Taxation of Interest . . . . . . . 179

      b.    Post-1986 Act Years . . . . . . . . . . 180

         (1)  Character and Source Rules
for Interest . . . . . . . . . . . 180

         (2)  Taxation of Interest . . . . . . . 181

  3.  Withholding Tax on Dividends . . . . . . . 183

      a.    Character and Source Rules
for Dividends . . . . . . . . . . . . . 183

      b.    Taxation of Dividends . . . . . . . . . 183

  4.  Discussion of Interest . . . . . . . . . . 185

      a.    Pre-1986 Act Years . . . . . . . . . . . 185

         (1)  Application of the Character
and Source Rules for Interest . . . 185

         (2)  Taxation of Interest . . . . . . . 188

      b.    Post-1986 Act Years . . . . . . . . . . 189

         (1)  Application of the Character
and Source Rules for Interest . . . 189

         (2)  Taxation of Interest . . . . . . . 190

          5.   Discussion of Dividend Income  . . . . . . . . 191
     D.   Whether LTD Is Entitled to Deductions . . . . . . . 194
          1.   Law . . . . . . . . . . . . . . . . . . . . . 194
          2.   Discussion . . . . . . . . . . . . . . . . . . 195
     E.   Whether Income Should Be Allocated
     Pursuant to Section 482 . . . . . . . . . . . . . . . . 199
          1.   Background . . . . . . . . . . . . . . . . . . 199
          2.   Law  . . . . . . . . . . . . . . . . . . . . . 200
               a.   Section 482 in General  . . . . . . . . . 200
               b.   The Section 482 Regulations . . . . . . . 203
          3.   Discussion . . . . . . . . . . . . . . . . . . 208
     F.   Remaining Issues  . . . . . . . . . . . . . . . . . 231
          1.   Positions of the Parties . . . . . . . . . . . 231
          2.   Issues With Respect to LTD . . . . . . . . . . 232
          3.   Issues With Respect to INC . . . . . . . . . . 232
          4.   Issues With Respect to Holdings . . . . . . . 232
     G.   Additions to Tax  . . . . . . . . . . . . . . . . . 233
          1.   Section 6651(a)(1) . . . . . . . . . . . . . . 233
          2.   Sections 6653(a)(1) and 6653(a)(1)(A)  . . . . 237
          3.   Section 6655(a)  . . . . . . . . . . . . . . . 241
          4.   Section 6656(a)  . . . . . . . . . . . . . . . 241
          5.   Section 6661(a)  . . . . . . . . . . . . . . . 243

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined deficiencies in and additions to InverWorld, Ltd.'s (LTD) withholding tax as follows:

<u>InverWorld, Ltd., Docket Nos. 27090-90, 3443-93</u>

| | | Additions to Tax | | | |
| | | Sec. | Sec. | Sec. | Sec. |
| <u>Year</u> | <u>Deficiency</u> | <u>6651</u> | <u>6653(a)(1)</u> | <u>6653(a)(2)</u> | <u>6656</u> |
| 1984 | $4,891,617 | $1,222,904 | $244,581 | [1] | $489,162 |
| 1985 | 10,119,885 | 2,529,971 | 505,994 | [1] | 1,011,988 |

| | | Additions to Tax | | | |
| | | Sec. | Sec. | Sec. | Sec. |
| <u>Year</u> | <u>Deficiency</u> | <u>6651(a)(1)</u> | <u>6653(a)(1)(A)</u> | <u>6653(a)(1)(B)</u> | <u>6656</u> |
| 1986 | 13,506,793 | 3,376,698 | 675,340 | [1] | 1,350,679 |
| 1987 | 733,420 | 183,355 | 36,671 | [1] | 73,342 |

| | | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| <u>Year</u> | <u>Deficiency</u> | <u>6651(a)(1)</u> | <u>6653(a)(1)</u> | <u>6656</u> |
| 1988 | 1,524,928 | 381,232 | 76,246 | 152,493 |
| 1989 | 2,951,566 | 737,891 | --- | 295,157 |

[1] 50 percent of the interest due on the deficiency.

Respondent determined deficiencies in and additions to LTD's Federal income taxes as follows:[2]

### InverWorld, Ltd., Docket No. 3444-93

| Tax Year Sec. Ended Sec. 6656 | Deficiency | Additions to Tax | | | | |
|---|---|---|---|---|---|---|
| | | Sec. 6651(a)(1) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6655 | |
| June 30, 1987 | $2,060,490 | $515,123 | $103,025 | [1] | $101,169 | $206,049 |
| June 30, 1988 | 2,299,853 | 574,963 | 114,993 | [1] | 128,503 | 229,985 |

[2]

Respondent sent LTD a notice of liability for withholding tax and a notice of deficiency in corporate income tax, each dated Sept. 7, 1990, for its taxable years ended 1984, 1985, and 1986. LTD timely filed a petition with this Court contesting respondent's determinations in the notice of liability. LTD attached the notice of liability to its petition but did not attach the notice of deficiency. In its petition, LTD did not refer to or dispute any of the deficiencies in corporate income tax determined in the notice of deficiency. Because LTD failed to contest the determinations in the notice of deficiency, respondent, on Feb. 6, 1991, assessed the amounts of the tax, additions to tax, and interest for LTD's taxable years ended 1984, 1985, and 1986, as determined in the notice of deficiency.

After the period for filing a petition with respect to the notice of deficiency had expired, LTD filed a motion for leave to file amendments to its petition contesting the notice of liability, pursuant to Rule 41(a). In InverWorld, Ltd. v. Commissioner, 98 T.C. 70 (1992), affd. 979 F.2d 868 (D.C. Cir. 1992), we held, inter alia, that, because each notice must be considered independently for purposes of jurisdiction, this Court did not acquire jurisdiction over the corporate income tax deficiencies determined in the notice of deficiency by virtue of a petition which contested only the withholding tax determinations in the notice of liability.

Respondent then assessed and collected $7.7 million of LTD's corporate income tax deficiencies and additions to tax. In the U.S. District Court for the District of Columbia, LTD has commenced a refund action, InverWorld, Ltd. v. United States, Civil Action No. 93-1704-LFO (D.D.C., filed Mar. 11, 1994), which has been stayed pending resolution of the instant case.

| Tax Year Ended | Deficiency | Additions to Tax | | | |
|---|---|---|---|---|---|
| | | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6655 | Sec. 6656 |
| June 30, 1989 | 6,828,339 | 1,707,085 | 341,417 | 417,253 | 682,834 |

[1] 50 percent of the interest due on the deficiency.

Respondent determined deficiencies in and additions to InverWorld, Inc.'s (INC) Federal withholding taxes as follows:

InverWorld, Inc., Docket No. 3441-93

| Year | Deficiency | Additions to Tax | | | |
|---|---|---|---|---|---|
| | | Sec. 6651(a)(1) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6656 |
| 1987 | $733,420 | $183,355 | $36,671 | [1] | $73,342 |

| Year | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6656 |
| 1988 | 1,524,928 | 381,232 | 76,246 | 152,493 |
| 1989 | 2,951,566 | 737,891 | --- | 295,157 |

[1] 50 percent of the interest due on the deficiency.

Respondent determined deficiencies in and additions to INC's Federal income tax for taxable years ended June 30, 1985 and 1986. Subsequent to the issuance of the statutory notice and upon submission of additional information to the District Director, Austin, respondent determined revised deficiencies in and additions to INC's Federal income tax as follows:

InverWorld, Inc., Docket No. 27089-90

| Tax Year Ended | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
| June 30, 1985 | $77,851,228 | $3,892,561 | [1] | $19,462,807 |
| June 30, 1986 | 157,044,730 | 7,852,237 | [1] | 39,261,183 |

[1] 50 percent of the interest due on the deficiency.

Respondent determined deficiencies in and additions to InverWorld Holdings, Inc.'s (Holdings) Federal income tax as follows:

InverWorld Holdings, Inc., Docket No. 3442-93

| Tax Year Ended | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 |
| June 30, 1987 | $454,333 | $22,717 | [1] | $113,471 |
| June 30, 1988 | 365,507 | 18,275 | [1] | 91,377 |

[1] 50 percent of the interest due on the deficiency.

| Tax Year Ended | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
| June 30, 1989 | 1,453,333 | 72,667 | --- | 363,333 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## I.   STATEMENT OF ISSUES

The issues for decision are:

A.   Issues With Respect to LTD

1.   Whether LTD is engaged in trade or business within the United States pursuant to section 864(b) for its taxable years ended June 30, 1985 through 1989;[3]

---

[3] LTD's deficiencies in income tax for its taxable years ended June 30, 1984, 1985, and 1986, are not at issue in the instant case.  See supra note 2.  We must, however, decide whether LTD was engaged in trade or business pursuant to sec. 864(b) for its taxable years ended June 30, 1985, and 1986, in order to apply the dividend source rules.  See infra p. 174.

2.    if we decide that LTD is engaged in trade or business within the United States for its taxable years ended June 30, 1985 through 1989, then we must decide whether each item of LTD's income was sourced from within or without the United States and whether each such item was effectively connected with the conduct of such trade or business within the United States;[4]

3.    whether LTD is liable for branch profits tax pursuant to section 884 for its taxable years ended June 30, 1988 and 1989;

4.    whether LTD is liable for environmental tax pursuant to section 59A for its taxable years ended June 30, 1988 and 1989;

5.    whether LTD is liable for additions to corporate income tax pursuant to sections 6651, 6653(a), and 6656 for its taxable years ended June 30, 1987, 1988, and 1989;

6.    whether LTD is liable as a withholding agent pursuant to sections 1441 and 1442 for failing to withhold tax on items of income of nonresident aliens and foreign corporations derived from sources within the United States for calendar years 1984 through 1989;

---

[4]

LTD's deficiencies in income tax for its taxable years ended June 30, 1984, 1985, and 1986, are not at issue in the instant case.  See supra note 2.  We must, however, decide whether each item of LTD's income was sourced from within or without the United States and whether each such item was effectively connected with the conduct of trade or business within the United States for its taxable years ended June 30, 1985 and 1986, in order to apply the dividend source rules.  See infra p. 174.

7.     whether LTD is liable for additions to withholding tax pursuant to sections 6651, 6653(a), and 6656 for calendar years 1984 through 1989.

B.     Issues With Respect to INC

1.     Whether income should be allocated to INC pursuant to section 482 for its taxable years ended June 30, 1985 and 1986;

2.     whether INC is entitled to claimed deductions for legal and audit expenses for its taxable year ended June 30, 1986;

3.     whether the net operating loss deduction claimed by INC should be increased for its taxable year ended June 30, 1985, and decreased for taxable year ended June 30, 1986;

4.     whether investment credits claimed by INC should be increased for its taxable year ended June 30, 1985, and decreased for its taxable year ended June 30, 1986;

5.     whether INC is liable for additions to corporate income tax pursuant to sections 6653(a) and 6661 for its taxable years ended June 30, 1985 and 1986;

6.     whether INC is liable as a withholding agent pursuant to sections 1441 and 1442 for failing to withhold tax on items of income of nonresident aliens and foreign corporations derived from sources within the United States for calendar years 1987, 1988, and 1989;

7.     whether INC is liable for additions to withholding tax pursuant to sections 6651, 6653(a), and 6656 for calendar years

1987, 1988, and 1989.

C.   Issues With Respect to Holdings

1.    Whether income should be allocated to Holdings pursuant to section 482 for its taxable years ended June 30, 1987, 1988, and 1989;

2.    whether Holdings is entitled to claimed deductions for legal and audit fees for its taxable year ended June 30, 1987;

3.    whether Holdings is entitled to claimed deductions for professional and legal fees for its taxable years ended June 30, 1988 and 1989;

4.    whether Holdings is entitled to claimed deductions for employee training and recruiting for its taxable year ended June 30, 1989;

5.    whether Holdings is liable for environmental tax pursuant to section 59A for its taxable year ended June 30, 1989;

6.    whether Holdings is liable for additions to corporate income tax pursuant to sections 6653(a) and 6661 for its taxable years ended June 30, 1987, 1988, and 1989.

## II.   FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91.  The parties' stipulations of facts are incorporated herein by reference, and they are found accordingly.

A.   Petitioners

LTD, an investment management and financial services

company, is a corporation that was organized pursuant to the laws of the Cayman Islands on November 27, 1981.

INC is a corporation that was organized pursuant to the laws of the State of Delaware on December 22, 1982. At the time the petitions in docket Nos. 27089-90 and 3441-93 were filed, INC's principal office was at 1250 N.E. Loop 410, Suite 1030, San Antonio, Texas 78209. During the years in issue, LTD owned, either directly or indirectly, all of the outstanding stock of INC. On November 15, 1985, INC was registered with the SEC as an investment adviser pursuant to section 203 of the Investment Advisers Act of 1940.

Holdings is a corporation that was organized pursuant to the laws of the State of Delaware on February 24, 1987. At the time the petition in docket No. 3442-93 was filed, Holdings' principal office was at 1250 N.E. Loop 410, Suite 1030, San Antonio, Texas 78209. During certain of the taxable years in issue, LTD owned all the outstanding stock of Holdings, and Holdings was the owner of all of the outstanding stock of INC.

B.   Petitioners' Returns

LTD maintained its books and records using a June 30 taxable year. LTD did not file U.S. Annual Withholding Tax Returns for U.S. Source Income of Foreign Persons (Forms 1042) for calendar years 1984, 1985, 1986, 1987, 1988, and 1989; U.S. Corporation Income Tax Returns of a Foreign Person (Forms 1120F) for its taxable years ended June 30, 1987, 1988, and 1989; or any other

U.S. tax returns for calendar years 1984, 1985, 1986, 1987, 1988, and 1989, or its taxable years ended June 30, 1987, 1988, and 1989. During each of its taxable years ended June 30, 1984 through 1989, LTD did not file income tax returns with any governmental entity, either foreign or domestic. LTD did not file any statements, forms, or other documents in lieu of income tax returns in Mexico or the Cayman Islands.

INC maintained its books and records using a June 30 taxable year. INC filed U.S. Corporation Income Tax Returns (Forms 1120) for taxable years ended June 30, 1985 and 1986. INC did not file U.S. Annual Withholding Tax Returns for U.S. Source Income of Foreign Persons (Forms 1042) for calendar years 1987, 1988, and 1989. For its taxable years ended June 30, 1987, 1988, and 1989, INC was joined in the consolidated income tax returns filed by Holdings.

Holdings maintained its books and records using a June 30 taxable year. Holdings filed U.S. Corporation Income Tax Returns (Forms 1120) for taxable years ended June 30, 1987, 1988, and 1989.

C. Creation of LTD

LTD was created by principals of InverMexico, S.A. de C.V., Casa de Bolsa, which was a securities brokerage firm that was registered in Mexico and headquartered in Mexico City, Mexico. On November 27, 1981, LTD was incorporated as an exempted

company[5] pursuant to the laws of the Cayman Islands.  To maintain
its registration as an exempted company in the Cayman Islands,
LTD submitted on March 4, 1983, November 21, 1983, December 5,
1984, February 18, 1988, November 29, 1988, and December 8, 1989,
an "Annual Return and Declaration" stating, inter alia, that its
operations since its last return have been mainly outside the
Cayman Islands.

LTD was a "sister company" of InverMexico; i.e., LTD and
InverMexico were owned by the same persons or entities.  During
the years in issue, no client of LTD was a citizen or resident of
the United States.

The principals of InverMexico managed a diverse group of
financial services companies in the name of InverMexico and other
entities; such companies were called "Grupo Inver", or the "Inver
Group".  During the late 1970's and early 1980's, in the face of
Mexico's declining oil revenues, the massive devaluation of the
peso, and a growing sense of political instability, wealthy
Mexicans increasingly sought opportunities outside Mexico's
borders for investments that were considered safer than domestic
investment opportunities.  In response to such "capital flight",
during those years the Mexican Government placed increasing

---

[5]

An "exempted company" is one the operation of which is
conducted mainly outside the Cayman Islands.  Secs. 179, 181, The
Companies Law of the Cayman Islands.

restrictions on the operations of Mexican financial institutions, having already closed its borders to non-Mexican financial institutions. The culmination of Mexico's restrictive investment regime was the imposition of exchange controls by presidential decree during September 1982 and the nationalization of the country's private banks. From that date onward, no Mexican-chartered bank or financial institution was permitted to handle foreign-currency-denominated accounts. Peso-based investments lost value. During 1982, many of the accounts managed by InverMexico were diminished as a result of the capital flight. Clients of InverMexico were sending their money to Merrill Lynch in the United States and to Swiss and Japanese banks.

From its inception through its taxable year ended June 30, 1990, LTD did not file any registration statement, reporting statement, or any other statement with any governmental entity in Mexico. During each of its taxable years ended June 30, 1984 through 1990, LTD was not registered to do business in Mexico.

D. Creation of INC

Prior to 1983, LTD had fewer than 15 clients. For the administration of the accounts of such clients, LTD used the services of United States Trust Co. of New York (Cayman), Ltd. (United States Trust); Paine Webber; and Shearson, American Express, Inc. (Shearson). United States Trust provided basic research, accounting, bookkeeping, reporting, and order-filling

services for LTD and maintained the account records of LTD's clients.  United States Trust charged commissions directly against each individual account on a sliding scale with the highest charge being approximately 0.75 percent of a client's net assets.  For their equity investments, LTD clients used the investment management services of Paine Webber and Shearson.  Generally, Shearson charged commissions directly against an LTD client's account.  Shearson then compensated either LTD or InverMexico by paying a percentage of the fees or commissions that Shearson earned from managing LTD clients' portfolios.

After 1 year of working with United States Trust, LTD's principals concluded that the service provided by United States Trust did not meet their expectations and that LTD was losing fee revenue and possibly clients to United States Trust.  The executive committee of the Inver Group decided to create another related company that would perform the research, bookkeeping, and administrative services formerly provided by United States Trust.  On December 22, 1982, INC was incorporated pursuant to the laws of the State of Delaware for that purpose.

The original INC office was established in New York City by George Fahey, president and a director of INC.  Mr. Fahey leased a small space at Rockefeller Center during early 1983.  INC's office personnel consisted of Mr. Fahey and a secretary.  Mr. Fahey maintained that office through the end of calendar year

1983.  Notwithstanding the creation of INC, LTD's clients continued to keep their accounts at United States Trust through the end of 1983.

Jose Zollino, treasurer and a director of INC, and Raymundo Leal, chairman of the board of directors of INC, moved to San Antonio, Texas, in August 1983.  By November 1983, INC had leased space and opened an office in San Antonio.  By the end of that year, Mr. Zollino informed Mr. Fahey that INC's management wanted to close the New York office and to have Mr. Fahey move to San Antonio.  Mr. Fahey agreed to move to San Antonio, arriving there on January 15, 1984.  Subsequently, LTD's clients were transferred from United States Trust to LTD.  Prior to that time, none of the United States Trust accounts had been transferred to LTD.  For its office, INC purchased an office copier, computer equipment and software, and office equipment and furniture.

E.    Structure and Operation of LTD's
      Promotion, Service, and Sales

As conceived by LTD's founders, LTD's business was to provide U.S. and foreign investment opportunities to InverMexico clients.  As a foreign (i.e., non-Mexican) financial institution, however, LTD was restricted by Mexican law in the manner by which it could advise clients in Mexico.  Accordingly, LTD chose not to establish a direct corporate presence in Mexico.  When LTD was first established, its clients were on the client roster of InverMexico.  Additionally, clients were referred to LTD by the principals of InverMexico (including principals of InverMexico

who were directors, officers, or shareholders of LTD) and by InverMexico account executives and employees. Accordingly, LTD depended upon referrals rather than direct marketing.

The account executives of InverMexico (known in Mexico as promotores and in the United States as promoters) were trained to sell in Mexico the services of the companies within the Inver Group, including LTD. For clients who were interested in Mexican, peso-based investments, an account would be opened at InverMexico. For clients who were interested in dollar deposits or other investments outside Mexico, an account would be opened at LTD. The number of client accounts at LTD was approximately 70 during 1984, 257 during 1985, 434 during 1986, 557 during 1987, 870 during 1988, and 1,131 during 1989. Not all client accounts were actively traded. For those years, the total amounts of client assets placed with LTD were $42,627,253 during 1984; $82,808,357 during 1985; $135,861,724 during 1986; $166,544,045 during 1987; $291,002,145 during 1988; and $285,621,179 during 1989.

Each promoter earned compensation for services rendered in the form of a salary and bonus from InverMexico. Promoters also earned "commissions", which did not follow a strict formula in any one year. In some cases, a promoter might also have received a commission directly from LTD.

Promoters presented new clients with a package of account opening documents, which consisted of signature cards, an

Investment Management Agreement/Discretionary Authorization (discretionary authorization), the client's investment instructions, and a power of attorney.  The promoter explained the investment options available to the client and received the client's executed copies of the documents.  It was the promoter's obligation to verify the facts presented in the account opening documents, including the fact that the client was not a resident or citizen of the United States

Each signature card contained the client's name and signature, the client's LTD account number, and, generally, the client's address.  The discretionary authorization signed by each client granted LTD the "sole discretion" to invest the client's assets in a vast range of financial products, subject to the client's investment instructions, in consideration of a fee paid to LTD based on the net value of the client's assets on the first day of each month.  On a separate page for investment instructions, clients authorized division of their investments among four broad categories:  Real estate, securities, fixed assets, and other investments.  The discretionary authorizations specifically granted LTD

> the full power to delegate the whole or any part of its powers, duties, discretions and authority granted hereunder to InverWorld, Inc.[,] a wholly owned subsidiary of * * * [LTD], provided that * * * [LTD] shall remain fully liable to the Client for any and all actions of InverWorld, Inc.[,] undertaken pursuant to authority delegated to it by * * * [LTD].

The discretionary authorizations granted LTD the power to maintain or to transfer assets in omnibus accounts.  In its early Discretionary Authorizations, as well as in a brochure for "selected investors who are not residents of the U.S.A.", and a printed newsletter entitled "InverNews", LTD listed the San Antonio office as its return address.

Each client also granted a power of attorney to LTD, allowing LTD to make investments in the name of the client, to endorse for deposit and collection instruments payable to the client, and to pay bills and fees of third parties on behalf of the client.  During LTD's taxable years ended 1984 through 1986, inclusive, the powers of attorney were notarized in Bexar County, Texas.

In some cases, the promoter assembled the account opening documents signed by the client and sent them to San Antonio, where they were countersigned in the name of LTD.  Mr. Fahey executed "some" discretionary authorizations on behalf of LTD in the United States.

Once the account was opened, the promoter directed the client to wire funds to a bank account opened in Texas in the name of LTD.  LTD called this bank account the client clearing account or clearing account.  Pursuant to its consulting agreement with LTD, INC had the authority to invest the "cash, securities, and other properties comprising the assets" of LTD's

clients as instructed by LTD. During each of the years in issue, one or more employees or officers of INC had signatory authority for LTD's bank accounts.

INC maintained in San Antonio two types of files. The first type was the client statement file, or client file, which contained documents relating to client account activity. The client statement file contained copies of LTD Statements of Account, which identified only the client's LTD account number and, if applicable, the client's third party institution account number (e.g., the client's Shearson account number). Additionally, if applicable, the client statement files contained copies of: (1) Third party institution statements of account, which identified the client's name and the third party institution client number; (2) LTD Cash Receipt forms, which identified the client's name and LTD account number; (3) LTD Check Requisition forms, which identified the client's name and LTD account number; and (4) LTD Debit/Credit Memorandum forms, which identified the client's name and LTD account number.

The second type of file maintained by INC in San Antonio was the client legal file, which contained documents relating to the establishment of the client account itself. The client legal file contained copies of: (1) The discretionary authorization between LTD and the client, which included the client's investment instructions and identified the client's name and LTD

account number; (2) the power of attorney, which identified the client's name; (3) the client's Signature Card, signed by the client, which identified the client's name, LTD account number, and address; and (4) the client's passport, which identified the client's name.  Additionally, if applicable, the client legal file contained correspondence, and, with corporate clients, corporate documents such as certificates of incorporation and minutes of corporate meetings.

F.    INC's Consulting Agreement With LTD

LTD and INC entered into an agreement dated "as of February 1, 1983" (the Agreement).  Pursuant to the terms of the Agreement, INC agreed to furnish LTD "with such factual information, research reports and investment recommendations relating to securities of issuers or other investments designated by * * * [LTD]".  INC agreed to furnish LTD with "such advice as * * * [LTD] may reasonably request with respect to the relative attractiveness of securities of issues or other investments located in the United States."

Paragraph 4 of the Agreement provides that, at the discretion of LTD, INC

     will invest such cash, securities and other properties
     comprising the assets of investment advisory clients of
     * * * [LTD] as * * * [LTD] shall instruct, in such manner as
     * * * [LTD] shall instruct.  In order to carry out such
     instructions, * * * [INC] will have the authority for and in
     the name of * * * [LTD]:
          (a)  to purchase, sell and deal in, on margin or

otherwise, listed and unlisted capital stock, preorganization certificates and subscriptions, warrants, bonds, notes, debentures whether subordinated, convertible or otherwise, trust receipts, bankers' acceptances, government obligations and other obligations, choses in action, instruments or evidences of indebtedness by whomsoever issued, and other securities of whatever kind or nature of any person, corporation, government or entity whatsoever, whether readily marketable or not, and such rights or options relating thereto including put and call options written by * * * [INC] on behalf of * * * [LTD] or by others (all such items being referred to herein as securities), and to sell such securities short and cover such sales;

(b)  to purchase, hold, sell, transfer, exchange, mortgage, pledge and otherwise act to acquire and dispose of and exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to securities held on behalf of * * * [LTD] or its clients, with the objective of the preservation, protection and increase in value thereof;

(c)  to purchase securities for investment and to make such representations to the seller of such securities, and to other persons, that * * * [INC] may deem proper in such circumstances, including the representation that such securities are purchased by * * * [LTD] or its clients for investment and not with a view to their sale or other dispositions;

(d)  to lend any of the properties which are from time to time held by * * * [LTD] on behalf of its clients; and

(e)  to open, maintain, conduct and close accounts, including margin accounts, with any broker, dealer or investment concern at which * * * [LTD] maintains an account on behalf of its clients with respect to the disposition and application of monies or securities of * * * [LTD] or its clients and from time to time held by such broker, dealer or investment concern.

Paragraph 5 of the Agreement provides that INC agrees

to maintain all books and records relating to the accounting for transactions executed by * * * [INC] in accordance with paragraph 4.  Such accounting services shall include, without limitation, the following:

(a)  maintaining documentation and records relating to the purchase, sale and settlement of portfolio securities, including an investment ledger and a dealer ledger;

(b) monitoring, expediting and recording the collection of all income due * * * [LTD] or its clients;

(c) summarizing, posting and recording all items of cash receipts and disbursements, including reconciling all bank accounts with the general books of account;

(d) maintaining a general ledger for the recording of all transactions to the accounts of * * * [LTD] or its clients; and

(e) preparing and issuing quarterly, semiannual and annual reports to * * * [LTD] and its clients and providing all information necessary for the preparation and filing of any and all tax returns and reports to governmental agencies by * * * [LTD] and its clients.

Paragraph 6 of the Agreement provides:

In consideration for the performance by * * * [INC] of the advisory and administrative Services pursuant to this Agreement, there shall be paid to * * * [INC] an annual fee of $114,000.00, payable monthly.

The foregoing annual fee shall be subject to yearly amendment after review of the costs to * * * [INC] of providing services hereunder. Such costs shall include that portion of the salaries, wages and profit sharing of the employees of * * * [INC] attributable to the performance of services on behalf of * * * [INC] hereunder.

Paragraph 8 of the Agreement provides:

* * * [INC] shall for all purposes be an independent contractor and not an agent or employee of * * * [LTD], and * * * [INC] shall have no authority to act for, represent, bind or obligate * * * [LTD], any of its affiliates or any account managed or advised by * * * [LTD].

The Agreement was executed, on behalf of LTD, by William L. Bricker (a tax partner at Curtis, Mallet-Prevost, Colt & Mosle, in New York, New York, who was secretary and tax counsel of LTD) and, on behalf of INC, by Mr. Fahey. Letter agreements amended INC's annual fee pursuant to the Agreement for the taxable years ended June 30, 1984 through 1989. Such letter agreements were

normally signed by Mr. Bricker on behalf of LTD and then sent to Mr. Fahey for his signature on behalf of INC.

The letter agreement for the taxable year ended June 30, 1984, signed by Mr. Bricker and Mr. Fahey, was dated December 18, 1984.

The letter agreement for the taxable year ended June 30, 1985, signed by Mr. Fahey but not Mr. Bricker, was dated July 1, 1984. The cover letter transmitting the letter agreement for the taxable year ended June 30, 1985, was dated July 17, 1985. LTD made 11 payments of $29,500, one each month, for a total of $324,500 in fees during taxable year ended June 30, 1985. LTD made an adjustment on June 30, 1985, paying an additional $257,500 in fees for a final total of $582,000 for taxable year ended June 30, 1985.

The letter agreement for taxable year ended June 30, 1986, signed by Mr. Bricker and Mr. Fahey, was dated "As of July 1, 1985". A letter from Steve Dooley, INC's controller, to Mr. Bricker requesting that INC's fee for taxable year ended June 30, 1986, be adjusted to $945,000 was dated July 18, 1986.

The letter agreement for taxable year ended June 30, 1987, signed by Mr. Bricker and Mr. Fahey, was dated "As of July 1, 1986". A letter dated August 5, 1987, telecopied from Mr. Dooley to Mr. Bricker included a suggested annual fee of $1,281,000 and a proposed profit and loss statement for INC's taxable year ended

June 30, 1987. In his response letter dated August 17, 1987, Mr. Bricker asked Mr. Dooley "whether there may be some basis coming up perhaps with a similar result but basing it upon a percentage of assets."

The letter agreement for taxable year ended June 30, 1988, signed by Mr. Bricker and Mr. Fahey, was dated "As of August 1, 1987".

The letter agreement for taxable year ended June 30, 1989, signed by Mr. Bricker and Mr. Fahey, was dated "As of July 1, 1988".

The total fees paid by LTD to INC and the gross revenues received by INC for each taxable year are set forth in the following table:

| TYE June 30 | Management fee from LTD to INC | Gross Revenues of INC | Percentage of INC's Gross Revenues |
|---|---|---|---|
| 1985 | $582,000 | $618,190 | 94.1% |
| 1986 | 945,000 | 953,583 | 99.1 |
| 1987 | 1,281,000 | 1,395,545 | 91.8 |
| 1988 | 1,440,000 | 1,532,579 | 94.0 |
| 1989 | 1,830,000 | 1,909,563 | 95.8 |

G. Research

Pursuant to its Agreement with LTD, INC purchased, on behalf of clients of LTD, certificates of deposit and term deposits from banks located both within and without the United States. The executive committee of the Inver Group established criteria, relating to the bank's size, equity, profitability, size of

deposits, assets and liabilities ratios, and standing with the FDIC or FSLIC, to guide INC in selecting banks from which to purchase certificates of deposit and term deposits.

Pursuant to its Agreement with LTD, INC assembled and maintained a document entitled Institution Standings, which reflected financial information regarding financial institutions. Mr. Fahey contacted a list of banks throughout the United States and obtained interest rates from each bank for 30-day, 60-day, 90-day, and 6-month placements of certificates of deposit and term deposits. A list of the rates quoted by each bank was telecopied, usually daily, to Mexico to inform promoters of the current interest rates offered on the certificates of deposit and term deposits. A promoter had no discretion to offer a client higher interest rates than the rates reflected on the list but did have the discretion to offer lower rates.

H. Financial Accounting and Client Statements for LTD

Pursuant to its Agreement with LTD, INC provided the bookkeeping for LTD. INC maintained all of LTD's records of clients' transactions, which LTD called "lower level documents". Such records consisted of cash receipts, debit-credit memos, wire transfers, and check requests reflecting every transaction for every client. During the years in issue, LTD's lower level documents were maintained in the central filing system of INC in San Antonio.

INC produced in San Antonio daily proof sheets, which summarized all client investment activities for a specified day. Proof sheets included a summary of client positions, a summary of the certificates of deposit activity, and a summary of the "casa" or house account. Proof sheets were based on individual documentation of specific transactions as well as comparisons of the specific transactional information to daily transaction reports. Proof sheets reflected, for example, that a certain dollar amount of client certificates of deposit had been bought on a particular day. During the years in issue, the proof sheets were maintained in INC's office in San Antonio although not in the central filing system.

INC produced in San Antonio journal vouchers, which were summaries of the proof sheets, excluding references to client activity. Journal vouchers related only to the financial performance of LTD. INC used the journal vouchers to book income or credit and debit items to LTD. Additionally, INC used the journal vouchers to produce profit and loss statements and to make entries into different general ledger accounts.

INC generated monthly statements of LTD client account activity. Each month, INC printed a client account statement summarizing the client's activity for the month and the client's holdings at a particular bank or investment fund. The client statements, which listed only the client's LTD account number,

were printed numerically by geographical region in Mexico.

Generally, client statements were hand delivered by promoters to clients. The client statements either were picked up in San Antonio by a promoter from Mexico and taken to Mexico or were taken by someone from San Antonio to Mexico. After mid-1988, INC transferred the information in the client statements onto a computer tape and transported the tape to Mexico City where the statements were printed and sent to the promoters for distribution to LTD's clients.

I.   IRS Audit During Spring 1987

During the spring of 1987, the IRS notified INC that it would be the subject of an audit. After INC became aware of the upcoming audit, Mr. Dooley took LTD's general ledger to the Cayman Islands. Additionally, LTD's journal vouchers were sent to the Cayman Islands. The lower-level documents, however, remained in San Antonio. Mr. Dooley took the general ledger to the firm that LTD used to maintain its registration in the Cayman Islands and discussed the logistics of having the firm maintain the general ledger.

Mr. Zollino decided, however, to begin maintaining LTD's general ledger in Mexico. Journal vouchers, which were used to make entries into LTD's general ledger, were still being produced in San Antonio. Accordingly, David Rodriguez, an INC employee, was sent to Mexico with the journal vouchers, which were entered

into the laptop computer that he took with him from San Antonio to produce LTD's financial statements and general ledger.

The data and general ledger system for both INC and LTD were needed in Mexico because Michael Graves, another INC employee, and Mr. Rodriguez were producing consolidated financial statements. While in Mexico, Mr. Graves was responsible for insuring the integrity of the general ledger system and its proper operation. When Mr. Graves and Mr. Rodriguez returned from Mexico to San Antonio, they brought with them the computer tape containing the client statements, the laptop computer containing the general ledgers for LTD and INC, and a floppy disk containing the general ledgers for INC and LTD.

J.    The Transition to MultiValores

By the end of taxable year 1986, the Inver Group consisted of seven operating companies. During early 1986, the operations of InverMexico underwent a fundamental change, coinciding with its registration as a public company on the Mexican stock exchange. Such changes led to divisions within the Inver Group and a reexamination of LTD's relation to InverMexico.

During January 1987, Luis Garcia Blake, the principal and owner of MultiValores S.A. de C.V. (MultiValores), a small, Mexican stock brokerage firm, proposed to Mr. Zollino that LTD join forces with MultiValores. The eight LTD partners who left InverMexico were joined in the new Inver Group by six principals

of MultiValores who took interests in LTD.  The combination with MultiValores in 1987 brought changes in the financial and operating controls of LTD and the Inver Group.  Additionally, during 1988, promoters in Mexico began working with "district offices", which were consulting entities that served as intermediaries between LTD and LTD's clients.

K.   Accounting Firm Audit

LTD and INC engaged the services of the accounting firm of Deloitte Haskins & Sells (Deloitte) in 1984.  For each taxable year ended June 30, 1984 through 1989, Deloitte performed a separate audit of each company and a consolidated audit of LTD and subsidiaries.

L.   LTD's Receipts

LTD's receipts during the years in issue fall into four basic categories:  (1) Management fees, (2) interest income, (3) currency transactions, and (4) sales commissions and fees.  The total amounts of "gross receipts" and "direct costs" for each category are discussed below.

1.   Management Fees

LTD charged its clients for management of their assets in accordance with a "Schedule" or "Exhibit" attached to the discretionary authorization.  By signing the power of attorney, each client authorized LTD to perform the following acts:  (1) "To issue orders and directions to any bank or trust company for accounts held in name of the Client with respect to the

maintenance, disposition and application of its monies,
securities or commodities"; (2) "To open, maintain, conduct and
close accounts in the Client's name with any broker, dealer or
investment concern, to issue orders and directions to such
broker, dealer or investment concern for its account with respect
to the disposition and application of its monies, securities or
commodities from time to time held by such broker, dealer or
investment concern"; (3) "For the foregoing purpose to endorse
for deposit and collection all checks, certificates of deposit,
promissory notes, drafts, bills or exchange or other orders or
instruments for the payment of money payable to its order"; and
(4) "To pay bills and fees of third parties on behalf of the
Client for goods or services which the Client has received or
authorized."

By signing the discretionary authorization, each client
authorized LTD to "manage the investment of the cash, securities
and other property of the Client as the Manager may hold from
time to time."  Each client agreed that LTD,

> in its sole discretion, shall invest the Assets in time
> deposits, money market funds or interest bearing
> investments or buy, sell (including short sales) and
> trade commodities, commodity options, stocks, bonds,
> options (including uncovered short positions in option
> contracts or in the uncovering of any existing short
> position in option contracts and any other securities
> and/or contracts relating to the same on margin or
> otherwise.

The discretionary authorization set forth LTD's compensation
system.  The discretionary authorization stated:  "The Client

shall pay the Manager as full compensation for the services performed hereunder an annual fee based on the Manager's fee schedule in effect from time to time; and, agrees that such compensation may be deducted directly from the Assets by the Manager and paid when due."  The fee was fixed at 0.25, 0.50 or 1.00 percent of the value of the client's net assets placed with LTD, depending upon the category of investment made by the client.  During 1986, LTD began using a revised Discretionary Authorization in which LTD's fee was increased to 0.50 or 1.00 percent of the value of the client's net assets placed with LTD, depending upon the category of investment made by the client. The gross receipts and direct costs (viz, commissions to promoters) relating to LTD's "Management Fees" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1985 | $273,279 | $33,852 |
| 1986 | 565,222 | 88,112 |
| 1987 | 655,223 | 51,978 |
| 1988 | 886,017 | 27,620 |
| 1989 | 1,119,259 | (11,359) |

2.   Interest Income

   a.   U.S. Certificates of Deposit
        and Bank Deposits

All investments made by or on behalf of LTD's clients were made in accordance with the terms of the discretionary authorization and power of attorney.  With regard to any funds transferred to LTD's client clearing account for investment, the

client agreed that the investment was entirely at the client's risk.  The client agreed:

(a)  "to indemnify and hold * * * [LTD] harmless from and to pay * * * [LTD] promptly on demand any and all losses arising" from an investment;

(b)  that "* * * [LTD] shall not be liable for any error of judgment or for any loss suffered by the Client in connection with the subject matter of the * * * [investment management] Agreement";

(c)  that to the extent LTD acted as attorney in fact for the client, it was for the client's "account and risk"; and

(d)  that to the extent the client placed funds in excess of FDIC or FSLIC insurance at any one bank (through LTD or otherwise) "the client's investments may not be fully covered by such insurance."

LTD was also authorized by each client to pool that client's funds with other clients' funds in order to obtain higher rates of return.  In authorizing LTD to pool funds, a client agreed that "* * * [LTD] shall have the power to maintain, commingle, or transfer Assets in omnibus accounts in the name of * * * [LTD] as attorney in fact for the client and other clients having an interest in the omnibus account."

During 1986, the discretionary authorization signed by each client was changed to include the provision that

> The rate of return credited to the Client's account may not reflect directly the rate of return earned by specific investments; the Client's rate of return may be net of expenses or may reflect the fact that * * * [LTD] may retain the benefit of special rates attributable to the volume of investments controlled by * * * [LTD].

For any amounts transferred by the client in excess of $100,000, a certificate of deposit was purchased in the client's own name in the face amount of $98,000. The maximum amount that could be protected pursuant to the U.S. Government insurance programs of the FDIC and FSLIC was $100,000.

For amounts less than $100,000 and in increments of $10,000, a client's funds were pooled with the funds of one or more other LTD clients to purchase another $98,000 certificate of deposit. LTD called such a pooled fund the "IFF Fund". LTD represented to its clients that IFF was a 28-day investment in a portfolio comprising money market instruments and that IFF was created only once a week. IFF, however, was merely a marketing name used to differentiate between pooled and nonpooled purchases of certificates of deposit. INC performed a daily accounting of each client's investments. If a client had more than $10,000 in liquid funds in an LTD account as of the day once a week on which LTD "created" the IFF Fund, INC placed the client's funds in the IFF Fund in $10,000 increments.

By having the funds pooled, a higher rate of return was earned on larger certificates of deposit. IFF paid interest at a rate 20 basis points over the rate reported in the Wall Street

Journal's 30-day Jumbo CD report. Because the funds were pooled, LTD purchased the certificate of deposit in its own name pursuant to its authority to act as attorney in fact for each client in an omnibus account. Initially, when the interest was remitted to the client clearing account, a credit would be entered on each client's account. Later, LTD changed its policy to credit each client's account monthly, even though LTD had yet to receive any interest income.

Finally, for amounts less than $10,000, and in increments of $100, a client's funds were left on deposit in LTD's client clearing account, and the client's account was credited with the average rate paid by Frost Bank on the average balances for any particular period. LTD called such account the "Money Market Account" (MMA). LTD represented MMA to its clients as demand deposits in a portfolio comprising money market instruments. MMA, however, was merely a marketing name for the investment mechanism that we have described supra. INC performed a daily accounting of each client's investments. If a client had funds of less than $10,000 in an LTD account, INC placed the client's funds into the MMA in $100 increments. Any funds of a client below $100 were not so invested.

LTD derived three types of income from using the funds in the client clearing account to invest in U.S. certificates of deposit and U.S. bank deposits. The first type of income earned

by LTD was called a "byte",[6] which was the difference between the interest obtained on client certificates of deposit and the interest credited to client accounts. The second type of income earned by LTD was called internally "basis" income. For certain certificates of deposit purchased in the client's name, LTD paid clients a rate of return based upon a 365-day term of maturity when such certificates actually had a 360-day term of maturity. LTD retained the difference, which it called "basis" income. The third type of income earned by LTD was the "spread", which was either the difference between (1) the interest obtained on certificates of deposit purchased in LTD's name and the interest credited to client accounts for their IFF investments or (2) the interest obtained on LTD's client clearing account and the interest credited to client accounts for their MMA investments. Through the end of 1985, LTD credited its clients on the entire amount of interest earned on IFF.

During LTD's taxable year ended June 30, 1985, the date on which clients were paid interest for investments in certificates of deposit was the date on which the interest was received by LTD. With respect to the IFF and MMA, the date of payment of interest was independent of the date interest was received by LTD from the banks.

---

[6]
The record reveals that the term "byte" was used also to refer to what we call LTD's "spread".

b.   Loans

During March 1986, LTD began making loans to clients.  The loans were collateralized by the clients' own certificates of deposit.  LTD verified the availability of funds and then transferred the funds to the borrowers, usually by wire.  LTD lent the money to the client at the prime rate plus a maximum amount of 2 percent.  Accounting loans that were used to finance purchases in other funds, however, were charged the interest rate that the collateral was carrying, with the result that LTD did not receive any income.  Loans made to clients were not reflected on the books of LTD but were recorded against a particular client's account.  In documents for a loan to its clients, LTD listed the San Antonio office as its return address.

c.   Non-U.S. Certificates of Deposit
        and Term Deposits

During its taxable year ended 1989, LTD began offering its clients the opportunity to place their funds in pooled investments outside the United States.  Such non-U.S. certificates of deposit and non-U.S. term deposits program used the same mechanics for investment as the pooled purchases of U.S. certificates of deposit.  LTD pooled clients' funds and either purchased non-U.S. certificates of deposit or made non-U.S. term deposits in its own name, as attorney in fact, in accordance with the clients' authorization provided to LTD in the discretionary authorizations.  Accordingly, the client, not LTD, bore the risk

of a bank failure or other loss of the investment. Because there was no Government-sponsored insurance on the non-U.S. investments, there was no purpose in dividing the purchases into amounts of $100,000 or under. Consequently, all of the non-U.S. investments were in amounts of $1 million or more, which paid higher rates of return.

LTD offered its clients investments in non-U.S. certificates of deposit through products named "Eurodeposits", "InverCedes", and "InverCede2". LTD offered its clients investments in non-U.S. term deposits through products named "Liquid Assets" and "Term Deposits". LTD offered its clients a non-U.S. investment named "Asset Management Account". The names denoted different methods of timing of interest paid to the client, availability of funds, deposit amounts, etc. Each such certificate of deposit or term deposits, however, constituted a purchase from an omnibus account in bank deposits outside the United States and Mexico.

INC collected quotations of rates on certificates of deposit and term deposits from various banks and telecopied to the promoters term sheets listing all of the quoted rates. The term sheets listed the top rate paid by each bank, and promoters selling such investments negotiated a rate of return with clients. Promoters could negotiate a lower, but not higher, rate than the one listed on the term sheets. To the extent that a bank might quote a higher rate of return because of the size of the pooled deposit or the volume of transactions, LTD was

permitted by the discretionary authorization to retain a portion of the enhanced return as its income.

### d. Pace Investments

LTD offered Pace investments (including one called Pace II) to clients who had unused lines of credit with Mexican financial institutions. Generally, such institutions would have insufficient liquidity to allow clients to draw any further funds on their lines of credit. LTD offered to its clients (who were not necessarily the ones with unused lines of credit with Mexican financial institutions) a stated rate of return on funds invested for a fixed period of time. LTD deposited such funds with banks in Mexico for a period of time coinciding with the maturity date agreed upon with LTD's clients. LTD earned interest on the deposited funds. The deposit was made with the stipulation that the money be used to allow LTD's client in Mexico to draw on its formerly unused line of credit.

The client, now able to draw upon its line of credit, paid LTD a fee to complete the transaction. LTD derived income on the difference between (1) the sum of the interest earned from the Mexican bank and the fee earned from the client and (2) the interest paid to its clients as their stated rate of return for making a deposit with LTD.

### e. MMA II

MMA II was a "back-to-back" operation designed to take advantage of a loophole in the Mexican tax law that lasted

approximately 18 months before it was closed.  In a basic back-to-back operation, a client's funds deposited with LTD were used as collateral for loans to a related client account.  More specifically, the mechanism took the following form:  a client, usually a Mexican corporation, placed U.S. dollars in LTD's MMA II fund.  The money was then lent to the owner of the client corporation (MMA II notes).  The dollars were exchanged by the owner of the client corporation into pesos, and the pesos were used to buy Mexican Treasury bills or "cetes", which were lent to the client corporation.  The Treasury bills were sold by the client corporation and exchanged into dollars, and the dollars were deposited into the client corporation's MMA II fund with LTD.  LTD charged its client corporations 1 percent more for the loan than the interest rate paid on the MMA II notes.

One of LTD's "Direct Costs" of its interest income is an item entitled "Interest Expense - Special Accounts".  Such expense represents the amount that LTD paid to LTD accounts such as, inter alia,[7] FEIM Fund, Currency Fund, and TVA, for their positions in, inter alia, Eurodeposits, IFF, Pace Investments, and InverCedes.

The gross receipts and direct costs relating to LTD's "Interest Income" for each taxable year are as follows:

---

[7] We note that LTD had more investment products and investment funds during the taxable years in issue than the parties have addressed.

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1985 | $751,058 | $574,076 |
| 1986 | 1,431,377 | 953,362 |
| 1987 | 2,313,288 | 1,870,419 |
| 1988 | 2,900,805 | [1]2,053,624 |
| 1989 | 11,771,193 | 8,112,563 |

[1]We have deducted from the amount of direct costs the amount of $4,521, which represents LTD's T-bill commission expense for taxable year ended June 30, 1988, and which has been recategorized in "Commissions - T-Bills."  Accordingly, we recalculate the direct costs for LTD's taxable year ended June 30, 1988, to be $2,053,624.

The breakdown of LTD's "Direct Costs" for each taxable year is as

follows:[8]

| TYE June 30 | Direct Cost | Amount |
|---|---|---|
| 1985 | IFF + MMA | [1]$574,076 |
| 1986 | IFF | 545,781 |
|  | MMA | 407,581 |
| 1987 | IFF | 472,938 |
|  | MMA | 475,268 |
|  | Commissions | 726 |
|  | Byte | 887,634 |
|  | Casa interest | 33,853 |
| 1988 | IFF | 690,978 |
|  | MMA | 949,087 |
|  | Byte | 413,559 |
| 1989 | IFF | 874,404 |
|  | MMA | 1,473,299 |
|  | Asset Management Account | 1,107 |
|  | Eurodeposits | 576,089 |
|  | InverCedes | 880,845 |
|  | Liquid Assets | 191,344 |
|  | Term Deposits | 4,626 |
|  | Special Accounts | 259,414 |

---

[8]

The parties stipulated total amounts that constitute direct costs relating to LTD's "Interest Income" category.  The parties, however, did not stipulate a breakdown of the direct costs, which is necessary to our analysis, infra pp. 101-108, relating to LTD's interest income.  We note that facts disclosed by the Deloitte workpapers and the IRS revenue agent's workpapers provide the breakdown of the direct costs, which we set forth herein and utilize in our analysis, infra pp. 101-108.

|         |           |
|---------|-----------|
| Pace    | 831,176   |
| MMA II  | 2,903,946 |
| Byte    | 116,313   |

[1]The record indicates that, in the direct costs for taxable year ended June 30, 1985, the interest expenses consisted of IFF and MMA interest expenses combined without distinction.

3. Currency Exchange Transactions Income

LTD engaged in two types of currency exchange transactions.

a. Currency Swaps

LTD arranged for its clients currency swaps, which were contracts in dollar futures. In a currency swap, LTD and a client entered into a contract in which LTD agreed to sell U.S. dollars to the client for Mexican pesos at some future date. The sale price for the dollars was determined in accordance with the interest rate negotiated between LTD and the client. LTD's gross receipts consisted of commissions that it received from Bank of America and United States Trust for arranging the currency swaps. LTD's direct costs were the commissions it paid out for arranging the currency swaps. LTD stopped arranging currency swaps on September 1, 1984.

The gross receipts and direct costs relating to LTD's "Commissions on Foreign Exchange" are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|-------------|----------------|--------------|
| 1985        | $54,386        | $24,750      |

b. Currency Transactions

The second category of currency exchange transactions that LTD engaged in was the sale and purchase of dollars on behalf of

clients.  LTD engaged in four types of dollar transactions.

i.  LTD arranged sales of dollars to a client in exchange for pesos.  The client contacted a promoter in Mexico, who quoted an exchange rate for pesos to dollars.  Once the client and the promoter agreed on a rate, the promoter performed the exchange operation from his office in Mexico.  The client made pesos available in Mexico to be exchanged, and the promoter documented receipt of the pesos.  The promoter then converted the pesos to dollars at a Government-authorized Mexican exchange house.  Once the exchange was executed, the promoter directed that the dollars be wired to San Antonio to be credited to the client's account. The transaction appeared as a credit on the client's monthly statement.  LTD's income derived from the difference between the exchange rate obtained from the Mexican exchange house and the rate quoted to and agreed to by the client.

ii.  LTD sold dollars from its own account to a client in exchange for pesos.  LTD transferred money, usually by wire, from its Frost Bank Money Market account to the client's designated financial institution.  The transaction appeared as a debit from LTD's Frost Bank account.

iii.  LTD arranged purchases of dollars from a client in exchange for pesos.  The client withdrew dollars from an LTD account to exchange with pesos obtained by LTD.  The transaction appeared as a debit on the client's monthly statement.

iv.   LTD purchased dollars from a client in exchange for pesos and deposited the dollars into LTD's own account.  The transaction appeared as a credit to LTD's Frost Bank account.

Only transaction (i) involved the performance of personal services in Mexico by a promoter.  Specifically, in transaction (i), the promoter handled the exchange with the Mexican brokerage house.  In transactions (ii), (iii), and (iv), the currency transactions were handled in San Antonio with pesos being deposited with or received from Mexican institutions.

As of its taxable year ended June 30, 1989, LTD ceased to conduct the currency transactions in its own name.  The gross receipts and direct costs relating to LTD's income from "Currency Transactions" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1985 | [1]$531,003 | – 0 – |
| 1986 | 745,001 | 130,485 |
| 1987 | [2]434,867 | 16,125 |
| 1988 | [3]232,426 | 16,863 |

[1]The amount of gross receipts actually represents a net balance amount with expenses already deducted.  Neither revenue agent's workpapers nor Deloitte's workpapers reveal the true gross amount.

[2]The amount of gross receipts includes a check of $11,361 from the Guadalajara office representing its contribution to profits.

[3]The amount of gross receipts includes a check of $16,426 from the Guadalajara office representing its contribution to profits.

4. <u>Sales Commissions and Fees</u>

a. <u>Currency Fund</u>

LTD created the "InverWorld Currency Fund" (Currency Fund) to offer its clients access to the international currency market. Clients purchased units in the Currency Fund in $1,000 increments with a $20,000 minimum. LTD deposited the funds in a foreign bank, which decided in which currencies the funds that LTD placed with it would be invested.

The client's yield on the fund was based on any increase in the value per share over the term of the investment. No periodic dividend or interest was paid. LTD's role was to act as "Manager" of the Currency Fund. LTD and INC received clients' funds, transferred them for management by the European banks, and issued a periodic statement of the client's allocated share of the Fund, using values determined by the fund managers in Europe. Funds that were "placed" by LTD's clients in the Currency Fund were not always placed by LTD in foreign institutions. During the taxable year ended June 30, 1988, funds in the Currency Fund were invested in cash accounts, money market accounts, and investment accounts managed by Merrill Lynch and Lombard Odier & Lir (Lombard). During the taxable year ended June 30, 1989, funds in the Currency Fund were invested in Euro-deposits, Pace investments, loans, and investment accounts managed by Bear Stearns, Merrill Lynch, and Lombard.

LTD charged its clients an initial placement cost of 3
percent of the funds placed in the Currency Fund.  After the
first year LTD also charged an annual management fee of 1.00
percent of the value of the assets under management.  The gross
receipts and direct costs relating to LTD's "Commissions -
Currency Fund" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1986 | $116,604 | $35,293 |
| 1987 | 264,395 | 34,480 |
| 1988 | 61,510 | 1,858 |
| 1989 | (6,509) | - 0 - |

b.    FEIM Fund

The FEIM (an acronym for Fondo Estragegico De Inversion
Multiple) Fund was available to LTD clients during taxable years
ended June 30, 1986 through 1989.  Similar in operation to the
Currency Fund, the FEIM Fund initially consisted of a basket of
GNMA, FNMA, and Federal Home Loan Mortgage Association mortgages.
During taxable year ended June 30, 1988, client funds were
invested in the IFF.  During taxable year ended June 30, 1989,
client funds were invested in money market accounts, Euro-
deposits, Pace investments, loans, and investments managed by
Bear Stearns, Morgan Stanley, and Shearson.  Clients sent signed
FEIM authorizations directly to INC.  However, during the first 2
years, neither LTD nor INC had any role in the investment,
management, or valuation of the FEIM Fund assets.  LTD marketed
the investment through its promoters in Mexico, and INC's only

role was to arrange for transfer of the client funds to Merrill
Lynch in Luxembourg and to include a monthly statement of the
client's allocated share of the fund value.  Such valuation was
performed by the fund's managers at Merrill Lynch.  By June 30,
1988, LTD had stopped sending funds overseas.  In one of its
brochures describing the FEIM Fund, LTD listed the San Antonio
office as its return address.

LTD charged its clients an initial placement cost based on a
sliding scale of 4.00 percent to 0.25 percent, depending upon the
amount of funds placed in the FEIM Fund.  After the first year
LTD also charged an annual management fee of 1.00 percent of the
value of the assets under management.  The gross receipts and
direct costs relating to LTD's "Commissions - FEIM Fund" for each
taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
| --- | --- | --- |
| 1986 | $148,354 | $44,500 |
| 1987 | 71,716 | 11,587 |
| 1988 | (3,000) | 116 |
| 1989 | 4,951 | - 0 - |

c.   Matric Fund

The Matric Fund (Matric) was an investment fund financing a
time-share resort in Puerto Vallarta, Mexico.  Matric Corp.,
organized in the Cayman Islands, borrowed $10 million from LTD,
with Vallarta Internacional S.A., a Mexican corporation, as its
guarantor.  LTD raised the $10 million by seeking commitments
from its clients to invest in Matric.

Clients investing in Matric signed an agency agreement with LTD. Pursuant to the agency agreement, clients agreed to indemnify LTD for any potential loss and to hold LTD responsible for paying clients their share of the interest payments remitted by Matric only if Matric paid LTD.

LTD earned three types of income in connection with Matric during the tax year ending June 30, 1989. The first type of income that LTD earned was a 3-percent commission on the $10 million note, prorated for the 9 months that the note was outstanding during taxable year ended June 30, 1989. The second type of income that LTD earned was an initiation fee of 3-percent of the $10 million note. The last type of income that LTD earned was a consulting fee of $47,500. The gross receipts and direct costs relating to LTD's "Commissions [Matric]" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1989 | $575,000 | - 0 - |

d. Inversat Fund

LTD created Inversat REIT, a U.S. real estate investment trust (REIT), to market to its clients. Clients purchased shares in the REIT by placing funds with LTD, which in turn placed them in its Inversat Fund. LTD then allocated the funds from the Inversat Fund to the Inversat REIT, which purchased and managed U.S. real estate. The Fund consisted of 5,000 shares, sold at $1,000 each, with a minimum investment of $20,000. LTD sold all

2,774 shares in taxable year ended June 30, 1987. In one of its brochures describing the Inversat Fund, LTD listed the San Antonio office as its return address.

LTD charged its clients an initial placement cost based on a sliding scale of 3.50 to 0.25 percent, depending upon the amount of funds placed in the Inversat Fund. After the first year LTD also charged an annual management fee of 1.00 percent of the value of the assets under management. The gross receipts and direct costs relating to LTD's "Commissions Inversat" for each taxable year are as follows (it is noted that the Inversat Fund management fee was not charged until taxable year ended June 30, 1988, and is reported under the general "Management Fees" category):

| TYE June 30 | Gross Receipts | Direct Costs |
|-------------|----------------|--------------|
| 1987 | $86,762 | $3,188 |

      e.   T.V. Answer

T.V. Answer (TVA) is an attachment for television sets that uses radio signals to communicate with a minicomputer system. With the attachment, consumers can use their televisions to order movies, to purchase goods, to retrieve information, to respond to polls, and the like.

TVA, Inc., was formed to exploit the commercial potential of TVA. TVA, Inc., a Delaware corporation, was the wholly owned subsidiary of Magus, Ltd., a Cayman Islands corporation, which was in turn wholly owned by a trust.

On July 7, 1986, in Monterrey, Mexico, LTD, entered into a contract with the inventors of TVA and the investors in TVA, Inc. (TVA partners). LTD agreed to obtain the funds necessary for the commercial exploitation of TVA. To that end, LTD formulated a prospectus and executed a marketing program to solicit venture capital. The capital call was directed by Arnulfo Rodriguez, head of MultiValores' investment banking unit in Monterrey. All potential subscribers were contacted from the Monterrey office. Essentially, LTD raised $4,400,000 by purchasing units in the trust for its clients' accounts.

For its expenses incurred in the capital call, LTD directed INC to send Magus, Ltd., an invoice approximately every 6 months. LTD also instructed INC to pay TVA monthly an amount to cover its development expenses. INC performed no other activities in the capital call.

In raising the funds for TVA, LTD received three types of income. The first type of income was, pursuant to its contract with the TVA partners, LTD's right to commissions of 5 percent of the total funds that it raised for TVA. The second type of income was an administration fee from the TVA partners at a rate of $5,000 per month. The third type of income was revenue that LTD received by charging some clients who purchased units in the trust a percentage commission. The gross receipts and direct costs relating to LTD's "Commissions TV Answer" and "TV Answer * * * [Administration] Fee" for each taxable year are as follows:

| TYE June 30 | Commissions | Administration Fee | Direct Costs |
|---|---|---|---|
| 1987 | [1]$210,675 | $15,000 | $166,829 |
| 1988 | 50,607 | 60,000 | 800 |
| 1989 | 272,411 | 60,000 | - 0 - |

[1]We have deducted from the amount of commissions, $225,675, the amount of $15,000, which represents LTD's administration fees and which has been recategorized under "Administration Fee" for taxable year ended June 30, 1987.

### f.    Client Incorporation and Trust Creation

LTD offered its clients the option of establishing offshore corporations and trusts to hold their investments.  Each client signed a discretionary authorization granting LTD the power to invest the funds held by the client's corporation or trust.

To establish an offshore corporation or trust for a  client, a promoter in Mexico completed a form listing the client's choice of jurisdiction, company name, and appointed directors.  Such form was then sent to INC, which passed the information to outside lawyers or fiduciaries qualified to perform the necessary paperwork in the chosen jurisdiction.

The incorporation package completed by the lawyers or fiduciaries was then returned to INC, which returned the package to the client in Mexico.  LTD's role, through the promoters, was to provide the counseling on the structure and features of the various incorporation options.  Board of directors meetings for at least two companies incorporated by LTD clients were held at INC's offices in San Antonio.  LTD's clients used as their addresses the address of INC's offices in San Antonio.

Clients establishing an offshore corporation or trust were charged fees for the service directly against their accounts. LTD's gross receipts derived from charging an "opening expense" and an "annual expense". LTD's direct costs were its payments to the third party lawyers and fiduciaries. The gross receipts and direct costs relating to LTD's "Client Incorporation Fees" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1986 | $147,951 | $18,286 |
| 1987 | 363,014 | 126,855 |
| 1988 | 290,518 | 161,037 |
| 1989 | 404,286 | 227,697 |

### g.   Legal Advice Income

In an operating manual under the heading, "Legal Advise" (sic) LTD described its services regarding the creation of offshore corporations and trusts. The record reveals only that LTD derived gross receipts relating to "Legal Advice Income". LTD's direct costs were the commissions that it paid to promoters for counseling clients regarding offshore corporations or trusts. The gross receipts and direct costs relating to LTD's "Legal Advice Income" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1988 | $8,630 | $3,453 |
| 1989 | (328) | 5,272 |

### h.   Letters of Credit

LTD issued, either directly or through a bank, letters of credit to Mexican banks to secure loans for its clients. The

letters of credit were collateralized by certificates of deposit that LTD had purchased with the client's funds.  The gross receipts and direct costs relating to LTD's "Income from Letters of Credit" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|-------------|----------------|--------------|
| 1987 | [1]$24,152 | - 0 - |
| 1988 | 91,556 | - 0 - |
| 1989 | 53,047 | - 0 - |

[1]We have recategorized under "Income from Letters of Credit" for taxable year ended June 30, 1987, the amount of $24,152 of gross receipts, which was originally categorized under "Other Income".

### i.    Foreign Exchange Investments

LTD derived income from its foreign exchange investments. The gross receipts and direct costs relating to LTD's "Income Foreign Exchange Invest" are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|-------------|----------------|--------------|
| 1987 | $8,425 | - 0 - |

### j.    Treasury Bills

LTD earned commissions from third parties on the sale of U.S. Treasury bills to LTD's clients.  For taxable year ended June 30, 1989, LTD's commissions were from Merrill Lynch.  LTD's direct costs were the commissions that it paid to promoters.  The gross receipts and direct costs relating to LTD's "Commissions - T-bills" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|-------------|----------------|--------------|
| 1988 | [1]$15,139 | [2]$4,521 |
| 1989 | 5,026 | - 0 - |

[1] We have recategorized under "Commissions - T-bills" for taxable year ended June 30, 1988, the amount of $15,139 of gross receipts, which was originally categorized under "Other Commission Income".

[2] We have recategorized under "Commissions - T-bills" for taxable year ended June 30, 1988, the amount of $4,521 of direct costs, which was originally categorized under "Interest Income".

### k.    Wires and Checks

LTD charged its clients fees for transactions with third party banks.  For example, when a wire was sent or a foreign check was received for deposit, the third party bank sometimes charged a transaction fee to LTD, which passed through the fee to the client, plus a transaction fee of its own.  Depending on the type of transaction, LTD added a $10 to $15 fee.  The gross receipts and direct costs relating to LTD's "Wire and Check Fees" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|-------------|----------------|--------------|
| 1987 | [1]$6,866 | - 0 - |
| 1988 | 13,274 | - 0 - |
| 1989 | 26,360 | - 0 - |

[1] We have recategorized under "Wire and Check Fees" for taxable year ended June 30, 1987, the amount of $6,866 of gross receipts, which was originally categorized under "Other Income".

### l.    Gold and Silver Futures

LTD maintained a gold and silver futures operations for its clients.  The gross receipts and direct costs relating to LTD's

"Gold/Silver Income" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1988 | $14,110 | $371 |
| 1989 | 60,112 | - 0 - |

m.   Project Income

LTD earned income on a research project for one of LTD's clients.  The gross receipts and direct costs relating to LTD's "Project Income" are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1988 | $20,000 | $4,135 |

n.   Income From Investments

In the investment income category, LTD earned four items of revenue.  LTD reported gain on the sale of Currency Fund units. The funding account (also known as the client clearing account) purchased Currency Fund units from clients during October and November and subsequently sold them to the Currency Fund account for a gain of $64,291.18.  Additionally, LTD reported the gain on the sale of FEIM Fund units.  The funding account purchased FEIM Fund units from clients and subsequently sold them to the FEIM Fund account for a gain of $44,576.33.  LTD had a loss on the sale of stock in a concern known as TAMSA in the amount of $11,275.35.  Finally, LTD had a loss on an investment in Mexican stocks in the amount of $83,061.23.  The gross receipts and direct costs relating to LTD's "Income from Investments" are as

follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|-------------|----------------|--------------|
| 1988        | $14,531        | – 0 –        |

o.  Other Commission Income/
    Other Commissions and Fees

For taxable year ended June 30, 1988, the category "Other Commission Income" included two types of revenue:  $1,640 as commissions on a "back-to-back" transaction and $776 as commissions on the sale of stock.

For taxable year ended June 30, 1989, the category "Other Commissions and Fees" included two types of revenue:  $24,633 as additional commission fees that were charged to clients considered to be of higher than normal risk, and $8,852 as commissions on the sale of Inver stock.  The gross receipts and direct costs relating to LTD's "Other Commission Income" and "Other Commissions and Fees" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|-------------|----------------|--------------|
| 1988        | [1]$2,416      | – 0 – ("Other Commission Income") |
| 1989        | 33,485         | 8,345 ("Other Commissions and Fees") |

[1]  We have deducted from the amount of gross receipts, $17,555, the amount of $15,139, which represents LTD's commissions from sales of Treasury bills and which has been recategorized under "Commissions on the Sale of Treasury Bills" for taxable year ended June 30, 1988.

p.  Other Income

For taxable year ended June 30, 1985, the income items taken as samples for Deloitte's audit constituted "interest payments".

For taxable year ended June 30, 1986, the Deloitte workpapers provide no indication regarding the specific income items taken as audit samples.

For taxable year ended June 30, 1987, audit samples included: (1) $24,152 for Letters of Credit, which has been recategorized to "Letters of Credit", (2) $22,443 for Other Income, (3) $6,866 for Wire and Check Fees, which has been recategorized to "Wire and Check Fees", and (4) $2500 for Commissions and Fees.

For taxable year ended June 30, 1988, the four items taken as samples for Deloitte's audit were: (1) Interest earned on the sale of TVA, Inc. stock when the customer committed to buy the stock but did not pay for it for several months, (2) commissions on the sale of Lombard positions, (3) gain from the sale of Arabian horses, and (4) fees from guaranteeing a line of credit for a client.

For taxable year ended June 30, 1989, the three items taken as samples for Deloitte's audit were: (1) A reversal of excess interest paid to a client in a prior year, (2) a reversal of interest paid to a customer in error (with the end result of canceling out the item initially listed as an interest expense), and (3) revenue received for assisting a client in taking a special tax election. The gross receipts and direct costs relating to LTD's "Other Income" for each taxable year are as follows:

| TYE June 30 | Gross Receipts | Direct Costs |
|---|---|---|
| 1985 | $49,297 | - 0 - |
| 1986 | 20,735 | - 0 - |
| 1987 | [1]24,943 | - 0 - |
| 1988 | 83,442 | - 0 - |
| 1989 | 108,250 | 96,692 |

[1] We have deducted from the amount of gross receipts, $55,961, the amount of $24,152, which represents LTD's letters of credit fees, and which has been recategorized under "Fees for Letters of Credit" for taxable year ended June 30, 1987. Additionally, we have deducted from the amount of gross receipts the amount of $6,866, which represents LTD's wire and check fees, and which has been recategorized under "Wire and Check Fees" for taxable year ended June 30, 1987.

M.  Amounts Subject to Withholding Tax

The total amounts in docket No. 27090-90 on which LTD is potentially liable for withholding tax for each calendar year are as follows:[9]  $481,692 for 1984; $1,168,498 for 1985; and $1,135,757 for 1986.  The breakdown of these amounts for each calendar year is as follows:

| Calendar Year | Type of Interest or Dividend | Amount |
|---|---|---|
| 1984 | IFF | $333,137 |

[9] For calendar years 1984, 1985, and 1986, the parties stipulated as revisions to the statutory notice of liability amounts in docket No. 27090-90 on which LTD is potentially liable for withholding tax.  The parties, however, did not stipulate a breakdown of the withholding amounts, which is necessary to our analysis, infra pp. 160-184, relating to LTD's withholding tax liability.  We note that a stipulated joint exhibit provides the breakdown of the withholding amounts, which we set forth herein and utilize in our analysis, infra pp. 160-184.  We note that the stipulated joint exhibit provides total amounts subject to withholding tax different from the total amounts stipulated by the parties.

|      |          |         |
|------|----------|---------|
|      | MMA      | 148,540 |
| 1985 | IFF      | 460,160 |
|      | MMA      | 205,186 |
|      | Dividend | 503,147 |
| 1986 | IFF      | 593,093 |
|      | MMA      | 529,512 |
|      | Dividend | 13,146  |

LTD declared a dividend of $516,263 on December 10, 1985, and payable on December 20, 1985, to LTD shareholders according to an established schedule.  LTD paid $503,147 in calendar year 1985 and $13,146 in calendar year 1986.  Both dividend payments, however, were made during LTD's taxable year ended June 30, 1986.

The total amounts in docket No. 3443-93 on which LTD is potentially liable for withholding tax for each calendar year are as follows:[10]  $1,668,636 for 1987;[11] $6,105,862 for 1988; and

---

[10] For calendar years 1987, 1988, and 1989, the parties stipulated as revisions to the statutory notice of liability amounts in docket No. 3443-93 on which LTD is potentially liable for withholding tax.  The parties, however, did not stipulate a breakdown of the withholding amounts, which is necessary to our analysis, infra pp. 160-184, relating to LTD's withholding tax liability.  We note that a stipulated joint exhibit provides the breakdown of the withholding amounts, which we set forth herein and utilize in our analysis, infra pp. 160-184.  We note that the stipulated joint exhibit provides total amounts subject to withholding tax different from the total amounts stipulated by the parties.

[11] The statutory notice of liability included a dividend in the amount of $500,000 that was subject to withholding tax for calendar year 1987.  The parties' stipulated joint exhibit, however, did not include any dividend amount as subject to withholding tax for calendar year 1987.

At the commencement of trial, respondent moved to amend the answers and to conform the pleadings to the proof in docket nos. 3441-93 and 3443-93.  Respondent's motions included an attempt to introduce the $500,000 dividend as an amount subject to

(continued...)

$10,867,511 for 1989.  The breakdown of these amounts is as follows:

| Calendar Year | Type of Interest or Dividend | Amount |
|---|---|---|
| 1987 | IFF | $400,129 |
|  | MMA | 587,014 |
|  | Byte | 681,493 |
| 1988 | IFF | 1,115,904 |
|  | MMA | 1,751,904 |
|  | InverCedes | 220,178 |
|  | MMA II | 3,017,875 |
|  | Byte | 257,872 |
| 1989 | IFF | 402,695 |
|  | MMA | 800,214 |
|  | Asset Management Account | 12,222 |
|  | Eurodeposits | 1,579,147 |
|  | InverCedes | 1,434,760 |
|  | InverCede2 | 92,305 |
|  | Liquid Assets | 379,880 |

---

[11](...continued)
withholding tax for calendar year 1987.  Respondent contended that, because the dividend was in the statutory notice of liability for calendar year 1987, it was still in issue. Petitioners objected to the dividend issue on the ground that it was raised "only on the eve of trial."  The Court denied the motions as untimely.

Respondent argues on brief that "the Court did not specifically rule on petitioners' objection" and that their objection "should be overruled."  We believe that implicit in our denial of the motions to amend and to conform the pleadings to the proof was a ruling that petitioners' objection was sustained. Consequently, we find that the $500,000 dividend is not an amount that is in issue for calendar year 1987 in the instant cases.

For calendar year 1988, the parties' stipulated joint exhibit listed in brackets a dividend in the amount of $500,000 but did not include such amount in the total amount that was subject to withholding tax.  A dividend in the amount of $500,000 was not included in the statutory notice of liability for calendar year 1988.  Consequently, we find that the $500,000 amount listed as a dividend in the stipulated joint exhibit is not an amount that is in issue for calendar year 1988 in the instant cases.

| | |
|---|---:|
| Special Accounts | 259,411 |
| Term Deposits | 10,018 |
| Pace | 5,895,859 |
| Byte | 33,822 |

Respondent seeks to levy an identical withholding tax on INC for calendar years 1987, 1988, and 1989. We find that the total amounts on which INC is potentially subject to withholding tax are the same as for LTD, viz, $1,668,636 for 1987; $6,105,862 for 1988; and $10,867,511 for 1989. The breakdown of the withholding amounts is also the same as for LTD. See supra.

### III. OPINION

A.  Whether LTD Was Engaged in Trade
    or Business Within the United States

The first issue we must decide is whether LTD was engaged in trade or business within the United States pursuant to section 864(b). If we decide that LTD was engaged in trade or business within the United States, then we must decide the character and the source of each item of LTD's income and whether each such item was effectively connected with the conduct of such trade or business pursuant to section 864(c).

Foreign corporations operating in the United States are subject to two U.S. taxation regimes. Under the first regime, a foreign corporation engaged in trade or business within the United States during the taxable year is taxable on its income which is effectively connected with the conduct of such trade or business within the United States (effectively connected income).

Sec. 882(a)(1). Effectively connected income can originate from sources within the United States, sec. 864(c)(2) and (3), or from sources without the United States, sec. 864(c)(4), and is taxed at the same rates that apply to a U.S. corporation under section 11. Under the second regime, a flat tax of 30 percent is imposed on a foreign corporation's gross income from "interest (other than original issue discount as defined in section 1273), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, and other fixed or determinable annual or periodical gains, profits, and income", but only to the extent the amount is received from sources within the United States and is not effectively connected with the conduct of trade or business by such corporation within the United States. Sec. 881(a). A foreign corporation is not subject to tax on its income which is not effectively connected with its conduct of trade or business within the United States and which is received from sources without the United States. Id. In sum, if LTD is engaged in trade or business within the United States, income items effectively connected with LTD's trade or business, including items from sources without the United States as described in section 864(c)(4), are taxed pursuant to section 882(a)(1) at regular corporate rates; income items not effectively connected with any trade or business conducted by LTD within the United States, if sourced from within

the United States, are taxed at 30 percent pursuant to section 881(a), but if sourced from without the United States, are not subject to U.S. taxation.

## 1. Background

For purposes of section 882(a)(1), the phrase "trade or business within the United States" generally includes "the performance of personal services within the United States at any time within the taxable year". Sec. 864(b). We believe that section 1.864-4(c)(5)(i), Income Tax Regs., which determines whether a foreign corporation is "engaged in the active conduct of a banking, financing, or similar business in the United States", provides a useful framework in the instant case for analyzing whether LTD engaged in trade or business within the United States. For, if LTD engaged in the active conduct of a banking, financing, or similar business in the United States, then, a fortiori, LTD was engaged in trade or business within the United States.

## 2. Section 1.864-4(c)(5)(i), Income Tax Regs., Engaged in a Banking Business Test

Section 1.864-4(c)(5)(i), Income Tax Regs., provides that a foreign corporation is considered

> to be engaged in the active conduct of a banking, financing, or similar business in the United States if at some time during the taxable year the taxpayer is engaged in business in the United States and the activities of such business consist of any one or more of the following activities carried on, in whole or in

part, in the United States in transactions with persons situated within or without the United States:

(a) Receiving deposits of funds from the public,
(b) Making personal, mortgage, industrial, or other loans to the public,
(c) Purchasing, selling, discounting, or negotiating for the public on a regular basis, notes, drafts, checks, bills of exchange, acceptances, or other evidences of indebtedness,
(d) Issuing letters of credit to the public and negotiating drafts drawn thereunder
(e) Providing trust services for the public, or
(f) Financing foreign exchange transactions for the public.

LTD engaged in four of the six activities listed in the regulation. LTD engaged in "Receiving deposits of funds from the public" by receiving deposits of funds from its clients into its client clearing account. LTD engaged in "Making personal * * * loans to the public" by making loans to its clients. LTD engaged in "Purchasing * * * [and] selling * * * for the public on a regular basis * * * evidences of indebtedness" by purchasing and selling for its clients on a regular basis: (1) Certificates of deposit and (2) interests in such certificates of deposit. LTD engaged in "Issuing letters of credit to the public". Finally, LTD engaged in "Financing foreign exchange transactions for the public" by effecting currency exchange transactions for the public with Mexican banks. LTD engaged in all of the above activities,[12] in whole or in part, in the United States in

_____

[12]

Additionally, LTD engaged in creating and operating a U.S.
(continued...)

transactions with persons situated within or without the United States.  Accordingly, we conclude that LTD performed the activities required for a foreign corporation to be considered "a banking, financing, or similar business in the United States" within the meaning of section 1.864-4(c)(5)(i), Income Tax Regs.

In addition to the listed activities, however, section 1.864-4(c)(5)(i), Income Tax Regs., requires that the foreign corporation "at some time during the taxable year" be "engaged in business in the United States".  Petitioners argue that certain trading activities performed by LTD are excludable from the determination of whether LTD is engaged in "trade or business within the United States" pursuant to section 864(b). Petitioners argue that pursuant to section 864(b)(2)(A)(i) and (ii), LTD's trading in stocks or securities are excluded from the determination of whether LTD is engaged in "trade or business within the United States".  The activity of "Trading in stocks or securities through a resident broker, commission agent, custodian, or other independent agent" is excluded from the definition of "trade or business within the United States".  Sec. 864(b)(2)(A)(i).  The exclusion applies, however, "only if, at no time during the taxable year, the taxpayer has an office or other fixed place of business in the United States through which or by

[12](...continued)
real estate investment trust, creating offshore corporations and trusts, purchasing U.S. Treasury bills, and trading in gold and silver futures.

the direction of which the transactions in stocks or securities * * * are effected."  Sec. 864(b)(2)(C).

Petitioners argue that all of their activities are eligible to be excluded because the exclusion extends broadly to persons trading for their own account or for the account of others and because the agents through which trading is effected need not be independent in order to qualify under section 864(b)(2)(A)(i). We disagree.  The exclusion requires that the trading in stocks or securities be effected "through a resident broker, commission agent, custodian, or other independent agent."  Sec. 864(b)(2)(A)(i).  We conclude that the phrase means that excludable trading in stocks or securities must be effected through <u>independent</u> agents and that LTD's trading through INC was not so effected.

To qualify for the exclusion, trading in stocks or securities must be effected by the agents referred to in section 864(b)(2)(A)(i).  The fourth relationship to which that section refers is an "other independent agent."  We believe that the phrase "other independent agent" serves to modify the language preceding it.  In other words, the resident broker, commission agent, or custodian must each be an "independent agent." Consequently, we conclude that section 864(b)(2)(A)(i) requires that the trading in stocks or securities be effected through an independent resident broker, an independent commission agent, an

independent custodian, or some other independent agent.

The record shows that LTD engaged in the trading of securities through a resident broker by virtue of its certificates of deposit operation.[13]  The Inver Group established criteria to guide INC in selecting the financial institutions from which INC could purchase certificates of deposit for LTD and LTD's clients.  INC researched the financial institutions using the Inver Group's criteria and obtained interest rate quotes. Upon receipt of funds and an order to invest, INC placed the funds in certificates of deposit in either the client's or LTD's name.  We conclude that, by engaging in such activities, LTD engaged in trading in securities through its agent INC.

Section 1.864-7, Income Tax Regs., provides a definition of "independent agent" for purposes of determining whether a foreign corporation has "an office or other fixed place of business within the United States" within the meaning of section 864(c)(4)(B) and the regulations thereunder.  The phrase "office or other fixed place of business in the United States" also appears in section 864(b)(2)(C).  Although the regulation does not expressly provide that it is to apply for purposes of section

---

[13]

 Sec. 1.864-2(c)(2)(i), Income Tax Regs., defines a security for purposes of par. (c) of sec. 1.864-2, Income Tax Regs., as: "any note, bond, debenture, or other evidence of indebtedness, or any evidence of an interest in or right to subscribe to or purchase any of the foregoing."

864(b)(2)(A)(i), we believe that the regulation furnishes a proper framework for interpreting the term "independent agent" for purposes of section 864(b)(2)(A)(i).

Section 1.864-7(d)(3)(i), Income Tax Regs., provides:

> For purposes of this paragraph * * * [of the regulation], the term "independent agent" means a general commission agent, broker, or other agent of an independent status acting in the ordinary course of his business in that capacity.  Thus, for example, an agent who, in pursuance of his usual trade or business, and for compensation, sells goods or merchandise consigned or entrusted to his possession, management, and control for that purpose by or for the owner of such goods or merchandise is an independent agent.

Section 1.864-7(d)(3)(ii), Income Tax Regs., however, provides:

> The determination of whether an agent is an independent agent for purposes of this paragraph shall be made without regard to facts indicating that either the agent or the principal owns or controls directly or indirectly the other or that a third person or persons own or control directly or indirectly both.  For example, a wholly owned domestic subsidiary corporation of a foreign corporation which acts as an agent for the foreign parent corporation may be treated as acting in the capacity of independent agent for the foreign parent corporation.  The facts and circumstances of a specific case shall determine whether the agent, while acting for his principal, is acting in pursuance of his usual trade or business and in such manner as to constitute him an independent agent in his relations with the nonresident alien individual or foreign corporation.

Finally, section 1.864-7(d)(3)(iii), Income Tax Regs., provides:

> Where an agent who is otherwise an independent agent within the meaning of subdivision (i) of this subparagraph acts in such capacity exclusively, or almost exclusively, for one principal who is a nonresident alien individual or a foreign corporation, the facts and circumstances of a particular case shall be taken into account in determining whether the agent, while acting in that capacity, may be classified as an independent agent.

Applying the foregoing regulations to the facts of the instant case, we note that, although INC was, either directly or indirectly, a wholly owned subsidiary of LTD, section 1.864-7(d)(3)(ii), Income Tax Regs., requires the determination of whether INC is an independent agent to be made without regard to the fact that LTD "owns or controls directly or indirectly" INC. Accordingly, we disregard the fact that LTD owned, either directly or indirectly, all of INC in our consideration of whether INC was "a general commission agent, broker, or other agent of an independent status acting in the ordinary course of * * * [its] business in that capacity."  Sec. 1.864-7(d)(3)(i), Income Tax Regs.

INC was an investment adviser registered with the SEC. INC's business, in part, was that of a broker of certificates of deposit.  Guided by Inver Group's criteria, INC researched and selected the financial institutions from which it purchased certificates of deposit for LTD and LTD's clients.  INC performed brokerage services for LTD and LTD's clients.  INC, however, acted almost exclusively for one principal, i.e., LTD, which is a foreign corporation.  Consequently, we conclude that INC is an "exclusive" agent within the meaning of section 1.864-7(d)(3)(iii), Income Tax Regs., supra.  Accordingly, we must take into account the facts and circumstances "in determining whether the agent, while acting in that capacity, may be classified as an independent agent."  Sec. 1.864-7(d)(3)(iii), Income Tax Regs.

The record shows that INC had few clients other than LTD and LTD's clients. The services that INC performed were almost exclusively for LTD, such as bookkeeping, effecting trades in securities, generating client statements, and effecting currency exchange transactions. The percentage of INC's gross revenues derived from LTD were as follows: 94.1 percent in 1985, 99.1 percent in 1986, 91.8 percent in 1987, 94.0 percent in 1988, and 95.8 percent in 1989. Moreover, the record does not establish that INC marketed its services to clients on its own. Based on the record in the instant case, we conclude that INC was not an "independent agent" within the meaning of section 1.864-7(d)(3), Income Tax Regs. Consequently, we hold that LTD did not engage in trading in stocks or securities through an independent agent within the meaning of section 864(b)(2)(A)(i).

Additionally, section 864(b)(2)(A)(i) applies "only if, at no time during the taxable year, the taxpayer has an office or other fixed place of business in the United States through which or by the direction of which the transactions in stocks or securities * * * are effected." Sec. 864(b)(2)(C); see sec. 1.864-2(c)(1), Income Tax Regs. Both parties, presuming that INC's San Antonio office was an office through which or by the direction of which LTD's transactions in stocks or securities were effected, focus their arguments on whether INC's San Antonio office can be attributed to LTD. Petitioners seek to apply

section 1.864-7(d)(1)(i), Income Tax Regs.[14]  Accordingly,
petitioners contend that INC's office in San Antonio should not
be considered LTD's "office or other fixed place of business" in
the United States because INC did not have the authority to
negotiate or to conclude contracts on behalf of LTD.  Petitioners
argue that, "Even if INC is deemed to be a dependent agent, by
its agreement with LTD it had 'no authority to act for,
represent, bind or obligate * * * [LTD]' without first obtaining
LTD's consent and in fact it did not do so without first
obtaining the consent of LTD."

Respondent also seeks to apply section 1.864-7(d)(1)(i),
Income Tax Regs., contending that INC's San Antonio office should
be considered LTD's office for the purpose of applying the
regulation.

Section 1.864-7(d)(1)(i), Income Tax Regs., provides that
the office of an agent who is not an independent agent will be
disregarded in the determination of whether a taxpayer has "an

---

14
 Sec. 1.864-7(d)(1)(i), Income Tax Regs., provides:
  In determining whether a nonresident alien
individual or a foreign corporation has an office or
other fixed place of business, the office or other
fixed place of business of an agent who is not an
independent agent, as defined in subparagraph (3) of
this paragraph, shall be disregarded unless such agent
(a) has the authority to negotiate and conclude
contracts in the name of the nonresident alien
individual or foreign corporation, and regularly
exercises that authority, or (b) has a stock of
merchandise belonging to the nonresident alien
individual or foreign corporation from which orders are
regularly * * * [filled] on behalf of such alien
individual or foreign corporation * * *.

office or other fixed place of business in the United States"
unless the agent performs specified duties.  The physical
location of the office of an agent, however, is only one factor
of five provided in section 1.864-7, Income Tax Regs., to be
considered in such a determination.  Section 1.864-7(d)(1)(i),
Income Tax Regs., expressly provides that it applies for purposes
of section 864(c)(4)(B) and section 864(c)(4)(B)(iii), and the
regulations thereunder, but it does not expressly provide that it
is to apply for purposes of section 864(b)(2)(C).  Nonetheless,
because both parties argue their respective positions based on
section 1.864-7(d)(1)(i), Income Tax Regs., and because those
regulations construe the phrase "office or other fixed place of
business in the United States", which is also found in section
864(b)(2)(C), we use those regulations in the instant case as a
framework to decide whether LTD has "an office or other fixed
place of business in the United States" for purposes of section
864(b)(2)(C).

Section 1.864-7(a)(2), Income Tax Regs., provides that, in
determining whether a taxpayer has "an office or other fixed
place of business in the United States" within the meaning of the
statute, "due regard shall be given to the facts and
circumstances of each case, particularly to the nature of the
taxpayer's trade or business and the physical facilities actually
required by the taxpayer in the ordinary course of the conduct of
his trade or business."  The factors to consider include:  (1)

Fixed facilities, (2) management activity, (3) agent activity, (4) employee activity, and (5) office or other fixed place of business of a related person. Sec. 1.864-7, Income Tax Regs. We examine each of the factors in turn.

(1) Fixed facilities. The general rule is that "an office or other fixed place of business is a fixed facility, that is, a place, site, structure, or other similar facility, through which a nonresident alien individual or a foreign corporation engages in a trade or business." Sec. 1.864-7(b)(1), Income Tax Regs. "A fixed facility may be considered an office or other fixed place of business whether or not the facility is continuously used by a nonresident alien individual or foreign corporation." Id. Furthermore:

> A nonresident alien individual or a foreign corporation shall not be considered to have an office or other fixed place of business merely because such alien individual or foreign corporation uses another person's office or other fixed place of business, whether or not the office or other fixed place of business of a related person, through which to transact a trade or business, if the trade or business activities of the alien individual or foreign corporation in that office or other fixed place of business are relatively sporadic or infrequent, taking into account the overall needs and conduct of that trade or business. * * * [Sec. 1.864-7(b)(2), Income Tax Regs.]

(2) Management activity. The regulations take into account where the "top management" decision-making takes place and where "the day-to-day trade or business of the foreign corporation" occurs. Sec. 1.864-7(c), Income Tax Regs.

(3) Agent activity. The regulations provide:

the office or other fixed place of business of an agent who is not an independent agent, as defined in subparagraph (3) of this paragraph, shall be disregarded unless such agent (a) has the authority to negotiate and conclude contracts in the name of the nonresident alien individual or foreign corporation, and regularly exercises that authority, or (b) has a stock of merchandise belonging to the nonresident alien individual or foreign corporation from which orders are regularly * * * [filled] on behalf of such alien individual or foreign corporation.  * * *  [Sec. 1.864-7(d)(1)(i), Income Tax Regs.]

The regulations also provide:

an agent shall be considered regularly to exercise authority to negotiate and conclude contracts or regularly to fill orders on behalf of his foreign principal only if the authority is exercised, or the orders are filled, with some frequency over a continuous period of time.  This determination shall be made on the basis of the facts and circumstances in each case, taking into account the nature of the business of the principal; but, in all cases, the frequency and continuity tests are to be applied conjunctively.  Regularity shall not be evidenced by occasional or incidental activity.  An agent shall not be considered regularly to negotiate and conclude contracts on behalf of its foreign principal if the agent's authority to negotiate and conclude contracts is limited only to unusual cases or such authority must be separately secured by the agent from his principal with respect to each transaction effected.  * * * [Sec. 1.864-7(d)(1)(ii), Income Tax Regs.]

(4)  Employee activity.  The regulations provide:

Ordinarily, an employee of a nonresident alien individual or a foreign corporation shall be treated as a dependent agent to whom the rules of paragraph (d)(1) of this section apply if such employer does not in and of itself have a fixed facility (as defined by paragraph (b) of this section) in the United States or outside the United States, as the case may be. However, where the employee, in the ordinary course of his duties, carries on the trade or business of his employer in or through a fixed facility of such employer which is regularly used by the employee in the course of carrying out such duties, such fixed facility shall be considered the office or other fixed place of

business of the employer, irrespective of the rules of paragraph (d)(1) of this section. * * * [Sec. 1.864-7(e), Income Tax Regs.]

(5) Office or other fixed place of business of a related

person. The regulations provide:

The fact that a nonresident alien individual or a foreign corporation is related in some manner to another person who has an office or other fixed place of business shall not of itself mean that such office or other fixed place of business of the other person is the office or other fixed place of business of the nonresident alien individual or foreign corporation. Thus, for example, the U.S. office of foreign corporation M, a wholly owned subsidiary corporation of foreign corporation N, shall not be considered the office or other fixed place of business of N unless the facts and circumstances show that N is engaged in trade or business in the United States through that office or other fixed place of business. However, see paragraph (b)(2) of this section * * * [regarding relatively sporadic or infrequent activities]. * * * [Sec. 1.864-7(f), Income Tax Regs.]

With the foregoing factors in mind, we consider the facts

and circumstances of the instant case. The record establishes

that LTD had a fixed facility in the sense that it used the San

Antonio office to engage in its trade or business. The San

Antonio office, upon receipt of investment instructions from the

promoters, effected the transactions in question. The San

Antonio office's address was used as LTD's return address on,

inter alia, LTD's early discretionary authorizations, a FEIM Fund

brochure, an Inversat Fund brochure, a brochure for "selected

investors who are not residents of the U.S.A.", a printed

newsletter entitled "InverNews", and in documents for a loan to a

client.  The San Antonio office was the place where LTD client files were maintained.  LTD's use of the San Antonio office for both its operations and as a return address was so extensive that we believe, taking into account the overall needs and conduct of LTD's trade or business, that LTD's use of the San Antonio office cannot be described as falling under the "relatively sporadic or infrequent" exception.  Sec. 1.864-7(b)(2), Income Tax Regs.  Moreover, LTD has not shown that it maintained any other fixed facility through which it engaged in its activities.  Accordingly, we hold that the San Antonio office was LTD's fixed facility in the United States during the years in issue for purposes of section 1.864-7(b), Income Tax Regs.

As to the location of the management activity, section 1.864-7(c), Income Tax Regs., and related examples, section 1.864-7(g), Examples (1)-(3), Income Tax Regs., take into account not only where the "top management decisions" are made but also where "the day-to-day trade or business of the foreign corporation" is conducted.  LTD's day-to-day trade or business was to provide its Mexican clients with access to non-Mexican financial markets.  That day-to-day trade or business was conducted in the San Antonio office, where the clients' files were located, investment instructions were received and carried out, client statements were produced, and LTD's daily proof sheets and journal vouchers were produced.

As we have concluded, supra p. 70, that INC is not an "independent agent" within the meaning of section 1.864-7(d)(3), Income Tax Regs., we next examine whether INC is a dependent agent[15] which "has the authority to negotiate and conclude contracts in the name of the nonresident alien individual or foreign corporation, and regularly exercises that authority" within the meaning of section 1.864-7(d)(1)(i), Income Tax Regs. Petitioners argue that, if INC is deemed to be a dependent agent, INC is not to be considered regularly to "negotiate and conclude contracts" on behalf of LTD because INC had, pursuant to its agreement with LTD, no authority to act for, represent, bind or obligate LTD "without first obtaining LTD's consent" and that INC did not act for, represent, bind, or obligate LTD "without first obtaining the consent of LTD."  Additionally, petitioners contend that INC did not have the authority to negotiate or to conclude contracts on LTD's behalf.

In deciding whether INC had that type of authority, we examine the agreement governing the relationship between INC and LTD (Agreement) and the entire record before us.  Petitioners rely upon paragraph 8 of the Agreement, which provides that INC "shall for all purposes be an independent contractor and not an agent or employee of * * * [LTD], and * * * [INC] shall have no

---

[15]
   A dependent agent is equated in the regulations with "an agent who is not an independent agent, as defined in subparagraph (3) of this paragraph".  Sec. 1.864-7(d)(1)(i), Income Tax Regs.

authority to act for, represent, bind or obligate * * * [LTD], any of its affiliates or any account managed or advised by * * * [LTD]."  Paragraph 4 of the Agreement, however, provides detailed authority for INC to act on LTD's behalf:

> * * * [INC] will invest such cash, securities and other properties comprising the assets of investment advisory clients of * * * * [LTD] as * * * [LTD] shall instruct, in such manner as * * * [LTD] shall instruct.  In order to carry out such instructions, * * * [INC] will have the authority for and in the name of * * * [LTD]:
>       (a) to purchase, sell and deal in * * * instruments or evidences of indebtedness by whomsoever issued * * *;
>       (b) to purchase, hold, sell, transfer, exchange, mortgage, pledge and otherwise act to acquire and dispose of and exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to securities held on behalf of * * * [LTD] or its clients, with the objective of the preservation, protection and increase in value thereof;
>       (c) to purchase securities for investment and to make such representations to the seller of such securities, and to other persons, that * * * [INC] may deem proper in such circumstances, including the representation that such securities are purchased by * * * [LTD] or its clients for investment and not with a view to their sale or other disposition;
>       (d) to lend any of the properties which are from time to time held by * * * [LTD] on behalf of its clients; and
>       (e) to open, maintain, conduct and close accounts * * * with any broker, dealer or investment concern at which * * * [LTD] maintains an account on behalf of its clients with respect to the disposition and application of monies or securities of * * * [LTD] or its clients and from time to time held by such broker, dealer or investment concern.

Thus, paragraph 8 and paragraph 4 contain seemingly inconsistent terms.

As we interpret the Agreement, however, the specific vesting of authority in INC upon the issuance of instructions from LTD, pursuant to paragraph 4 of the Agreement, overrides the provision

in paragraph 8 that INC "shall have no authority to act for, represent, bind or obligate" LTD as to the matters covered by the instructions.  We therefore conclude that INC had "the authority for and in the name of LTD" to carry out the acts specified in the Agreement pursuant to LTD's instructions, including, inter alia, purchasing, selling, and dealing in instruments or evidences of indebtedness by whomsoever issued.  INC alone performed the purchase, sale, and redemption of the instruments and evidences of indebtedness.  Accordingly, we conclude that, pursuant to its Agreement with LTD, INC had "the authority to negotiate and conclude contracts" in the name of the foreign corporation LTD within the meaning of section 1.864-7(d)(1)(i), Income Tax Regs.

Nonetheless, we must consider whether INC "regularly exercised" its authority to negotiate and to conclude contracts in LTD's name, whether such authority was limited to unusual cases, and whether such authority was separately secured for each transaction effected within the meaning of section 1.864-7(d)(1)(ii), Income Tax Regs.  For LTD's certificates of deposit and term deposits operation, the executive committee of Inver Group established criteria (relating to the bank's size, equity, profitability, size of deposits, assets and liabilities ratios, and standing with the FDIC or FSLIC) to guide INC in selecting banks from which to purchase certificates of deposit and term

deposits.  Mr. Fahey testified that he compiled a list of banks that Mr. Zollino approved.

Pursuant to its Agreement with LTD, INC assembled and maintained a document entitled Institution Standings, which reflected the financial information of financial institutions that met the Inver Group's criteria.  Mr. Fahey contacted banks throughout the United States that were on the approved list and obtained interest rates from each bank for 30-day, 60-day, 90-day, and 6-month placements of certificates of deposit and term deposits.  A list of the rates quoted by each bank was telecopied, usually daily, to Mexico to inform promoters of the current interest rates offered on certificates of deposit and term deposits.  Mr. Fahey testified that he "got approval of the banks that were on * * * [the list telecopied to promoters], but not approval on a daily basis for the rates that I quoted on there."  Promoters sold the certificates of deposit or term deposits (or interests therein) to clients, who wired funds directly to LTD's account in San Antonio.

On its own, albeit pursuant to the criteria established by Inver Group and only from banks that had been approved by Mr. Zollino, INC purchased certificates of deposit or term deposits in either the client's name (for amounts greater than $98,000) or in LTD's name (for amounts less than $98,000, in increments of $10,000).  INC purchased the certificates of deposit and term deposits on behalf of LTD and LTD's clients with great frequency

over the continuous period of time in issue.  INC's authority to purchase certificates of deposit and term deposits was not "limited only to unusual cases", and its authority was not "separately secured" by INC from LTD "with respect to each transaction effected."  The exercise of INC's authority was not merely occasional or infrequent.  Accordingly, we conclude that INC exercised its authority to negotiate and to conclude contracts with the regularity and continuity required by section 1.864-7(d)(i)(ii), Income Tax Regs.  Consequently, we hold that INC is a dependent agent who had "the authority to negotiate and conclude contracts" in the name of the foreign corporation LTD and "regularly" exercised such authority within the meaning of section 1.864-7(d)(1)(i), Income Tax Regs.

As INC is a dependent agent which had "the authority to negotiate and conclude contracts" in the name of LTD and "regularly" exercised such authority over a continuous period of time, INC's office will not be disregarded in determining whether LTD had an office or other fixed place of business within the meaning of section 1.864-7(d), Income Tax Regs.  Sec. 1.864-7(d)(3)(i), Income Tax Regs.  Accordingly, we conclude that INC's office is to be used in deciding whether LTD had "an office or other fixed place of business in the United States" within the meaning of section 1.864-7(d), Income Tax Regs.

As INC is a corporation, and respondent makes no argument that its separate existence should be ignored, and as LTD had no

employees of its own in the San Antonio office, we do not apply the factor of employee activity.  Sec. 1.864-7(e), Income Tax Regs.

Finally, section 1.864-7(f), Income Tax Regs., provides that the fact that a foreign corporation is related in some manner to another person who has an office or other fixed place of business will not of itself mean that the related person's office or other fixed place of business is the foreign corporation's office or other fixed place of business unless the facts and circumstances show that the foreign corporation is engaged in trade or business in the United States through such office or fixed place of business.  Based on the record in the instant case, we conclude that the facts and circumstances show that LTD was engaged in trade or business in the United States through INC's office in San Antonio.  As we have discussed, supra pp. 72-73, LTD's involvement and activities in the San Antonio office were extensive, continuous, and regular.  Moreover, LTD has not shown that it maintained any other office or fixed place of business. Accordingly, we conclude that the San Antonio office of INC is the office or other fixed place of business of LTD for purposes of section 1.864-7(f), Income Tax Regs.

Pursuant to section 1.864-7(a)(2), Income Tax Regs., we have given "due regard" to the facts and circumstances of the instant case, "particularly to the nature of the taxpayer's trade or business and the physical facilities actually required by the

taxpayer in the ordinary course of the conduct of his trade or business."  The nature of LTD's trade or business is to provide Mexican investors with access to non-Mexican financial markets. The physical facility actually required by LTD in the ordinary course of the conduct of its trade or business is a place that can receive investment instructions from clients, effect such instructions, and maintain records of actions that have been taken.  LTD had no place that received clients' investment instructions, effected such instructions, and maintained records of actions taken, other than the San Antonio office.  In sum, we conclude that LTD had "an office or other fixed place of business in the United States" within the meaning of section 1.864-7(d), Income Tax Regs.

Consequently, we hold that LTD's trading in stocks or securities fails to qualify for exclusion pursuant to section 864(b)(2)(A)(i) for each of two reasons:  (1) The trading in stocks or securities was not carried out through an "independent" agent, and (2) LTD had "an office or other fixed place of business in the United States" through which such transactions were effected.  See sec. 864(b)(2)(C).  Accordingly, such trading activities are taken into account to determine whether LTD was engaged in "trade or business within the United States" pursuant to section 864(b).

We turn next to the exclusion allowed to taxpayers trading for their own account.  Section 864(b)(2)(A)(ii) provides that

certain activities are to be excluded from the definition of

"trade or business within the United States," to wit:

> Trading in stocks or securities for the taxpayer's own
> account, whether by the taxpayer or his employees or
> through a resident broker, commission agent, custodian,
> or other agent, and whether or not any such employee or
> agent has discretionary authority to make decisions in
> effecting the transactions.  * * *

Trading in stocks or securities, equated in the regulations with

"the effecting of transactions in the United States in stocks or

securities," includes:

> buying, selling (whether or not by entering into short
> sales), or trading in stocks, securities, or contracts
> or options to buy or sell stocks or securities, on
> margin or otherwise, for the account and risk of the
> taxpayer, and any other activity closely related
> thereto (such as obtaining credit for the purpose of
> effectuating such buying, selling, or trading).  * * *
> [Sec. 1.864-2(c)(2)(i), Income Tax Regs.]

The exclusion for trading in stocks or securities for the

taxpayer's own account, however, does not apply to:  (1) A dealer

in stock or securities, and (2) a corporation (other than one

described in the parenthetical clause of section

864(b)(2)(A)(ii)) whose principal business is trading in stocks

or securities for its own account and whose principal office is

in the United States.  Sec. 864(b)(2)(A)(ii).  A dealer in stocks

or securities is defined as "a merchant of stocks or securities,

with an established place of business, regularly engaged as a

merchant in purchasing stocks or securities and selling them to

customers with a view to the gains and profits that may be

derived therefrom."  Sec. 1.864-2(c)(2)(iv)(a), Income Tax Regs.

In the determination of whether a person is a dealer in stocks or securities, "such person's transactions in stocks or securities effected both in and outside the United States shall be taken into account."  Id.  The term "securities" for purposes of paragraph (c) of section 1.864-2, Income Tax Regs., means "any note, bond, debenture, or other evidence of indebtedness, or any evidence of an interest in or right to subscribe to or purchase any of the foregoing."  Sec. 1.864-2(c)(2)(i), Income Tax Regs.

Although the general rule is that a dealer in stocks or securities is ineligible for the exclusion of trading for the taxpayer's own account, certain types of dealers are excepted from that general rule by section 1.864-2(c)(2)(iv)(b), Income Tax Regs., which provides that

> A foreign person who otherwise may be considered a
> dealer in stocks or securities under (a) of this
> subdivision shall not be considered a dealer in stocks
> or securities for purposes of this subparagraph--
>
> \*        \*        \*        \*        \*        \*        \*
>
>       (2) Solely because of transactions effected in the
> United States in stocks or securities pursuant to his grant
> of discretionary authority to make decisions in effecting
> those transactions, if he can demonstrate to the
> satisfaction of the Commissioner that the broker, commission
> agent, custodian, or other agent through whom the
> transactions were effected acted pursuant to his written
> representation that the funds in respect of which such
> discretion was granted were the funds of a customer who is
> neither a dealer in stocks or securities, \* \* \* or a foreign
> corporation described in subdivision (iii)(b) of this
> subparagraph.  \* \* \*

For purposes of the foregoing exception (for certain dealers), a foreign person includes, inter alia, a nonresident alien

individual and a foreign corporation.  Sec. 1.864-2(c)(2)(iv)(b),

Income Tax Regs.  The exception applies, however, "only if the

foreign person at no time during the taxable year has an office

or other fixed place of business in the United States through

which, or by the direction of which, the transaction in stocks or

securities are effected."  Id.

Section 864(b)(2)(A)(ii) describes the second type of

foreign person that is ineligible for the exclusion of trading

for one's own account, to wit:

> A corporation (other than a corporation which is, or
> but for section 542(c)(7), 542(c)(10), or 543(b)(1)(C),
> would be, a personal holding company) the principal
> business of which is trading in stocks or securities
> for its own account, if its principal office is in the
> United States.

Petitioners argue that certain of LTD's trading activities

are eligible to be excluded pursuant to section 864(b)(2)(A)(ii)

from the determination of whether LTD is engaged in "trade or

business within the United States" pursuant to section 864(b).

Specifically, petitioners argue that the transactions LTD

undertook in its own name qualify for exclusion pursuant to

section 864(b)(2)(A)(ii).  Additionally, petitioners contend that

the transactions LTD undertook in its clients' names qualify for

exclusion pursuant to the exception for certain dealers in stocks

or securities provided in section 1.864-2(c)(2)(iv)(b)(2), Income

Tax Regs.  Petitioners argue that the foreign corporation

exception to the exclusion does not apply in the instant case

because LTD's principal business was not trading in stocks or securities for its own account and because LTD's principal office was located outside the United States during each of such years.

Respondent argues that the section 864(b)(2)(A)(ii) exclusion of trading for the taxpayer's own account does not apply to any of the transactions in LTD's financial services business.  Additionally, respondent argues that the exception in section 1.864-2(c)(2)(iv)(b)(2), Income Tax Regs., is unavailable because LTD had an office or other fixed place of business in the United States.

We agree with respondent.  In the instant case, LTD was regularly engaged in purchasing certificates of deposit and term deposits from U.S. and foreign banks as attorney in fact for its clients and was regularly engaged in selling evidences of an interest in such financial instruments with a view to making profits from such transactions.  The certificates of deposit and term deposits purchased by LTD are "evidences of indebtedness" and are therefore securities within the meaning of section 1.864-2(c)(2)(i), Income Tax Regs.[16]  The interests in IFF and the non-U.S. certificates of deposit are "interests in evidences of indebtedness" and are therefore securities within the meaning of

---

[16]

See supra note 13.

section 1.864-2(c)(2)(i), Income Tax Regs.[17]  Additionally, LTD

had a fixed place of business in the United States, viz, the San

Antonio office, through which such transactions were effected.

See supra p. 81.

We conclude that none of the transactions in LTD's financial

services business qualify for the exclusion pursuant to section

864(b)(2)(A)(ii).  The transactions that LTD undertook in its own

name were not of the type contemplated by the statute.  LTD did

not purchase and sell securities for its own account for the

purpose of investment or speculation within the meaning of

section 1.864-2(c)(2)(iv)(a), Income Tax Regs.  The transactions

in LTD's own name were part of its regular, continuous, and

extensive business of purchasing certificates of deposit with its

clients' funds, as attorney in fact for the clients, with a view

to making commissions or other profits from such transactions.

The office in San Antonio was instrumental to the conduct of that

business.  Based on the foregoing, we hold that LTD did not

effect the transactions in question for its own account within

the meaning of section 864(b)(2)(A)(ii).  Insofar as LTD may have

purchased any of the certificates of deposit for its own account,

we conclude that LTD was "a dealer in stocks or securities"

within the meaning of section 1.864-2(c)(2)(iv), Income Tax

---

[17]   Id.

Regs.[18]  Consequently, we hold that LTD's securities trading is not excluded pursuant to section 864(b)(2)(a)(ii) from the determination of whether LTD was engaged in "trade or business within the United States" pursuant to section 864(b).

Petitioners also argue that all of the activities that LTD performed are excluded by case law from the consideration of whether LTD was engaged in "trade or business within the United States" within the meaning of section 864(b).  Petitioners argue that, "as a matter of law, the fact that INC was or was not a dependent agent of LTD, or that its offices were or were not LTD's offices, is largely irrelevant."  Petitioners contend that "Whether or not INC was independent will not determine whether LTD engaged in trade or business within the United States".  Relying on Scottish Am. Inv. Co., Ltd. v. Commissioner, 12 T.C. 49 (1949), petitioners argue that the law concerns itself with the "character and purpose" of the U.S. activities.

Respondent contends that, pursuant to the facts and circumstances test of section 1.864-2(e), Income Tax Regs., LTD was engaged in trade or business within the United States.  Respondent contends that the test for determining if a taxpayer

---

[18]

We hold in the instant case that the exception of certain dealers contained in sec. 1.864-2(c)(2)(iv)(b)(2), Income Tax Regs., does not apply because LTD had "an office or other fixed place of business in the United States through which, or by the direction of which, the transactions in stocks or securities are effected" within the meaning of sec. 1.864-2(c)(2)(iv)(b), Income Tax Regs.  See supra pp. 79, 84.

is engaged in "trade or business within the United States" is whether substantial profit-oriented activities regularly and continuously occur in the United States whether carried on directly by the taxpayer or through agents.

Petitioners rely on a line of cases holding that the mere maintenance of records and collection of rents, interest, or dividends through managerial attention to securities does not constitute trade or business. See, e.g., Higgins v. Commissioner, 312 U.S. 212, 218 (1941); Continental Trading, Inc. v. Commissioner, 265 F.2d 40 (9th Cir. 1959); DeKrause v. Commissioner, T.C. Memo. 1974-291. The taxpayer in each of those cases managed only personal investments and/or personal investment income. Because those cases did not address taxpayers who managed the investments of others, as did LTD, we conclude that they are not dispositive of the instant case.

Petitioners also cite several cases which are distinguishable on their facts, to wit: Piedras Negras Broadcasting Co. v. Commissioner, 127 F.2d 260 (5th Cir. 1942), affg. 43 B.T.A. 297 (1941); Abegg v. Commissioner, 50 T.C. 145 (1968), affd. 429 F.2d 1209 (2d Cir. 1970), and Amalgamated Dental Co. v. Commissioner, 6 T.C. 1009 (1946). In Piedras Negras, the court held that none of the taxpayer's income was derived from sources within the United States. Piedras Negras Broadcasting Co. v. Commissioner, supra at 261. In the instant case, we conclude that the main situs of LTD's income-producing

activities was the San Antonio office.  Consequently, we conclude

that <u>Piedras Negras</u> does not support petitioners' position in the

instant case.

In <u>Abegg</u>, the taxpayer engaged in activities that were not

as substantial in both quantity and quality as LTD's activities

in the instant case.  In <u>Abegg</u>, the taxpayer engaged in

activities solely for its own benefit (viz, collecting dividends

and interest, managing existing investments, and investigating

new investments).  <u>Abegg v. Commissioner</u>, <u>supra</u> at 153-154.  In

contrast, in the instant case, LTD had clients to whom it

provided services and marketed investment products.

Additionally, in <u>Abegg</u>, the taxpayer had operations in the United

States that we characterized as "planning activities", <u>id.</u> at

154, in contrast to LTD's operations in the instant case, where

LTD's U.S. operations dealt with third parties and therefore

consisted of more than mere "planning activities".  Consequently,

we conclude that <u>Abegg</u> is not dispositive of the instant case.

In <u>Amalgamated Dental</u>, the Court held that the taxpayer was

not "engaged in trade or business within the United States"

because the relationship between the parties was that of

vendor/vendee.  <u>Amalgamated Dental Co. v. Commissioner</u>, <u>supra</u> at

1015-1016.  We conclude that the facts in the instant case are

distinguishable from those in <u>Amalgamated Dental</u>.  The

relationship between LTD and INC was not that of vendor/vendee.

LTD delegated authority to INC, which, inter alia, purchased

certificates of deposit in LTD's name.  Accordingly, we conclude that Amalgamated Dental is not dispositive of the instant case.

Petitioners also rely heavily on Spermacet Whaling & Shipping Co. S/A v. Commissioner, 30 T.C. 618 (1958).  In Spermacet, this Court addressed the issue of whether the taxpayer was "engaged in trade or business within the United States" within the meaning of section 231(b) of the 1939 Code, as amended.  The taxpayer entered into a contract to provide management services for whaling boats.  The Court held that the "business in which * * * [the taxpayer] was engaged was that of managing the [whaling] expedition" and that the taxpayer's "activities which produced the income in question took place almost entirely on the high seas or in Norway."  Id. at 633.  Additionally, the Court held that the activities that the taxpayer performed within the United States were "without substance."  Id.  The Court stated:

> * * * [the actions in the United States of the taxpayer's forty percent shareholder] in receiving monthly statements or correspondence involving * * * [the taxpayer], or in paying a limited number of obligations requiring payment in American dollars out of a bank account * * * maintained by * * * [the taxpayer], were ministerial and clerical in nature, involving very little exercise of discretion or business judgment necessary to the production of the income in question.  * * *  [Id. at 633-634.]

Finally, "The holding of the directors' meetings in New York City solely for the personal convenience of the directors was of no particular consequence."  Id. at 634.  Accordingly, the Court

stated that "we are convinced that * * * [the taxpayer] was not engaged in any substantial, regular, or continuous ordinary business activity in the United States."  Id. at 634.

We conclude that the facts in the instant case are distinguishable from those in Spermacet.  LTD's activities in the United States, as conducted by LTD directly and through INC, exceeded the mere receipt of LTD's own monthly statements or correspondence and limited payments of bills from a bank account.  LTD received clients' funds and placed such funds with third parties.  Additionally, LTD's activities in the United States were more extensive than the taxpayer's "ministerial and clerical" activities in Spermacet.  LTD traded in stocks or securities in the United States.  A substantial part of the activities that produced LTD's income took place in San Antonio.  In sum, we conclude that Spermacet Whaling & Shipping Co. S/A v. Commissioner, supra, is not dispositive of the instant case.

We also conclude that petitioner's reliance on Scottish Am. Inv. Co., Ltd. v. Commissioner, 12 T.C. 49 (1949), is without merit.  In Scottish American, this Court addressed the issue of whether a group of Scottish trusts, by virtue of the activities of an office in the United States, were "engaged in trade or business within the United States" within the meaning of section 231(b) of the 1939 Code, as amended.  The Court found the following facts:

All judgments as to investments, the purchase and
sale of securities, and substantially all other major
policy decisions were made by officers in the home
office of the trusts situated outside of the United
States; orders for purchase and sale of securities were
executed by * * * [the trusts] directly through
resident banks in the United States; * * * the American
office's activities were * * * confined to routine and
clerical functions performed by the banks prior to
1936.  * * *  [Id. at 55-56; fn. ref. omitted.]

The trusts' office, located in Jersey City, New Jersey,

performed the following activities:  Collected, verified,

deposited, and remitted to the trusts dividend and interest

payments; exercised voting rights; maintained records for the

trusts; obtained and forwarded investment information to the

trusts; prepared tax returns; leased an office; and paid

expenses.  Id. at 56-57.

The Court held that the Scottish trusts were not "engaged in

trade or business within the United States" within the meaning of

former section 231(b), as amended.  The Court reasoned that

the real business of * * * [the trusts], the doing of
what they were principally organized to do in order to
realize profit, was the cooperative management in
Scotland of British capital, a large part of which was
invested by them in American securities through
transactions effected through resident brokers.  To
this business of * * * [the trusts], the business
activities of the American office were merely helpfully
adjunct.  No consequential transactions were effected
through or by the direction of the Jersey City office.
It functioned primarily as a clerical department
performing a number of useful routine and incidental
services for * * * [the trusts].  But it can not be
said here that the local office, even though we look at
its activities as a whole, was doing what was
principally required to be done by * * * [the trusts]

in order to realize profit, or that its activities
constituted a business which * * * [the trusts] carried
on within the United States.  * * *  [Id. at 59; fn.
ref. omitted.]

The Court observed that, with respect to cases involving a determination of whether or not a taxpayer is "engaged in trade or business within the United States", "it is a matter of degree, based upon both a quantitative and a qualitative analysis of the services performed, as to where the line of demarcation should be drawn."  Id.  The Court concluded that "It is not so much the volume of the activities of the Jersey City office, although volume of activities may, in some cases, be a factor, but rather their character and the purpose for which the office is established that we believe are determinative."  Id.   The Court stated:

We are not convinced that the services of this local
office, quantitatively extensive and useful as they may
have been, approached that quality which is necessary
in order that * * * [the trusts] can be characterized
as having engaged in business in the United States
during the years involved within the meaning of section
231(b).  * * *  [Id.]

The facts in the instant case are distinguishable from those in Scottish American.  In Scottish American, the trusts' office in the United States did not effect the trusts' trading; the trusts' orders for purchases and sales of securities "were sent directly from Scotland to resident brokers in the United States." Id. at 56.  The trusts' resident brokers were also their resident banks, J.P. Morgan & Co. and the National City Bank of New York.

Id. at 51.  The trusts' office in the United States was advised
of the purchases and sales executed by the resident brokers "so
that it would make the proper entries on its books."  Id. at 56.

Unlike the trusts in Scottish American, LTD did not use
independent resident brokers to effect transactions in securities
for its own account during the years in issue.  Rather, LTD's
business consisted primarily of trading for its clients' accounts
through transactions effected by its wholly owned subsidiary INC
at the latter's office in the United States.  In sum, we conclude
that Scottish American is not dispositive of the instant case.
Consequently, we conclude that case law does not allow LTD to
exclude any of its trading activities from the consideration of
whether it was engaged in "trade or business within the United
States" pursuant to section 864(b).

One final inquiry into the issue of whether LTD was engaged
in "trade or business within the United States" remains.
Although LTD's trading activities are not eligible for exclusion
from "the performance of personal services" for purposes of
section 864(b), LTD is not automatically deemed to be engaged in
"trade or business within the United States."  Sec. 1.864-2(e),
Income Tax Regs.  The fact that a party "is not determined by
reason of this section to be not engaged in trade or business
within the United States is not to be considered a determination
that such person is engaged in trade or business within the
United States."  Id.  Whether such a person is engaged in trade

or business within the United States "shall be determined on the basis of the facts and circumstances in each case."  Id.

Accordingly, pursuant to section 1.864-2(e), Income Tax Regs., we apply the relevant case law, which provides tests regarding the amount of activity that is required for a conclusion that a taxpayer is engaged in "trade or business within the United States" pursuant to section 864(b).  Finding no cases addressing the term "trade or business within the United States" as used in section 864(b), we turn to the cases interpreting the statutory precursors of section 864 and section 882(a).

In European Naval Stores Co., S.A. v. Commissioner, 11 T.C. 127 (1948), the Court addressed whether the taxpayer, a foreign corporation, was "engaged in trade or business within the United States" within the meaning of section 231(b) of the 1939 Code, as amended.  In interpreting former section 231(b), the Court held that the "question as to what activities of a taxpayer constitute the carrying on of a business is one of fact."  Id. at 132 (citing Higgins v. Commissioner, 312 U.S. 212 (1941), which interpreted the phrase "carrying on any trade or business" within the meaning of section 23(a) of the Revenue Act of 1932 (a precursor of section 162(a))).  The Court in European Naval Stores indicated that the phrase "engaged in trade or business within the United States" refers to profit-seeking activities that are sufficiently regular, continuous, and extensive to

constitute "carrying on a trade or business" within the meaning

of section 162.  The Court added:

> The meaning of the phrases "engaged in business,"
> "carrying on business," and "doing business" were
> defined by the Circuit Court of Appeals for the Third
> Circuit in Lewellyn v. Pittsburgh, B. & L.E.R. Co., 222
> Fed. 177.  It was stated therein that, "The three
> expressions, either separately, or connectedly, convey
> the idea of progression, continuity, or sustained
> activity.  'Engaged in business' means occupied in
> business; employed in business.  'Carrying on business'
> does not mean the performance of a single disconnected
> business act.  It means conducting, prosecuting, and
> continuing business by performing progressively all the
> acts normally incident thereto, and likewise the
> expression 'doing business', when employed as
> descriptive of an occupation, conveys the idea of
> business being done, not from time to time, but all the
> time.  * * *".  [Id. at 133.]

In Scottish Am. Inv. Co., Ltd. v. Commissioner, 12 T.C. 49

(1949), the Court addressed whether the taxpayers, foreign

investment trusts, were, by virtue of maintaining a U.S. office,

"engaged in trade or business within the United States" within

the meaning of section 231(b) of the 1939 Code, as amended.  The

Court examined "the real business of * * * [the taxpayers], the

doing of what they were principally organized to do in order to

realize profit".  Id. at 59 and n.14 (citing Edwards v. Chile

Copper Co., 270 U.S. 452, 455 (1926)).  In Scottish American, the

Court decided that the taxpayers' real business was "the

cooperative management in Scotland of British capital" and that

"the business activities of the American office were merely

helpfully adjunct."  Id. at 59.  Additionally, the Court stated

that, "In cases such as these * * * [regarding whether the taxpayer is engaged in trade or business within the United States], it is a matter of degree, based upon both a quantitative and a qualitative analysis of the services performed, as to where the line of demarcation should be drawn." Id. In Scottish American, the Court decided that the factors to be examined were the "character" of the activities performed in the U.S. office, "the purpose for which the office * * * [was] established", and, to a lesser extent, "the volume of the activities". Id.

In Spermacet Whaling & Shipping Co. S/A v. Commissioner, 30 T.C. 618 (1958), the Court addressed whether the taxpayer, a foreign corporation, was "engaged in trade or business within the United States" within the meaning of section 231(b) of the 1939 Code, as amended. In interpreting former section 231(b), the Court stated:

> We have consistently held that before a taxpayer can be found to be "engaged in trade or business within the United States" it must, during some substantial portion of the taxable year have been regularly and continuously transacting a substantial portion of its ordinary business in this country. * * * [Id. at 634 and n.10 (citing, inter alia, European Naval Stores Co., S.A. v. Commissioner, supra, and Scottish American Investment Co. v. Commissioner, supra).]

After summarizing the test pursuant to former section 231(b), the Court concluded that the taxpayer was not "engaged in any substantial, regular, or continuous ordinary business activity in the United States." Id. at 634.

Petitioners contend that LTD's "real business" was "to render investment advice to clients in Mexico."  Accordingly, petitioners argue that all of the activities relating to LTD's business occurred in Mexico:  LTD's clients were solicited and advised by Mexican-based promoters in Mexico, their accounts were opened and approved in Mexico, clients changed their investment portfolios in consultation with their Mexican promoter, and the spread (where applicable) was negotiated in Mexico.  Petitioners contend that INC performed merely ministerial activities in the United States and did not render any investment advice to clients in Mexico.  On those premises, petitioners conclude that LTD's "real business"--even if INC's activities were imputed to LTD-- did not occur in the United States.

We disagree.  Contrary to petitioners' argument, we believe that the term "performance of personal services within the United States" for purposes of section 864(b) does not require that LTD itself perform such "personal services" in order to be engaged in "trade or business within the United States."

We first look to the "real business" of the taxpayers, the "doing of what * * * [the taxpayers] were principally organized to do in order to profit".  Scottish Am. Inv. Co., v. Commissioner, supra at 59.  LTD is a corporation organized pursuant to the laws of the Cayman Islands.  Based on the record, we believe that the "real business" of LTD, the doing of what LTD

was "principally organized to do in order to realize profit", was to enable Mexican nationals to invest their capital in non-Mexican financial markets. LTD's "real business" was not merely to render investment advice to clients in Mexico, as petitioners contend. During each of the years in issue, LTD's income consisted of four major categories: Management fees, interest income, currency transactions fees, and other fees and commissions. LTD's income, therefore, was derived from effecting, primarily in the United States, transactions in financial markets. Accordingly, we conclude that LTD's "real business" was providing Mexican nationals with access to non-Mexican financial markets and that such business was conducted primarily in the United States.

In Scottish Am. Inv. Co. v. Commissioner, supra at 59, the Court made "a quantitative and a qualitative analysis of the services performed". Quantitatively, LTD performed a substantial number of services in the United States. LTD maintained a client clearing account at Frost Bank in San Antonio in which it collected deposits from clients. During the years in issue, LTD had approximately the following number of client accounts: 257 during 1985, 434 during 1986, 557 during 1987, 870 during 1988, and 1,131 during 1989. Not all client accounts were actively traded. Nonetheless, we conclude that the number of LTD's client accounts, and, as a corollary, the number of services performed

in the United States for such accounts, during each of the years in issue, can be characterized as quantitatively substantial.

Qualitatively, LTD performed substantial services in the United States. Directly and through its agent INC, LTD provided investment management services and marketed investment products. The purpose for which LTD was established was to provide access to non-Mexican financial markets, and LTD conducted such business primarily in the United States. We therefore conclude that LTD's activities in the United States during each of the years in issue can be characterized as qualitatively substantial.

In sum, we conclude that LTD "engaged in * * * substantial, regular, or continuous ordinary business activity in the United States." Spermacet Whaling & Shipping Co. S/A v. Commissioner, supra at 634. We find that LTD's activities in the United States, conducted directly or through agents, included: Receiving client funds, monitoring interest rates, effecting trades, collecting and disbursing dividends and interest, maintaining customer account information, and valuing portfolios. Accordingly, we conclude that, during the years in issue, LTD was "engaged in business in the United States" within the meaning of section 1.864-4(c)(5)(i), Income Tax Regs. Consequently, we hold that LTD was "engaged in the active conduct of a banking, financing, or similar business in the United States" pursuant to section 1.864-4(c)(5)(i), Income Tax Regs. A fortiori, we hold that LTD was engaged in "trade or business within the United

States" pursuant to section 864(b) for its taxable years June 30, 1985 through 1989.

B.     Whether Each Item of LTD's Income
       Was Effectively Connected

      1.     Character and Source Rules

Before deciding whether an item of income is "effectively connected with the conduct of trade or business within the United States" pursuant to section 882(a)(1), we must first decide the character and source of each item of income.  Items of income include, inter alia, personal services income and interest income.  Secs. 861(a) and 862(a).  An item may be classified as income from sources within the United States pursuant to section 861, as income from sources without the United States pursuant to section 862, or as income partly from within and partly from without the United States pursuant to section 863(b).

Generally, income from the performance of personal services has its source where the services are performed.  Absent an exception not applicable in the instant case, compensation for labor or personal services performed in the United States is treated as income from sources within the United States.  Sec. 861(a)(3).  Compensation for labor or personal services performed without the United States is treated as income from sources without the United States.  Sec. 862(a)(3).

For LTD's taxable years ended June 30, 1985 and 1986, generally, the source of interest depends on the residence of the

obligor.  Interest on bonds, notes, or other interest-bearing obligations of U.S. residents, corporate or otherwise, is generally treated as income from sources within the United States.  Sec. 861(a)(1).  The term "resident of the United States", used in section 1.861-2(a)(1), Income Tax Regs. (promulgated pursuant to section 861(a)(1)), includes, inter alia, "a foreign corporation or a foreign partnership, which at any time during its taxable year is engaged in trade or business in the United States."  Sec. 1.861-2(a)(2)(iv), Income Tax Regs.

Interest that is not treated as income from sources within the United States pursuant to section 861(a)(1) is treated as income from sources without the United States.  Sec. 862(a)(1). Additionally, notwithstanding section 861(a)(1) and the regulations thereunder, certain interest is treated as income from sources without the United States.  Sec. 1.861-2(b), Income Tax Regs.

For LTD's taxable years ended June 30, 1987 through 1989, generally, the source of interest depends on the residence of the obligor.  Absent exceptions not applicable in the instant case, interest on bonds, notes, or other interest-bearing obligations of noncorporate residents or domestic corporations is treated as income from sources within the United States.  Sec. 861(a)(1). Interest that is not treated as income from sources within the United States pursuant to section 861(a)(1) is treated as income from sources without the United States.  Sec. 862(a)(1).

Generally, interest from foreign corporations is not treated as income from sources within the United States pursuant to section 861(a)(1) and is therefore treated as income from sources without the United States. Sec. 862(a)(1).

### 2. Application of the Character and Source Rules

#### a. Management Fees

Petitioners contend that the management fees received by LTD are personal services income because such fees are compensation for investment services. Petitioners argue that such services included investment advice and related financial services that LTD performed in managing the clients' portfolios in Mexico. Petitioners argue that the persons performing the services were the promoters and advisers working in district offices in Mexico. Petitioners contend that the management fees should be treated as income from sources without the United States because the services relating to the fees were provided in Mexico.

Respondent concedes that the management fees are personal services income because the fees are compensation for investment services. Respondent, however, contends that the management fees should be treated as income from sources within the United States because the services relating to the management fees were provided in San Antonio.

In deciding whether the management fee income is from sources within or from sources without the United States, we must analyze the relationship LTD had with its clients. The primary

document interpreting that relationship is the discretionary authorization, which states that the client is to pay LTD "as full compensation for the services performed hereunder an annual fee". The phrase "services performed hereunder" refers to the four activities that the clients, by signing the discretionary authorization, authorize LTD to perform. Those activities include instructing banks on the disposition of client assets, working with brokers on the disposition of client assets, applying client deposits with LTD to client investments, and paying bills for a client. In sum, the services listed in the discretionary authorization do not include promoters' services in Mexico, as petitioners argue. The four activities for which the management fee was paid all appear to be services that were performed in San Antonio. Accordingly, we hold that the management fee is characterized as compensation for personal services performed in the United States and is treated as income from sources within the United States. Sec. 861(a)(3).

b. Service Fees

(1) U.S. Certificates of Deposit
and Bank Deposits

We must decide two issues: (1) The proper amount of income in issue and (2) the proper characterization of such income. As to the proper amount of income in issue, the parties stipulated to the "Gross Receipts" and the "Direct Costs" relating to LTD's "Interest Income". The "Gross Receipts" included all interest

paid to LTD,[19] including the interest that LTD ultimately paid out to its clients. The "Direct Costs" included, primarily, the interest that LTD paid out to its clients.

Petitioners contest the inclusion of the interest that LTD paid out to its clients in LTD's "Gross Receipts" and "Direct Costs". Petitioners note that respondent imposes no tax on the interest earned by LTD's clients on certificates of deposit purchased in their own name. Additionally, as to respondent's attempt to tax the interest earned on certificates of deposit purchased in LTD's name with the pooled funds of clients, petitioners contend that the distinction in the name of the instrument holder "does not justify the different tax treatment."

Petitioners, relying on Estate of Smith v. Commissioner, 313 F.2d 724 (8th Cir. 1963), affg. in part and revg. in part 33 T.C. 465 (1959), argue that the interest paid by LTD to its clients should not be treated as gross income to LTD. Petitioners note

_____

[19]

Although the parties did not differentiate among the four types of interest income from U.S. certificates of deposit, we observe that there are four types of income earned by LTD from U.S. certificates of deposit and bank deposits: the byte, the basis income, the IFF spread, and the MMA spread. The byte, the basis income, and the IFF spread are income derived from LTD's certificates of deposit operation. U.S. banks paid interest on LTD's certificates of deposit directly to LTD, which held such instruments in its own name. The byte, the basis income, and the IFF spread constitute portions of such interest from U.S. certificates of deposit. The MMA spread, however, is income derived from LTD's bank accounts. The U.S. banks paid interest on LTD's bank account directly to LTD, which held the account in its own name. The MMA spread constituted a portion of such interest from U.S. banks.

that "only the client's principal had been invested." Petitioners argue that the mere act of pooling "did not alter the essential relation among LTD, its clients and the clients' funds." Finally, petitioners argue that "LTD did not become an owner, with the client, in the * * * [certificate of deposit] purchased." In sum, petitioners argue that all interest payments are bifurcated: the portion retained by LTD was compensation for services, and the portion received by LTD's clients was interest income to the clients themselves and not to LTD.

As to the characterization of the "Interest Income", petitioners contend that the income is personal services income. Petitioners note that the income represents the portion of the interest earned on pooled investment funds that was retained by LTD pursuant to the discretionary authorization. Accordingly, petitioners, relying on Estate of Smith, argue that the character of such income is compensation for services and not a portion of the investment income of the pooled funds. Petitioners contend that the investment management services that produced such income were performed in Mexico, and therefore such income should be treated as income from sources without the United States.

Respondent's primary argument is that the character of the income is interest income from U.S. certificates of deposit and bank deposits. Because such interest derived from a U.S. obligor, respondent contends that, pursuant to the interest source rules, the interest is treated as income from sources

within the United States.  Alternatively, respondent argues that the character of the income is personal services income attributable to management activities performed in the United States and therefore constitutes personal services income from sources within the United States.

In Estate of Smith v. Commissioner, 33 T.C. 465 (1959), Longstreet-Abbott & Co. (LACO), a commodities trading advisor that was a partnership, offered its clients two investment opportunities.  The first type of investment was an "Individual Trading Account" for which LACO purchased and sold, with capital furnished by the client, commodity futures and spot commodities in the name of the client.  The second type of investment was a common "fund" out of which LACO purchased and sold, with capital furnished by several clients and pooled by LACO, commodity futures and spot commodities in the name of the "fund".  As its compensation, LACO received a portion of the trading profit.

LACO "actively solicited individuals to participate in the Funds" that it managed.  Id. at 485.  LACO's "only expectation of income was from the successful management of other individuals' moneys."  Id.  LACO invested "no money of its own."  Id.  LACO "only had authority to manage the Funds and to withdraw a certain share of the profits" and was not permitted to withdraw any portion of an investor's cash contribution.  Id.  Finally, LACO "had no economic interest in the commodity futures or spot commodities as such, but only an interest in a share of the

profits which might be realized from the trading of the commodities."  Id. at 485-486.

Based on those factors, we concluded:  "It seems clear that LACO was receiving a share of the profits in return for its management services, and the gains it realized are ordinary income both to LACO and to * * * [the taxpayers] composing LACO." Id. at 486.  We then applied a similar analysis with regard to the Individual Trading Accounts and sustained respondent's determination that LACO's share of the profits was compensation for services.  Id. at 487.  The Court of Appeals affirmed our ruling on that issue "both with respect to the individual investor accounts and the funds".  313 F.2d at 737.

In the instant case, as to the proper amount of interest income, we agree with petitioners that the interest earned by LTD's clients is not income to LTD.  We conclude that LTD functioned in a manner not unlike LACO in Estate of Smith, where LACO, as the investment manager, was taxed only on its "share of the profits", not on the entire gains derived from the trading. 33 T.C. at 486.  In the instant case, LTD purchased the certificates of deposit or made bank deposits in its own name as attorney in fact for its clients.  LTD invested little, if any, money of its own.  LTD had no economic interest in the certificates of deposit or bank deposits and only had an interest in the spread between the rates earned from the investments and the rates paid by LTD to its clients.  Upon collecting the

interest from either certificates of deposit or bank deposits on behalf of its clients, LTD paid to its clients their respective portions of the interest and retained only LTD's spread. Accordingly, we conclude that LTD should include in its income only the amounts that it retained as interest spreads from certificates of deposit and bank deposits.

As to the character of the income, we agree with petitioners that LTD's portion of the interest income is compensation for services. We conclude that LTD functioned in a manner not unlike LACO in Estate of Smith. LTD placed clients' funds in certificates of deposit and bank deposits in the client's own name and in LTD's name. LTD's only expectation of income was from the management of its clients' moneys, for which it received a management fee, as discussed supra pp. 100-101. The rate spreads that LTD retained also derived from placing its clients' funds in certificates of deposit and bank deposits. Accordingly, we conclude that such income was compensation for services.

Based on the record, we believe that the activities from which LTD earned its interest spreads were services that were performed in San Antonio. Petitioners argue that the investment management services performed in Mexico (i.e., the counseling of clients) produced the income in issue. We disagree. As we view the evidence in the instant case, we conclude that the most important activity in producing the interest spread income was the actual placing of funds in the certificates of deposit or the

bank deposits.  LTD's client clearing account, from which LTD placed clients' funds in certificates of deposit or bank deposits, was located in Frost Bank in San Antonio.  Accordingly, we hold that the income from U.S. certificates of deposit and bank deposits is characterized as compensation for personal services performed in the United States and is treated as income from sources within the United States.  Sec. 861(a)(3).

### (2)  Non-U.S. Certificates of Deposit and Term Deposits

As with LTD's U.S. investment program, we must decide two issues regarding LTD's non-U.S. investment program:  (1) The proper amount of income in issue and (2) the proper characterization of such income.  As to the proper amount of income in issue, based on our analysis regarding LTD's U.S. investment program, we similarly conclude that LTD should include in its income only the amounts that it retained as interest spreads from the non-U.S. certificates of deposit and term deposits.

As to the character of the income, petitioners contend that the character of the income earned by LTD from non-U.S. certificates of deposit and term deposits is interest income which should be treated as income from sources without the United States.  Respondent, however, does not specifically address either the character or the source of the income earned from non-U.S. certificates of deposit or term deposits.  Respondent merely

argues that petitioners have failed to prove that the interest income is foreign source income.

We conclude that LTD's portion of the interest income is compensation for services. The non-U.S. investment program consisted of purchases of certificates of deposit and term deposits in banks outside the United States. LTD operated the non-U.S. investment program in a manner similar to its U.S. investment program. Accordingly, we apply our analysis of the U.S. program, supra pp. 101-107, to the non-U.S. program and conclude that the spread income was compensation for services.

We believe that the activities from which LTD earned its interest spreads were services that were performed in San Antonio. We conclude that the most important activity in producing the interest spread income was the actual placing of funds in the certificates of deposit or the term deposits. LTD's client clearing account, from which LTD placed clients' funds in certificates of deposit or term deposits, was located in Frost Bank in San Antonio. Accordingly, we hold that the income from non-U.S. certificates of deposit and term deposits is characterized as compensation for personal services performed in the United States and is treated as income from sources within the United States. Sec. 861(a)(3).

### (3) Pace Investments

Petitioners contend that the Pace investments were purchases

of certificates of deposit issued by foreign branches of Mexican banks and that the character of the Pace investments income is therefore interest income.  Petitioners contend that the Pace investments income is from sources without the United States because the obligors were foreign.

Respondent does not specifically address either the character or the source of the Pace investments income. Respondent merely argues that petitioners have failed to prove that the income is from a foreign source.

Petitioners' contention that the Pace investments were merely purchases of certificates of deposit issued by foreign branches of Mexican banks is unsupported by the record.  We believe that the Pace investments constituted a specialized mechanism for clients to draw upon their unused lines of credit. The income that LTD earned from its Pace investments was the excess of (1) the sum of the interest earned from the Mexican banks and the fees earned from the clients, over (2) the interest paid to the clients as their stated rate of return.  We conclude that such income represented compensation for services rendered in San Antonio in arranging the Pace investments.  Accordingly, we hold that the Pace investments income is characterized as compensation for personal services performed in the United States and is treated as income from sources within the United States. Sec. 861(a)(3).

c.    Interest Income

(1)    Loans

Petitioners do not address either the character or the source of the income earned by LTD on its loans to clients and Mexican corporations.

Respondent contends that the character of the income from LTD's loans is interest income.  Respondent argues that the income is attributable to interest on loans made to LTD's clients and Mexican corporations.  Because the debtors resided without the United States, respondent contends that the interest is treated as income from sources without the United States.

We believe that LTD's interest from loans was all paid by Mexican individuals and corporations.  Accordingly, we hold that the interest is characterized as interest from non-U.S. obligors and is treated as income from sources without the United States. Sec. 862(a)(1).

(2)    MMA II

Petitioners contend that LTD's MMA II income was interest earned on client funds placed in non-U.S. bank deposits, thus constituting income from sources without the United States. Respondent agrees that the MMA II income was interest. Respondent, however, argues that petitioners have failed to prove that the interest came from a foreign source.

We find that, in the MMA II program, clients placed funds with LTD and earned interest on such funds.  Mexican corporations

borrowed such funds from LTD, which charged them interest. LTD's MMA II income derived from the difference between the interest that was charged and the interest that was paid out. Accordingly, we hold that the MMA II income is characterized as interest from non-U.S. obligors and is treated as income from sources without the United States. Sec. 862(a)(1).

d.    Currency Exchange Transactions
      Income (Currency Swaps
      and Currency Transactions)

Without distinguishing between the two types of currency transactions, see supra pp. 41-43, petitioners contend that the income earned by LTD from those transactions was compensation for personal services rendered entirely in Mexico. Respondent contends that the income was from personal services, or in the alternative, was gain from the sale of personal property, and in either event had its source solely within the United States.

We conclude that LTD's income from currency transactions was compensation for the performance of personal services rather than gain from the purchases and sales of personal property. LTD functioned as an intermediary, working in San Antonio and in Mexico to effect its clients' currency transactions. As to the currency swaps, LTD's income derived from commissions from Bank of America and United States Trust. As to the currency transactions, LTD's income derived from the fees it charged its clients for effecting the transactions. Accordingly, we hold that the currency exchange transactions income is characterized

as compensation for personal services performed both in the United States and outside the United States and is treated as income from sources partly within and partly without the United States. Sec. 863(b).

Petitioners, however, did not provide an apportionment scheme for the currency exchange transactions income. The Deloitte workpapers disclose that two income items derived directly from the Guadalajara office's currency operations. Accordingly, we hold that, pursuant to section 863(b), each of the Guadalajara income items is treated as income from sources without the United States, and the remaining currency exchange transactions income is treated as income from sources within the United States.

### e. Sales Commissions and Fees

#### (1) Currency Fund, FEIM Fund, and Matric Fund

Petitioners contend that the character of the commissions from the funds is compensation for investment services. Petitioners contend that the commissions should be treated as income from without the United States because sales of each such fund took place in Mexico.

Respondent contends that the commissions should be treated as income from sources within the United States because the investment services relating to each such fund were provided in San Antonio.

We conclude that LTD's Currency Fund commission is compensation for investment services. As stated in its promotional material, LTD acted as "Manager" of the Currency Fund. The services that LTD rendered in relation to the Currency Fund included accepting clients' deposits, opening an account with a foreign bank, and issuing clients periodic statements. All of such activities were performed through the office in San Antonio. We disagree with petitioners' contention that only the selling of the fund is to be examined in deciding the source of the commission income. LTD provided many services beyond the initial sale of the fund. We conclude that LTD's commission was compensation for providing those services, not for selling the fund. In sum, LTD's management of the Currency Fund entailed performing personal services in San Antonio. Accordingly, we hold that LTD's Currency Fund commission is characterized as compensation for personal services performed in the United States and is treated as income from sources within the United States. Sec. 861(a)(3).

We similarly conclude that LTD's FEIM Fund commission is compensation for investment services. The services that LTD rendered in relation to the FEIM Fund included accepting clients' deposits, transferring those deposits to Merrill Lynch, and issuing periodic statements to clients. All of those activities were performed through the office in San Antonio. We disagree with petitioners' contention that only the selling of the fund is

to be examined in deciding the source of the commission income. LTD provided many services beyond the initial sale of the fund. We conclude that LTD's commission was compensation for providing those services, not for selling the fund. In sum, LTD's management of the FEIM Fund entailed performing personal services in San Antonio. Accordingly, we hold that LTD's FEIM Fund commission is characterized as compensation for personal services performed in the United States and is treated as income from sources within the United States. Sec. 861(a)(3).

We similarly conclude that LTD's Matric Fund commission, initiation fee, and consulting fee are compensation for investment services. The services that LTD rendered in relation to the Matric Fund included handling the paperwork and general administration, and administering the interest payments to the investors. Clients placed their commitments with LTD through the San Antonio office. LTD handled all paperwork regarding the Matric Fund accrual of interest in the San Antonio office. We disagree with petitioners' contention that only the selling of the fund is to be examined in deciding the source of the commission income. LTD provided many services beyond the initial sale of the fund. We conclude that LTD's commission was compensation for providing such services, not for selling the fund. In sum, LTD's management of the Matric Fund entailed performing personal services in San Antonio. Accordingly, we hold that LTD's Matric Fund income is characterized as

compensation for personal services performed in the United States and is treated as income from sources within the United States. Sec. 861(a)(3).

### (2)  Inversat Fund

Petitioners contend that the character of the Inversat Fund commission is personal services income because such commission is compensation for investment services.  Petitioners contend that the commission should be treated as income from sources without the United States because the services relating to the Inversat Fund commission were provided in Mexico.  Petitioners do not specify the services relating to the Inversat Fund that are relevant for sourcing purposes.

Respondent contends that the commission should be treated as income from sources within the United States.

We conclude that LTD's Inversat Fund commission was compensation for investment services.  The services that LTD rendered in relation to the Inversat Fund included accepting clients' deposits, transferring the funds from Inversat Fund to Inversat REIT, and general investment management, all of which were performed through the office in San Antonio.  In sum, LTD's management of the Inversat Fund entailed performing personal services in San Antonio.  Accordingly, we hold that LTD's Inversat Fund commission is characterized as compensation for personal services performed in the United States and is treated as income from sources within the United States.  Sec. 861(a)(3).

(3)  <u>TVA</u>

Petitioners contend that the character of the TVA commission is personal services income because such commission is compensation for investment services.  Petitioners contend that the commission should be treated as income from without the United States because the services relating to the TVA project were provided in Mexico.  Petitioners argue that the services relating to the TVA project relevant for sourcing purposes include only the underwriting activities.  Petitioners maintain that the TVA project's only connection to the United States was that INC recorded money going in or out of a client account.

Respondent contends that the commission should be treated as income from sources within the United States because the investment services relating to the TVA project were provided in San Antonio.

The TVA commission includes three types of income, and we analyze each type individually.  As to the first type of income, we conclude that LTD's 5-percent commission on the total funds raised was compensation for personal services.  The services that LTD rendered in relation to the 5-percent commission included formulating the prospectus and executing the marketing program to solicit venture capital.  We conclude that such services were performed in Mexico.  In sum, LTD's activities relating to the 5-percent commission consisted of performing personal services in

Mexico.  Accordingly, we hold that LTD's 5-percent commission is characterized as compensation for personal services performed outside the United States and is treated as income from sources without the United States.  Sec. 862(a)(3).

As to the second type of income, we conclude that LTD's monthly administration fee is compensation for personal services. The services that LTD rendered in relation to the fee included administering the funds raised in the capital call.  We conclude that such services were performed in San Antonio.  In sum, LTD's activities relating to the monthly administration fee consisted of performing personal services in San Antonio.  Accordingly, we hold that LTD's monthly administration fee is characterized as compensation for personal services performed in the United States and is treated as income from sources within the United States. Sec. 861(a)(3).

As to the third type of income, we conclude that LTD's percentage commission charged to certain clients purchasing units in the trust is compensation for personal services.  The services that LTD rendered in relation to the percentage commission from certain clients included formulating the prospectus and executing the marketing program to solicit venture capital.  We conclude that such services were performed in Mexico.  In sum, LTD's activities relating to the percentage commission consisted of performing personal services in Mexico.  Accordingly, we hold that LTD's percentage commission is characterized as compensation

for personal services performed outside the United States and is treated as income from sources without the United States.  Sec. 862(a)(3).

(4)  Client Incorporation and Trust
Creation, Legal Advice
Income, and Letters of Credit

Respondent contends that the character of the client incorporation and trust creation fees, the legal advice income, and the letters of credit fees are personal services income. Respondent contends that such income items should be treated as income from sources within the United States because the investment services relating to the income were provided in San Antonio.

Petitioners do not dispute respondent's contentions. Consequently, we treat petitioners as having conceded that such income is characterized as compensation for personal services income performed in the United States and is treated as income from sources within the United States.  Sec. 861(a)(3).

(5)  Foreign Exchange Investments

We analyze LTD's foreign exchange investments income in a manner similar to that in the currency exchange transactions section, supra pp. 110-112.

Petitioners, however, did not provide any basis for apportionment of the foreign exchange investments income. Accordingly, we sustain respondent's determinations that such income is characterized as compensation for personal services

performed in the United States and is treated entirely as income from sources within the United States.  Sec. 861(a)(3).

> (6)  Treasury Bills, Wires and Checks,
> Gold and Silver Futures, Project
> Income, Income from Investments,
> Other Commission Income, Other
> Commissions and Fees,
> and Other Income

Petitioners do not specifically address either the character or the source of such income items.  Consequently, we treat petitioners as having conceded such items.  Accordingly, we sustain respondent's determinations that the income in each such category is characterized as compensation for personal services income performed in the United States and is treated as income from sources within the United States.  Sec. 861(a)(3).

### 3.  Effectively Connected Income Rules

#### a.  Introduction to the Rules

A foreign corporation engaged in trade or business within the United States is taxed on income which is "effectively connected with the conduct of a trade or business within the United States" (hereinafter effectively connected).  Sec. 882(a)(1).  For this purpose, income from sources within the United States generally is segregated between two categories, pursuant to section 864(c)(2) and (3).  The income to which section 864(c)(2) applies includes, inter alia, income described in section 871(a)(1), section 871(h), section 881(a), or section

881(c).  Compensation, interest (other than "portfolio" interest), dividends, and other fixed or determinable annual or periodical gains, profits, and income are income items described in section 871(a)(1) and section 881(a) and are therefore subject to the section 864(c)(2) rules.

Section 864(c)(2) provides two general "factors" to consider in determining whether income from sources within the United States falling under its purview is effectively connected:  (1) Whether the income is derived from assets used in or held for use in the conduct of the trade or business, sec. 864(c)(2)(A) (asset-use test), and (2) whether the activities of the trade or business were a material factor in the realization of the income, sec. 864(c)(2)(B) (business-activities test).  A special regime applies pursuant to section 864(c)(2), however, in determining whether the income of taxpayers "engaged in the active conduct of a banking, financing, or similar business in the United States" is effectively connected.  Sec. 1.864-4(c)(5), Income Tax Regs.

All income from sources within the United States other than that covered by section 864(c)(2) or section 1.864-4(c)(5), Income Tax Regs., falls into the residual category of section 864(c)(3) and is treated as effectively connected with any U.S. trade or business conducted by the taxpayer (regardless of whether an actual connection exists).

Certain income from sources without the United States is also deemed effectively connected if such income is attributable

to an office or other fixed place of business within the United States.  Sec. 864(c)(4)(B).  Excepting foreign source income deemed effectively connected pursuant to, inter alia, section 864(c)(4)(B), no foreign source income is treated as effectively connected.  Sec. 864(c)(4)(A).

      b.    <u>Section 1.864-4(c)(5), Income</u>
            <u>Tax Regs., Banking Activity Test</u>

Once a taxpayer is determined to be engaged in the active conduct of a banking business within the meaning of section 1.864-4(c)(5)(i), Income Tax Regs., set forth <u>supra</u> p. 64, then the income of the taxpayer from sources within the United States is placed in one of three categories, each of which provides an effectively connected income test.

In the first category of income,

> any dividends or interest from stocks or securities, or any gain or loss from the sale or exchange of stocks or securities which are capital assets, which is from sources within the United States and derived by a nonresident alien individual or a foreign corporation in the active conduct during the taxable year of such banking, financing, or similar business in the United States shall be treated as effectively connected with the conduct of that business * * * [Sec. 1.864-4(c)(5)(ii), Income Tax Regs.]

only if two conditions are met:  (1) "the stocks or securities giving rise to such income, gain, or loss are attributable to the U.S. office through which such business is carried on", and (2) the stocks or securities either (a) were acquired in one of three specified ways, or (b) consist of one of three specified types of securities.  <u>Id.</u>  A security for purposes of section 1.864-

4(c)(5), Income Tax Regs., is defined as "any bill, note, bond, debenture, or other evidence of indebtedness, or any evidence of an interest in, or right to subscribe to or purchase, any of the foregoing items."  Sec. 1.864-4(c)(5)(v), Income Tax Regs.

In the second category of income, any dividends or interest from stocks or securities, or any gain or loss from the sale or exchange of stocks or securities, which does not meet the conditions described supra and therefore is not treated as effectively connected with the taxpayer's active conduct of a banking, financing or similar business in the United States still "may be effectively connected for the taxable year" with the conduct of another business by the taxpayer in the United States pursuant to either the asset-use test or the business-activities test.  Sec. 1.864-4(c)(5)(vi)(a), Income Tax Regs.  In the last category of income, any income, gain, or loss from sources within the United States (other than dividends or interest from, or gain or loss from the sale or exchange of, stocks or securities) is determined to be effectively connected pursuant to either the asset-use test or business-activities test.  Sec. 1.864-4(c)(5)(vi)(b), Income Tax Regs.

c.   Section 864(c)(2)(A) Asset-use Test

The Code provides that one factor to consider in determining whether income described in section 864(c)(2) is effectively

connected with a U.S. trade or business is whether "the income, gain, or loss is derived from assets used in or held for use in the conduct of such trade or business" (asset-use test). Sec. 864(c)(2)(A). Additionally, the Code provides that "due regard shall be given to whether or not such asset or such income, gain, or loss was accounted for through such trade or business." Sec. 864(c)(2). The regulations provide that the asset-use test ordinarily applies "in making a determination with respect to income, gain, or loss of a passive type where the trade or business activities as such do not give rise directly to the realization of the income, gain, or loss." Sec. 1.864-4(c)(2)(i), Income Tax Regs. The regulations state that the test is "of primary significance where, for example, interest or dividend income is derived from sources within the United States by a nonresident alien individual or foreign corporation that is engaged in the business of manufacturing or selling goods in the United States." Id.

> d. Section 864(c)(2)(B)
>    Business-Activities Test

The Code provides that another factor to consider in determining whether income is effectively connected to a U.S. trade or business is whether "the activities of such trade or business were a material factor in the realization of the income, gain, or loss" (business-activities test). Sec. 864(c)(2)(B). Additionally, the Code provides that "due regard shall be given

to whether or not such asset or such income, gain, or loss was accounted for through such trade or business."  Sec. 864(c)(2). The regulations provide that the business-activities test is of primary significance in cases in which:

> (a) dividends or interest are derived by a dealer in stocks or securities, (b) gain or loss is derived from the sale or exchange of capital assets in the active conduct of a trade or business by an investment company, (c) royalties are derived in the active conduct of a business consisting of the licensing of patents or similar intangible property, or (d) service fees are derived in the active conduct of a servicing business.  * * * [Sec. 1.864-4(c)(3)(i), Income Tax Regs.]

The regulations, however, add that

> In applying the business-activities test, activities relating to the management of investment portfolios shall not be treated as activities of the trade or business conducted in the United States unless the maintenance of the investments constitutes the principal activity of that trade or business.  * * * [Id.]

> e.    Section 864(c)(4)(B) Rules for Income
>       From Sources Without the United States

Once a taxpayer is determined to be engaged in the active conduct of a banking, financing, or similar business within the meaning of section 1.864-5(b)(2)(i), Income Tax Regs.,[20] then all dividends and interest from sources without the United States are

---

[20]

The test articulated in sec. 1.864-4(c)(5)(i), Income Tax Regs., regarding whether a foreign corporation is engaged in the active conduct of "a banking, financing, or similar business in the United States" is to be applied.  Sec. 1.864-5(b)(2)(i), Income Tax Regs.

placed in one of three categories, each of which provides an effectively connected income test.  In the first category of income, any dividends or interest from stocks or securities, or any gain or loss from the sale of exchange of stocks or securities which are capital assets, which is from sources without the United States and derived by a nonresident alien individual or a foreign corporation in the active conduct during the taxable year of a banking, financing, or similar business in the United States, shall be treated as effectively connected under the same principles of section 1.864-4(c)(5)(ii), Income Tax Regs., that are applied to U.S. source dividends or interest derived in the active conduct of a banking, financing, or similar business in the United States.  Sec. 1.864-6(b)(2)(ii)(b), Income Tax Regs.  Accordingly, such foreign source dividends, interest, gain, or loss from stocks or securities are treated as effectively connected income only if two conditions are met:  (1) "the stocks or securities giving rise to such income are * * * attributable to the U.S. office through which such [banking, financing, or similar] business is carried on", and (2) the stocks or securities either (a) were acquired in one of three ways, or (b) consist of one of three types of securities.  Sec. 1.864-4(c)(5)(ii), Income Tax Regs.

In the second category of income, any dividends, interest, gain, or loss from stocks or securities which does not meet the

conditions described <u>supra</u> and therefore is not treated as effectively connected with the taxpayer's active conduct of a banking, financing or similar business in the United States, still "may be effectively connected * * * [pursuant to section 1.864-6(b)(2)(ii)(<u>a</u>), Income Tax Regs.] for the taxable year * * * with the conduct by such taxpayer of a trade or business in the United States which consists of trading in stocks or securities for the taxpayer's own account."  Sec. 1.864-6(b)(2)(ii)(<u>d</u>)(<u>1</u>), Income Tax Regs.

The last category of income consists of "dividends or interest from sources without the United States * * * derived in the active conduct of a banking, financing, or similar business in the United States" other than dividends or interest from, or gain or loss from the sale or exchange of, stocks or securities described in the first category <u>supra</u> pp. 123-124.  Sec. 1.864-6(b)(2)(ii)(<u>d</u>)(<u>2</u>), Income Tax Regs.  That category of dividends and interest is subject to the same requirements as dividends and interest of a taxpayer not engaged in the active conduct of a banking, financing, or similar business.  <u>Id.</u>  Accordingly, the dividends or interest is treated as effectively connected if the taxpayer has "an office or other fixed place of business within the United States to which such * * * [dividends or interest is] attributable."  Sec. 864(c)(4)(B); see sec. 1.864-6(b)(2)(ii)(<u>a</u>), Income Tax Regs.

For purposes of section 864(c)(4)(B), three rules apply in determining whether the taxpayer has "an office or other fixed place of business within the United States to which such income, gain, or loss is attributable". Sec. 864(c)(5).

The first rule is:

in determining whether a nonresident alien individual or a foreign corporation has an office or other fixed place of business, an office or other fixed place of business of an agent shall be disregarded unless such agent (i) has the authority to negotiate and conclude contracts in the name of the nonresident alien individual or foreign corporation and regularly exercises that authority or has a stock or merchandise from which he regularly fills orders on behalf of such individual or foreign corporation, and (ii) is not a general commission agent, broker, or other agent of independent status acting in the ordinary course of his business. * * * [Sec. 864(c)(5)(A).]

The regulations promulgated thereunder are set forth supra pp. 69-72.

The second rule is:

income, gain, or loss shall not be considered as attributable to an office or other fixed place of business within the U.S. unless such office or fixed place of business is a material factor in the production of such income, gain or loss and such office or fixed place of business regularly carries on activities of the type from which such income, gain, or loss is derived. * * * [Sec. 864(c)(5)(B)]

See also sec. 1.864-6(b)(1), Income Tax Regs. Additionally, the income, gain, or loss must be "realized in the ordinary course of the trade or business carried on through that office or other fixed place of business." Sec. 1.864-6(b)(1), Income Tax Regs.

The regulations provide guidance in applying the material

factor test to specific classes of income.  Sec. 1.864-6(b)(2),

Income Tax Regs.  For dividends or interest, or gains or losses

from the sale or exchange of certain stocks or securities, an

office or other fixed place of business is considered a material

factor in the realization of such income, gain, or loss:

> if the office or other fixed place of business either
> actively participates in soliciting, negotiating, or
> performing other activities required to arrange, the
> issue, acquisition, sale, or exchange, of the asset
> from which such income, gain, or loss is derived or
> performs significant services incident to such issue,
> acquisition, sale, or exchange.  * * * [Sec. 1.864-
> 6(b)(2)(ii), Income Tax Regs.]

An office or other fixed place of business in the United States

is not considered to be a material factor in the realization of

income, gain, or loss:

> merely because the office or other fixed place of
> business conducts one or more of the following
> activities:  (1) collects or accounts for the
> dividends, interest, gains, or losses, (2) exercises
> general supervision over the activities of the persons
> directly responsible for carrying on the activities or
> services described in the immediately preceding
> sentence, (3) performs merely clerical functions
> incident to the issue, acquisition, sale, or exchange,
> or (4) exercises final approval over the execution of
> the issue, acquisition, sale, or exchange.  * * * [Sec.
> 1.864-6(b)(2)(ii)(a), Income Tax Regs.]

The third rule in pertinent part is that "the income, gain,

or loss which shall be attributable to an office or other fixed

place of business within the United States shall be the income,

gain, or loss properly allocable thereto."  Sec. 864(c)(5)(C).

The regulation thereunder provides no definition of the term

"properly allocable".  Instead, the regulation provides the general guideline that if an office or other fixed place of business is "a material factor in the realization for that year of an item of income, gain, or loss * * * such item of income, gain, or loss shall be considered to be allocable in its entirety to that office or other fixed place of business."  Sec. 1.864-6(c)(1), Income Tax Regs.

Finally, any foreign source income initially deemed effectively connected shall not be treated as effectively connected if such income, assuming it were derived by the taxpayer from sources within the United States for the taxable year, "would not be treated under § 1.864-4 as effectively connected for the taxable year with the conduct of a trade or business in the United States."  Sec. 1.864-5(a), Income Tax Regs.  In other words, foreign source income deemed effectively connected pursuant to, inter alia, section 864(c)(4)(B) must also meet the applicable effectively connected income tests of section 1.864-4, Income Tax Regs., i.e., the asset-use test, the business-activities test, or the banking activity test, as if such income were from sources within United States.

4.   Application of the Effectively
     Connected Income Rules

We have held, supra p. 98, that LTD was "engaged in the active conduct of a banking, financing, or similar business in the United States" within the meaning of section 1.864-

4(c)(5)(i), Income Tax Regs. Because section 1.864-5(b)(2)(i), Income Tax Regs., applies the test articulated in section 1.864-4(c)(5)(i), Income Tax Regs, we also hold that LTD was "engaged in the active conduct of a banking, financing, or similar business in the United States" within the meaning of section 1.864-5(b)(2)(i), Income Tax Regs. Accordingly, we apply the special effectively connected income rules for a foreign corporation considered to be so engaged.

### a. Management Fees

Petitioners contend that the management fee is income from sources without the United States. Petitioners contend that such fee is not effectively connected income because it is not one of the types of foreign source income that is deemed effectively connected income pursuant to section 864(c)(4)(B) or (C).

Respondent contends that the management fee is income from sources within the United States. Respondent applies the business-activities test only by implication and contends that the fee is effectively connected income.

We have held, supra p. 101, that the management fee is characterized as compensation for personal services and is treated as income from sources within the United States. Accordingly, as petitioners' effectively connected income argument presumes foreign source income, we find that argument to have no merit. Although respondent applies the business-

activities test only by implication, we are convinced that the test is properly applied to the management fee.

LTD's management fee is any "income, gain, or loss from sources within the United States" not already described in the first two categories of U.S. source income and, therefore, falls under the third category of U.S. source income of a foreign corporation engaged in the active conduct of a banking, financing, or similar business.  Sec. 1.864-4(c)(5)(vi)(b), Income Tax Regs.  Accordingly, we analyze LTD's management fee pursuant to either the asset-use or business-activities test. Id.

The business-activities test is of primary significance under circumstances, inter alia, where "service fees are derived in the active conduct of a servicing business".  Sec. 1.864-4(c)(3)(i), Income Tax Regs.  LTD's management fee is a service fee derived in the active conduct of a servicing business. Consequently, we apply the business-activities test to decide whether such fee is effectively connected income.

Before applying the business-activities test, however, we must address the exception for activities relating to the management of investment portfolios provided in section 1.864-4(c)(3)(i), Income Tax Regs.  We hold that such exception is inapplicable because the maintenance of investments constitutes the principal activity of LTD's trade or business within the

meaning of section 1.864-4(c)(3)(i), Income Tax Regs.   Although regulations do not define "principal activity" for the purposes of section 1.864-4(c)(3)(i), Income Tax Regs., in interpreting such words, we look to their "ordinary, everyday senses." Soliman v. Commissioner, 506 U.S. 168, 174 (1993), and the cases cited therein.  The term "principal" has been defined to mean "most important, consequential, or influential."  Id. at 174 (quoting Webster's Third New International Dictionary 1802 (1971) and defining "principal place of business" for purposes of the home office deduction pursuant to section 280A(c)(1)).

In the instant case, the "maintenance" of investments, which is equated in section 1.864-4(c)(3)(i), Income Tax Regs., to the "management" of investments, constitutes the "most important, consequential, or influential" activity of LTD's trade or business as seen by both its total activities and total income. Accordingly, we conclude that the "maintenance" of investments constitutes the principal activity of LTD's trade or business within the meaning of section 1.864-4(c)(3)(i), Income Tax Regs. Consequently, we hold that LTD's activities relating to the management of investment portfolios shall be treated as activities of LTD's trade or business conducted in the United States for purposes of applying the business-activities test.

In applying the business-activities test to decide whether the management fee is effectively connected income, we must

consider whether "the activities of such trade or business were a material factor in the realization of the income". Sec. 864(c)(2)(B). We have held, <u>supra</u> p. 98, that LTD was engaged in "trade or business within the United States" pursuant to section 864(b) during its taxable years in issue. The activities of LTD's trade or business relating to the management fee included instructing banks on the disposition of client assets, working with brokers on the disposition of client assets, applying client deposits with LTD to client investments, and paying bills for clients. We conclude that such activities of LTD's trade or business were "a material factor in the realization of the income" within the meaning of section 864(c)(2)(B). We have given due regard to the question of whether such income was accounted for through such trade or business, and we find LTD's management fee to have been accounted for through LTD's trade or business. Sec. 864(c)(2). Consequently, we hold that LTD's management fee is effectively connected income pursuant to section 1.864-4(c)(5)(vi)(<u>b</u>), Income Tax Regs., and section 864(c)(2)(B).

### b. <u>Service Fees</u>

#### (1) U.S. Certificates of Deposit and Bank Deposits

Petitioners contend that the income from U.S. certificates of deposit and bank deposits is personal services income from sources without the United States. Petitioners contend that such

items are not effectively connected income because they do not fall under one of the types of foreign source income which is deemed effectively connected income pursuant to section 864(c)(4)(B) or (C).  Alternatively, petitioners contend that such items, if treated as income from sources within the United States, cannot be effectively connected income because (1) they fail the asset-use test as they were not derived by LTD from assets used in the conduct of trade or business in the United States, and (2) they fail the business-activities test as the activities of any alleged U.S. trade or business of LTD were not a material factor in the realization of the amounts of interest income properly allocable to LTD.

Respondent contends alternatively that the income from the U.S. certificates of deposit and bank deposits is interest income or personal services income from sources within the United States.  Respondent contends that such income items are effectively connected because they pass the business-activities test.  Respondent argues that, as the activities of LTD's U.S. business were a material factor in the realization of the interest items, such items are effectively connected income. Additionally, respondent argues that, if the income from U.S. certificates of deposit and bank deposits is determined not to be effectively connected income, a tax of 30 percent is imposed pursuant to section 881.

We have held, supra pp. 106-107, that LTD's income from U.S. certificates of deposit and bank deposits is characterized as compensation for personal services and is treated as income from sources within the United States.  Accordingly, as petitioners' first effectively connected income argument presumes foreign source income, we find that argument to have no merit.  Additionally, because we apply the business-activities test, we need not address petitioners' arguments regarding the asset-use test.

LTD's income from U.S. certificates of deposit and bank deposits is any "income, gain, or loss from sources within the United States" not already described in the first two categories of U.S. source income and, therefore, falls under the third category of U.S. source income of a foreign corporation engaged in the active conduct of a banking, financing, or similar business.  Sec. 1.864-4(c)(5)(vi)(b), Income Tax Regs.  Accordingly, we analyze LTD's income from U.S. certificates of deposit and bank deposits pursuant to either the asset-use or business-activities test.  Id.

The business-activities test is of primary significance under circumstances, inter alia, where "service fees are derived in the active conduct of a servicing business".  Sec. 1.864-4(c)(3)(i), Income Tax Regs.  LTD's income from U.S. certificates of deposit and bank deposits consists of service fees derived in

the active conduct of a servicing business.  Consequently, we apply the business-activities test to decide whether such income is effectively connected income.

Before applying the business-activities test, however, we must address the exception for activities relating to the management of investment portfolios provided in section 1.864-4(c)(3)(i), Income Tax Regs.  We have held, supra pp. 130-131, that the investment portfolio management exception is inapplicable and, consequently, that LTD's activities relating to the management of investment portfolios shall be treated as activities of LTD's trade or business conducted in the United States for purposes of applying the business-activities test.

In applying the business-activities test to decide whether LTD's income from U.S. certificates of deposit and bank deposits is effectively connected income, we must consider whether "the activities of such trade or business were a material factor in the realization of the income".  Sec. 864(c)(2)(B).  We have held, supra p. 98, that LTD was engaged in "trade or business within the United States" pursuant to section 864(b) during its taxable years in issue.  The activities of LTD's trade or business relating to its income from U.S. certificates of deposit and bank deposits included receiving clients' funds, depositing the funds in the client clearing account, either purchasing a certificate of deposit from a U.S. bank or keeping the funds in

the client clearing account, and maintaining records of LTD's and its clients' positions with respect to the investments or deposits. We conclude that such activities of LTD's trade or business were "a material factor in the realization of the income" within the meaning of section 864(c)(2)(B). We have given due regard to the question of whether such income was accounted for through such trade or business, and we find LTD's income from U.S. certificates of deposit and bank deposits to have been accounted for through LTD's trade or business. Sec. 864(c)(2). Consequently, we hold that LTD's income from U.S. certificates of deposit and bank deposits is effectively connected income pursuant to section 1.864-4(c)(5)(vi)(b), Income Tax Regs., and section 864(c)(2)(B).

### (2) Non-U.S. Certificates of Deposit and Term Deposits

Petitioners contend that the income from non-U.S. investments and term deposits is from sources without the United States. Petitioners contend that such income is not effectively connected income because LTD was not engaged in the active conduct of a banking, financing, or similar business in the United States, its principal business was not trading in stock or securities for its own account, and it did not have an office in the United States to which such income is attributable.

Respondent contends that the income from non-U.S. investments and term deposits is from sources within the United

States.  Respondent contends that such income is effectively connected income pursuant to the business-activities test because the activities of LTD's U.S. business were a material factor in the realization of the income.

We have held, supra p. 108, that the income from non-U.S. certificates of deposit and term deposits is characterized as compensation for services and is treated as income from sources within the United States.  Accordingly, as petitioners' effectively connected income argument presumes foreign source income, we find that argument to have no merit.

LTD's income from non-U.S. certificates of deposit and term deposits is any "income, gain, or loss from sources within the United States" not already described in the first two categories of U.S. source income and, therefore, falls under the third category of U.S. source income of a foreign corporation engaged in the active conduct of a banking, financing, or similar business.  Sec. 1.864-4(c)(5)(vi)(b), Income Tax Regs. Accordingly, we analyze LTD's income from non-U.S. certificates of deposit and term deposits pursuant to either the asset-use or business-activities test.  Id.

The business-activities test is of primary significance under circumstances, inter alia, where "service fees are derived in the active conduct of a servicing business".  Sec. 1.864-4(c)(3)(i), Income Tax Regs.  LTD's income from non-U.S.

certificates of deposit and term deposits consists of service fees derived in the active conduct of a servicing business. Consequently, we apply the business-activities test to decide whether such interest is effectively connected income.

Before applying the business-activities test, however, we must address the exception for activities relating to the management of investment portfolios provided in section 1.864-4(c)(3)(i), Income Tax Regs.  We have held, supra pp. 130-131, that the investment management portfolio exception is inapplicable and, consequently, that LTD's activities relating to the management of investment portfolios shall be treated as activities of LTD's trade or business conducted in the United States for purposes of applying the business-activities test.

In applying the business-activities test to decide whether LTD's income from non-U.S. certificates of deposit and term deposits is effectively connected income, we must consider whether "the activities of such trade or business were a material factor in the realization of the income".  Sec. 864(c)(2)(B).  We have held, supra p. 98, that LTD was engaged in "trade or business within the United States" pursuant to section 864(b) during its taxable years in issue.  The activities of LTD's trade or business relating to its income from non-U.S. certificates of deposit and term deposits included receiving clients' funds, depositing such funds in the client clearing account, either

purchasing a certificate of deposit from a non-U.S. bank or placing the funds in a non-U.S. term deposits, and maintaining records of LTD's and its clients' positions with respect to such investments or deposits. We conclude that such activities of LTD's trade or business were "a material factor in the realization of the income" within the meaning of section 864(c)(2)(B). We have given due regard to the question of whether such income was accounted for through such trade or business, and we find LTD's income from non-U.S. certificates of deposit and term deposits to have been accounted for through LTD's trade or business. Sec. 864(c)(2). Consequently, we hold that LTD's income from non-U.S. certificates of deposit and term deposits is effectively connected income pursuant to section 1.864-4(c)(5)(vi)(b), Income Tax Regs., and section 864(c)(2)(B).

### (3)  Pace Investments

Petitioners contend that the Pace investments income is income from sources outside the United States. Petitioners contend that the Pace investments income is not effectively connected income because it is not one of the types of foreign source income which is deemed effectively connected income pursuant to section 864(c)(4)(B) or (C).

Respondent does not address the issue of whether the Pace investment income is effectively connected.

We have held, supra p. 109, that the Pace investments income

is characterized as compensation for personal services and is treated as income from sources within the United States. As petitioners' effectively connected income argument presumes foreign source income, we find that argument to have no merit.

LTD's Pace investments income is any "income, gain, or loss from sources within the United States" not already described in the first two categories of U.S. source income and, therefore, falls under the third category of U.S. source income of a foreign corporation engaged in the active conduct of a banking, financing, or similar business. Sec. 1.864-4(c)(5)(vi)(b), Income Tax Regs. Accordingly, we analyze LTD's Pace investment income pursuant to either the asset-use or business-activities test. Id.

The business-activities test is of primary significance under circumstances, inter alia, where "service fees are derived in the active conduct of a servicing business". Sec. 1.864-4(c)(3)(i), Income Tax Regs. LTD's Pace investments income consists of service fees derived in the active conduct of a servicing business. Consequently, we apply the business-activities test to decide whether such fee is effectively connected income.

Before applying the business-activities test, however, we must address the exception for activities relating to the management of investment portfolios provided in section 1.864-

4(c)(3)(i), Income Tax Regs.  We have held, supra pp. 130-131, that the investment management portfolio exception is inapplicable and, consequently, that LTD's activities relating to the management of investment portfolios shall be treated as activities of LTD's trade or business conducted in the United States for purposes of applying the business-activities test.

In applying the business-activities test to decide whether the Pace investments income is effectively connected income, we must consider whether "the activities of such trade or business were a material factor in the realization of the income".  Sec. 864(c)(2)(B).  We have held, supra p. 98, that LTD was engaged in "trade or business within the United States" during its taxable years in issue.  The activities of LTD's trade or business relating to the Pace investments income included raising funds from clients, depositing such funds with Mexican banks, and arranging for clients to draw upon their unused lines of credit. We conclude that such activities of LTD's trade or business were "a material factor in the realization of the income" within the meaning of section 864(c)(2)(B).  We have given due regard to the question of whether such income was accounted for through such trade or business, and we find LTD's Pace investments income to have been accounted for through LTD's trade or business.  Sec. 864(c)(2).  Consequently, we hold that LTD's Pace investments income is effectively connected income pursuant to section 1.864-4(c)(5)(vi)(b), Income Tax Regs., and section 864(c)(2)(B).

c.  Interest Income

(1)  Loans

Petitioners contend that the loan interest is not effectively connected income because the activities occurring in INC's office were not the "material factor" underlying the interest income.  Petitioners argue that, because INC's only role in handling the loans to clients was to note that a loan had been extended and to record the rate agreed between the promoter and client in Mexico, INC's activities do not rise to the level of conducting "a banking, financing, or similar business within the United States" within the meaning of section 1.864-4(c)(5)(i), Income Tax Regs.

Respondent contends that the interest from loans is interest income from sources without the United States.  Respondent contends that such income is effectively connected income because it falls under one of the types of foreign source income that is deemed effectively connected pursuant to section 864(c)(4)(B)(ii).  Additionally, respondent argues that the San Antonio office was a material factor in the production of the interest from loans.

We have held, supra p. 110, that the loan interest is characterized as interest income and is treated as income from sources without the United States.  Because petitioners' effectively connected argument presumes U.S. source income, we find that argument to have no merit.  Additionally, we need not

address petitioners' argument regarding INC because the proper examination is with respect to LTD.

The loan interest is compensation for loans to LTD's clients that LTD made in the active conduct of its trade or business in the United States. Accordingly, the loan interest is "interest" because it is "compensation for the use or forbearance of money." Deputy v. DuPont, 308 U.S. 488, 498 (1940). We have held, supra p. 98, that LTD was "engaged in the active conduct of a banking, financing, or similar business in the United States" within the meaning of section 1.864-4(c)(5)(i), Income Tax Regs. Consequently, we hold that LTD was "engaged in the active conduct of a banking, financing, or similar business within the United States" within the meaning of section 864(c)(4)(B)(ii). Accordingly, the loan interest is interest that is "derived in the active conduct of a banking, financing, or similar business within the United States" within the meaning of section 864(c)(4)(B)(ii).

The loan interest is "interest from sources without the United States" other than interest from stocks or securities and, therefore, falls under the third category of foreign source income of a foreign corporation engaged in the active conduct of a banking, financing, or similar business within the United States. Sec. 1.864-6(b)(2)(ii)(d)(2), Income Tax Regs. Accordingly, in deciding whether such interest is effectively

connected income, we apply the requirements for dividends and interest of a taxpayer not engaged in the active conduct of a banking, financing, or similar business within the United States. Id.  Accordingly, the loan interest is treated as effectively connected if LTD has "an office or other fixed place of business within the United States to which such income * * * is attributable."  Sec. 864(c)(4)(B); see sec. 1.864-6(b)(2)(ii)(a), Income Tax Regs.

The loan interest is attributable to LTD's office or fixed place of business within the meaning of section 864(c)(4)(B) because it satisfies the three tests articulated in section 864(c)(5) and the regulations thereunder.  The first test provides that the office of an agent shall be disregarded unless the agent:

> (i) has the authority to negotiate and conclude contracts in the name of the nonresident alien individual or foreign corporation and regularly exercises that authority or has a stock of merchandise from which he regularly fills orders on behalf of such individual or foreign corporation, and (ii) is not a general commission agent, broker, or other agent of independent status acting in the ordinary course of his business.  * * * [Sec. 864(c)(5)(A)]

See also sec. 1.864-7(d)(1)(i), Income Tax Regs.  As to clause (i), during the years in issue, INC had the authority to negotiate and to conclude contracts in LTD's name and regularly exercised such authority when it purchased the certificates of deposit from banks on LTD's behalf.  As to clause (ii), we have concluded, supra p. 67, that INC was not an "independent agent"

within the meaning of the section 1.864-7(d)(3)(i), Income Tax Regs. Accordingly, INC's office shall not be disregarded in the examination of whether LTD has an office or other fixed place of business for purposes of section 864(c)(4)(B). We have held, supra p. 79, with regard to the exclusion for trading in stocks or securities pursuant to section 864(b)(2)(C) that LTD has "an office or fixed place of business in the United States" within the meaning of section 1.864-7, Income Tax Regs. Consequently, we hold that LTD has "an office or other fixed place of business in the United States" for purposes of section 864(c)(4)(B).

The second test provides that income, gain, or loss is not to be considered as attributable to an office or fixed place of business within the United States unless such office or fixed place of business is a material factor in the production of such income, gain, or loss. Sec. 864(c)(5)(B). The regulations provide that loan interest meets the materiality test if it satisfies either of the following alternative requirements:

> the office or other fixed place of business either actively participates in soliciting, negotiating, or performing other activities required to arrange, the issue, acquisition, sale, or exchange, of the asset from which such income, gain, or loss is derived or performs significant services incident to such issue, acquisition, sale, or exchange. * * * [Sec. 1.864-6(b)(2)(ii), Income Tax Regs.]

The San Antonio office meets both of the alternative requirements. As to the first requirement, the office actively arranged the loan from which the loan interest was derived by

verifying the availability of LTD's funds and then transferring such funds (usually by wire) to the borrowers, who were usually clients. We view the second requirement as providing a less stringent test than the first requirement because it provides only that the office must perform "significant services incident" to the transaction in issue. In the instant case, when the office transferred the funds (usually by wire) to the borrowers per their direction, we conclude that it effected the loans, which was the performance of "significant services incident" to such loans. Additionally, the office did not merely conduct the four types of activities that do not cause an office to be considered a material factor in the realization of income, gain, or loss pursuant to section 1.864-6(b)(2)(ii)(a), Income Tax Regs.; i.e., the San Antonio office did not merely (1) collect the interest, (2) exercise general supervision over the activities of the persons collecting the interest, (3) perform merely clerical functions incident to the loan, or (4) exercise final approval over the execution of the loan. Consequently, we hold that the San Antonio office is a material factor in the production of LTD's loan interest within the meaning of section 864(c)(5)(B).

The third test provides that "the income, gain, or loss which shall be attributable to an office or other fixed place of business within the United States shall be the income, gain, or loss properly allocable thereto". Sec. 864(c)(5)(C). As the San

Antonio office is a material factor in the realization of the loan interest for the taxable years in issue, such income is considered to be allocable in its entirety to the San Antonio office.  Sec. 1.864-6(c)(1), Income Tax Regs.

Accordingly, because LTD satisfies the three tests regarding its office or other fixed place of business, we conclude that its foreign source loan interest is treated as effectively connected income pursuant to section 1.864-6(b)(2)(ii)(d)(2), Income Tax Regs., and section 864(c)(4)(B).

Nonetheless, any foreign source income deemed effectively connected shall not be treated as effectively connected if such income, assuming it were derived by the taxpayer from sources within the United States for the taxable year, would not be treated as effectively connected pursuant to the rules for U.S. source income.  Sec. 1.864-5(a), Income Tax Regs.  Accordingly, we must analyze whether LTD's loan interest, if it were U.S. source income, would be effectively connected income.

LTD's loan interest, if U.S. source, would be any "income, gain, or loss from sources within the United States" not already described in the first two categories of U.S. source income and, therefore, would fall under the third category of U.S. source income of a foreign corporation engaged in the active conduct of a banking, financing, or similar business.  Sec. 1.864-4(c)(5)(vi)(b), Income Tax Regs.  Consequently, we analyze LTD's loan interest pursuant to either the asset-use or business-

activities test.  Id.

Section 1.864-4(c)(3)(i), Income Tax Regs., provides that the business-activities test is of primary significance under circumstances, inter alia, where "dividends or interest are derived by a dealer in stocks or securities" but does not define "a dealer in stocks or securities."  However, section 1.864-2(c)(2)(iv), Income Tax Regs., provides that "a dealer in stocks or securities" is excepted from excluding trading activity from the calculation of whether it is engaged in "trade or business within the United States" pursuant to section 864(b); i.e., the dealer must include trading activity in such calculation.  We have concluded, supra p. 85, with regard to the section 864(b)(2)(A)(ii) exclusion of trading for LTD's trading for its own account, that LTD is "a dealer in stocks or securities" within the meaning of section 1.864-2(c)(2)(iv), Income Tax Regs. Because the two terms appear in the same Code section, we apply the same definition to section 1.864-4(c)(3)(i), Income Tax Regs. Consequently, we hold that LTD is "a dealer in stocks or securities" within the meaning of section 1.864-4(c)(3)(i), Income Tax Regs.

Accordingly, LTD's interest from loans is interest derived by a dealer of stocks or securities within the meaning of section 1.864-4(c)(3)(i), Income Tax Regs.  Consequently, we apply the business-activities test to decide whether such interest is effectively connected income.

Before applying the business-activities test, however, we must address the exception for activities relating to the management of investment portfolios provided in section 1.864-4(c)(3)(i), Income Tax Regs. We have held, supra pp. 130-131, that the investment portfolio management exception is inapplicable and, consequently, that LTD's activities relating to the management of investment portfolios shall be treated as activities of LTD's trade or business conducted in the United States for purposes of applying the business-activities test.

In applying the business-activities test to decide whether the loan interest is effectively connected income, we must consider whether "the activities of such trade or business were a material factor in the realization of the income". Sec. 864(c)(2)(B). We have held, supra p. 98, that LTD was engaged in "trade or business within the United States" pursuant to section 864(b) during its taxable years in issue. The activities of LTD's trade or business relating to the loan interest included receiving clients' funds, lending such funds to other clients, collecting the interest and principal from the loans, and maintaining records of LTD's and the clients' positions with respect to such loans. We conclude that such activities of LTD's trade or business were "a material factor in the realization of the income" within the meaning of section 864(c)(2)(B). We have given due regard to the question of whether such income was accounted for through such trade or business, and we find LTD's

loan interest to have been accounted for through LTD's trade or business.  Sec. 864(c)(2).  Accordingly, we conclude that LTD's loan interest, if it were U.S. source, would be effectively connected income pursuant to section 1.864-4(c)(5)(vi)(b), Income Tax Regs., and section 864(c)(2)(B).  Consequently, we hold that LTD's loan interest is effectively connected income pursuant to section 1.864-6(b)(2)(ii)(d)(2), Income Tax Regs., and section 864(c)(4)(B).

(2)  MMA II

Petitioners contend that the MMA II interest is from sources without the United States.  Petitioners contend that such interest is not effectively connected income because it is not one of the types of foreign source income that is deemed effectively connected income pursuant to section 864(c)(4)(B) or (C).

Respondent contends that the MMA II interest from sources without the United States.  Respondent contends that such foreign source interest is effectively connected income pursuant to section 1.864-4(c)(5)(vi), Income Tax Regs.

We have held, supra p. 110, that the MMA II income is characterized as interest income and is treated as income from sources without the United States.  We believe that respondent incorrectly relies on section 1.864-4(c)(5)(vi), Income Tax Regs., which addresses U.S. source income.

The MMA II interest is compensation for loans to Mexican corporations that LTD made in the active conduct of its trade or business in the United States.  Accordingly, LTD's MMA II is "interest" because it is "compensation for the use or forbearance of money".  Deputy v. DuPont, 308 U.S. at 498.  We have held supra p. 98, that LTD is "engaged in the active conduct of a banking, financing, or similar business within the United States" within the meaning of section 864(c)(4)(B)(ii).  Accordingly, the MMA II interest is "derived in the active conduct of a banking, financing, or similar business within the United States" within the meaning of section 864(c)(4)(B)(ii).

The MMA II interest is "interest from sources without the United States" other than interest from stocks and securities and, therefore, falls under the third category of foreign source income of a foreign corporation engaged in the active conduct of a banking, financing, or similar business in the United States.  Sec. 1.864-6(b)(2)(ii)(d)(2), Income Tax Regs.  Accordingly, in deciding whether such interest is effectively connected income, we apply the requirements for dividends and interest of a taxpayer not engaged in the active conduct of a banking, financing, or similar business in the United States.  Id.  Accordingly, the MMA II interest is treated as effectively connected if LTD has "an office or other fixed place or business within the United States to which such income * * * is

attributable".  Sec. 864(c)(4)(B); see sec. 1.864-6(b)(2)(ii)(a),
Income Tax Regs.

Based upon our analysis of the interest from loans, supra
pp. 142-145, and applying a similar analysis to the MMA II
interest, we hold that the MMA II interest satisfies the three
tests to be applied in deciding whether a taxpayer has "an office
or other fixed place of business within the United States to
which such income, gain, or loss is attributable" within the
meaning of section 864(c)(4)(B).  Consequently, we conclude that
the MMA II income is effectively connected income pursuant to
section 1.864-6(b)(2)(ii)(d)(2), Income Tax Regs., and section
864(c)(4)(B).

Nonetheless, any foreign source income deemed effectively
connected shall not be treated as effectively connected if such
income, assuming it were derived by the taxpayer from sources
within the United States for the taxable year, would not be
treated as effectively connected pursuant to the rules for U.S.
source income.  Sec. 1.864-5(a), Income Tax Regs.  Accordingly,
we must analyze whether LTD's foreign source MMA II income, if it
were U.S. source income, would be effectively connected.

LTD's MMA II interest, if U.S. source, would be any "income,
gain, or loss from sources within the United States" not already
described in the first two categories of U.S. source income and,
therefore, would fall under the third category of U.S. source

income of a foreign corporation engaged in the active conduct of a banking, financing, or similar business. Sec. 1.864-4(c)(5)(vi)(b), Income Tax Regs. Accordingly, we analyze LTD's MMA II interest pursuant to either the asset-use or business-activities test. Id.

We have held, supra pp. 146-147, that LTD is "a dealer in stocks or securities" within the meaning of section 1.864-4(c)(3)(i), Income Tax Regs. Accordingly, LTD's MMA II interest is interest derived by a dealer of stocks or securities within the meaning of section 1.864-4(c)(3)(i), Income Tax Regs. Consequently, we apply the business-activities test to decide whether such interest is effectively connected income.

Before applying the business-activities test, however, we must address the exception for activities relating to the management of investment portfolios provided in section 1.864-4(c)(3)(i), Income Tax Regs. We have held, supra pp. 130-131, that the investment portfolio management exception is inapplicable and, consequently, that LTD's activities relating to the management of investment portfolios shall be treated as activities of LTD's trade or business conducted in the United States for purposes of applying the business-activities test.

In applying the business-activities test to decide whether the MMA II interest is effectively connected income, we must consider whether "the activities of such trade or business were a material factor in the realization of the income". Sec.

864(c)(2)(B).  We have held, <u>supra</u> p. 98, that LTD was engaged in "trade or business within the United States" pursuant to section 864(b) during the taxable years in issue.  The activities of LTD's trade or business relating to the MMA II interest included receiving clients' funds, lending such funds to other clients, collecting the interest and principal from the loans, and maintaining records of LTD's and the clients' positions with respect to the loans.  We conclude that such activities of LTD's trade or business were "a material factor in the realization of the income" within the meaning of section 864(c)(2)(B).  We have given due regard to the question of whether such income was accounted for through such trade or business, and we find LTD's MMA II interest to have been accounted for through LTD's trade or business.  Sec. 864(c)(2).  Accordingly, we conclude that LTD's MMA II interest, if it were U.S. source, would be effectively connected income pursuant to section 1.864-4(c)(5)(vi)(<u>b</u>), Income Tax Regs., and section 864(c)(2)(B).  Consequently, we hold that LTD's MMA II interest is effectively connected income pursuant to section 1.864-6(b)(2)(ii)(<u>d</u>)(<u>2</u>), Income Tax Regs., and section 864(c)(4)(B).

        d.   Currency Exchange Transactions
            Income (Currency Swaps
            <u>and Currency Transactions)</u>

Petitioners contend that the currency exchange transactions income is from sources without the United States.  Petitioners

contend that the income is not effectively connected income because it is not one of the types of foreign source income that is deemed effectively connected income pursuant to section 864(c)(4)(B) or (C).

Respondent contends that the currency exchange transactions income is, alternatively, (1) personal services income or (2) gain from the sale of personal property. Respondent contends that such income is effectively connected income pursuant to the business-activities test because the activities of LTD's U.S. business were a material factor in the realization of the income.

We have held, supra pp. 111-112, that the currency exchange transactions income is characterized as personal services income and is treated as income in part from sources within the United States and in part from sources without the United States. For the portion of income which is foreign source, we agree with petitioners that such income is not effectively connected income because it is not one of the types of foreign source income that is deemed effectively connected income pursuant to section 864(c)(4)(B) or (C). For the portion of income which is U.S. source, we hold that such income is any "income, gain, or loss from sources within the United States" not already described in the first two categories of U.S. source income and, therefore, falls under the third category of U.S. source income of a foreign corporation engaged in the active conduct of a banking,

financing, or similar business.  Sec. 1.864-4(c)(5)(vi)(b),
Income Tax Regs.  Accordingly, we analyze LTD's U.S. source
currency transactions income pursuant to either the asset-use or
business-activities test.  Id.

The business-activities test is of primary significance
under circumstances, inter alia, where "service fees are derived
in the active conduct of a servicing business."  Sec. 1.864-
4(c)(3)(i), Income Tax Regs.  LTD's U.S. source currency
transactions income consists of service fees derived in the
active conduct of a servicing business.  Consequently, we apply
the business-activities test to decide whether such income is
effectively connected income.

Before applying the business-activities test, however, we
must address the exception for activities relating to the
management of investment portfolios provided in section 1.864-
4(c)(3)(i), Income Tax Regs.  We have held, supra pp. 130-131,
that the investment portfolio management exception is
inapplicable and, consequently, that LTD's activities relating to
the management of investment portfolios shall be treated as
activities of LTD's trade or business conducted in the United
States for purposes of applying the business-activities test.

In applying the business-activities test to decide whether
the U.S. source currency transactions income is effectively
connected income, we must consider whether "the activities of
such trade or business were a material factor in the realization

of the income".  Sec. 864(c)(2)(B).  We have held, <u>supra</u> p. 98,
that LTD was engaged in "trade or business within the United
States" pursuant to section 864(b) during its taxable years in
issue.  The activities of LTD's trade or business relating to the
U.S. source currency transactions income included contacting
institutions for exchange rates and depositing or withdrawing
dollars or pesos.  We conclude that such activities of LTD's
trade or business were "a material factor in the realization of
the income" within the meaning of section 864(c)(2)(B).  We have
given due regard to the question of whether such income was
accounted for through such trade or business, and we find LTD's
U.S. source currency transactions income to have been accounted
for through LTD's trade or business.  Sec. 864(c)(2).
Consequently, we hold that LTD's U.S. source currency
transactions income is effectively connected income pursuant to
section 1.864-4(c)(5)(vi)(<u>b</u>), Income Tax Regs., and section
864(c)(2)(B).

        e.    <u>Sales Commissions and Fees</u>

    We examine all of LTD's income from commissions and fees
together, except for the foreign source TVA commissions, because
of the similarity of the services provided by LTD in earning such
commissions and fees.  Petitioners and respondent provide similar
arguments for all of the commissions and fees, which are
summarized below.

### (1)  <u>Foreign Source TVA Commissions</u>

Petitioners contend that the TVA commission is income from sources outside the United States.  Petitioners contend that such commission is not effectively connected because it is not one of the types of foreign source income that is deemed effectively connected income pursuant to section 864(c)(4)(B) or (C).

Respondent contends that the TVA commission is from sources within the United States.  Respondent contends that such commission is effectively connected income through an implied application of the business-activities test.

We have held, <u>supra</u> pp. 116-117, that the TVA commission consists of three types of income, two of which are foreign source personal services income and one of which is U.S. source personal services income.  We agree with petitioners that the two foreign source income items are not effectively connected income because they do not fall under one of the types of foreign source income that is deemed effectively connected income pursuant to section 864(c)(4)(B) or (C).  Consequently, we hold that those two items are not subject to U.S. taxation.  However, petitioners' argument, which presumes foreign source income, is inapplicable to the TVA administration fee, which is characterized as personal services income and which is treated as income from sources within the United States.  We analyze the administration fee with all remaining LTD commissions and fees.

(2) All Commissions and Fees Excepting
the Foreign Source TVA Commissions

Petitioners contend that the commissions and fees are income from sources without the United States.  Petitioners contend that the commissions and fees are not effectively connected income because they do not fall under one of the types of foreign source income that is deemed effectively connected income pursuant to section 864(c)(4)(B) or (C).

Respondent contends that the commissions and fees are income from sources within the United States.  Respondent contends that the commissions and fees are effectively connected income through an implied application of the business-activities test.

We have held, supra pp. 112-118, that all of the commissions and fees, excepting the two types of foreign source TVA commissions, are characterized as personal services income and are treated as income from sources within the United States. Because petitioner's effectively connected income argument presumes foreign source income, we find that argument to have no merit.   LTD's commissions and fees (excepting the two types of foreign source TVA commissions) are any "income, gain, or loss from sources within the United States" not already described in the first two categories of U.S. source income and, therefore, fall under the third category of U.S. source income of a foreign corporation engaged in the active conduct of a banking, financing, or similar business.  Sec. 1.864-4(c)(5)(vi)(b),

Income Tax Regs.  Accordingly, we analyze LTD's commissions and fees pursuant to either the asset-use or business-activities test.  Id.

The business-activities test is of primary significance under circumstances, inter alia, where "service fees are derived in the active conduct of a servicing business".  Sec. 1.864-4(c)(3)(i), Income Tax Regs.  LTD's commissions and fees consist of service fees derived in the active conduct of a servicing business.  Consequently, we apply the business-activities test to decide whether such income is effectively connected.

Before applying the business-activities test, however, we must address the exception for activities relating to the management of investment portfolios provided in section 1.864-4(c)(3)(i), Income Tax Regs.  We have held, supra pp. 130-131, that the investment management portfolio exception is inapplicable and, consequently, that LTD's activities relating to the management of investment portfolios shall be treated as activities of LTD's trade or business conducted in the United States for purposes of applying the business-activities test.

In applying the business-activities test to decide whether the commissions and fees are effectively connected income, we must consider whether "the activities of such trade or business were a material factor in the realization of the income".  Sec. 864(c)(2)(B).  We have held, supra p. 98, that LTD was engaged in "trade or business within the United States" pursuant to section

864(b) during the taxable years in issue.  We examine separately the activities of LTD's trade or business relating to each of the commissions and fees.  For the following reasons, we hold that in each of the following commission or fee income categories, the associated activities of LTD's trade or business were a material factor in the realization of such commission or fee:

Currency Fund:  LTD accepted clients' deposits, opened an account with a foreign bank, and issued periodic statements to clients.

FEIM Fund:  LTD accepted clients' deposits, transferred such deposits to Merrill Lynch, and issued periodic statements to clients.

Matric Fund:  LTD handled the paperwork and general administration and distributed the interest payments to the investors.

Inversat Fund:  LTD accepted clients' deposits, transferred the funds from Inversat Fund to Inversat REIT, and provided general investment management.

TVA administration fee:  LTD instructed INC to pay TVA a monthly stipend to cover its development expenses and administered the funds raised in the capital call itself.

Client incorporation and trust creation and legal advice income:  LTD counseled clients regarding the proper entity for their investments and handled the paperwork, including arranging legal services from third parties.

Letters of credit:  LTD sent the letters of credit, either directly or indirectly through a bank, to Mexican banks in order to secure loans for clients.

Foreign exchange investments:  LTD contacted institutions for exchange rates and deposited or withdrew dollars or pesos per the client's direction.

Treasury bills:  LTD arranged for the purchase of Treasury bills through Merrill Lynch and other third party institutions.

Wires and checks:  LTD effected the wire and check transactions.

Gold and silver futures:  LTD obtained rates and helped effect the exchange transactions of gold and silver.

Project income:  LTD helped arrange the research project and derived the income therefrom.

Income from investments, other commissions income, other commissions and fees, and other income:  LTD performed the services that earned LTD the income in such categories.

We conclude that, for each commission or fee, excepting the two types of foreign source TVA commissions, the activities of LTD's trade or business were "a material factor in the realization of the income" within the meaning of section 864(c)(2)(B).  We have given due regard to the question of whether such income was accounted for through such trade or business, and we find LTD's commissions and fees to have been accounted for through LTD's trade or business.  Sec. 864(c)(2).

Consequently, we hold that all of LTD's commissions and fees, except the foreign source TVA commissions, are effectively connected income pursuant to section 1.864-4(c)(5)(vi)(b), Income Tax Regs., and section 864(c)(2)(B).

## C. Whether LTD and INC are Liable for Withholding Tax

### 1. Background

Respondent seeks to impose a withholding tax on three types of income items paid by LTD to its clients. The first type of income item, interest paid by LTD to its clients on investments made in LTD's name in U.S. certificates of deposit or bank deposits, consists of interest paid on IFF and MMA investments during the calendar years 1984 through 1989 (U.S. pooled investments). The second type of income item, interest paid by LTD to its clients from investments made in LTD's name in foreign banks, consists of interest paid on Asset Management Account, Eurodeposits, InverCedes, InverCede2, Liquid Assets, Special Accounts, Term Deposits, Pace, and MMA II investments[21] during

---

[21]

As we have noted, supra pp. 56-59, the parties stipulated the amounts on which LTD is potentially liable for withholding tax. Respondent argues that the withholding tax should be imposed on "interest paid or credited to accounts of clients which was earned on funds of clients pooled and invested in LTD's name." Based on facts disclosed by the record, we believe that the interest listed as a "Special Accounts" expense consists of interest paid by LTD to various other LTD accounts. Thus, the interest paid to "Special Accounts" does not fall within respondent's withholding tax argument. Petitioners, however, did not contest either the stipulation or respondent's argument. Consequently, we will observe the parties' stipulation and
(continued...)

the calendar years 1988 and 1989 (non-U.S. pooled investments). The third type of income, dividends, consists of a dividend paid by LTD to its shareholders during the calendar years 1985 and 1986.

## 2. Withholding Tax on Interest

Withholding tax, which is imposed only on gross income items from sources within the United States, is reported on a calendar year basis. Sec. 1.1461-2(c), Income Tax Regs. Source rules for interest, however, are generally applied based upon the obligor's taxable year.

We first analyze the issue of who, in LTD's pooled investments program, is the obligor of the interest. Petitioners argue that the obligor in LTD's pooled investments program are the U.S. and foreign banks from which LTD purchased the investments. Petitioners, noting respondent's concession that the bank deposit exception to withholding tax applied to the interest paid on certificates of deposit in the client's name, contend that there is no legal basis for distinguishing between interest paid on certificates of deposit in the client's name and interest paid on U.S. or foreign investments in LTD's name (the pooled investments).[22] Petitioners argue that all investments

---

[21](...continued)
include the "Special Accounts" expense as an amount on which LTD is potentially liable for withholding tax.

[22]
Petitioners do not argue that the interest is exempt from
(continued...)

made by LTD's clients were for their own account and risk and did not establish a debtor-creditor relationship between LTD and its clients or a shareholder-corporation relationship between the clients and the pooled investment accounts. Petitioners contend that, because the risk of loss always remained with the client, the mere act of combining two or more clients' funds to purchase a larger certificate of deposit did not create a "mutual fund".

Petitioners rely on Estate of Smith v. Commissioner, 33 T.C. 465 (1959). Petitioners argue that neither LTD nor INC was the "obligor" of the interest earned in LTD's name and paid to LTD's clients from pooled investments. Petitioners contend that the relation among LTD/INC, the client, and any investment were the same whether the investment was purchased in the client's name or, by pooling, in LTD's name. Petitioners argue that the interest "flowed through" INC and/or LTD and retained its underlying character in the hands of LTD's clients. Accordingly, petitioners contend that, in the case of a pooled investment in a U.S. certificate of deposit or bank deposit, the interest was statutorily exempt from withholding, and, in the case of a pooled investment in a non-U.S. certificate of deposit or term deposits, the interest was foreign source, not subject to U.S. taxation of any kind.

Respondent, however, argues that the obligor in LTD's pooled

---

[22](...continued)
withholding tax as portfolio interest pursuant to secs. 871(h) and 881(c). Consequently, we do not consider such argument.

investments program was LTD.  Respondent argues that numerous factors support such contention:  The clients had no control over how or where the money was invested; the money of all the clients in all of the different LTD funds was pooled and invested in LTD's name; LTD not only invested the pooled funds in certificates of deposit but also used the pooled funds to make loans to its clients and others, to use in special operations, and to fund Inver Group's own investment projects; the rate of return credited to the clients' accounts did not reflect the rate of return earned by the investments because LTD received all of the interest and paid the clients interest at a previously set rate, retaining the benefit of the spread attributable to the volume of the investments; LTD paid its clients interest, regardless of whether or when LTD itself was paid; and LTD credited interest to its clients, even though it had not yet received the interest payment.

Respondent contends that LTD was engaged in trade or business in the United States.  Accordingly, respondent argues that, pursuant to the source rules for interest, the interest paid by LTD as obligor was U.S. source income to LTD's clients. Consequently, respondent contends that LTD is required to withhold tax on the interest it paid to its clients.  Respondent contends that LTD is not "carrying on the banking business" for purposes of the exemption for interest on deposits with persons carrying on the banking business.

Additionally, respondent argues that INC had signatory authority over the accounts in which funds were held, managed the investments for the funds, and was responsible for crediting the accounts of the clients from the funds.  Accordingly, respondent contends that INC controlled the payment of interest and is therefore a withholding agent liable for withholding tax.

In the instant case, we conclude that, in its pooled investments program, LTD was not the obligor to its clients.  We have concluded, supra p. 96, that the "real business" of LTD was to enable Mexican nationals to invest their capital in non-Mexican financial markets.  LTD's clients did not place their funds with LTD as an investment in LTD; rather, LTD's clients placed their funds with LTD as a manager, to be invested in non-Mexican financial markets per the clients' direction.

Respondent has conceded that the exemption for interest on deposits with persons carrying on the banking business applies to the interest paid on certificates of deposit in the clients' name.  We conclude that LTD's relationship with its clients with regard to pooled investments differs in no material respect from its relationship with its clients with regard to investments purchased in the client's name.  In both investment programs, LTD had no economic interest in the pooled investments as such but only an interest in the spread between the rates earned from the investments and the rates paid by LTD to its clients.  After paying to its clients their respective portions of the interest

earned on pooled investments, LTD retained only the spread that it was able to negotiate. Accordingly, we conclude that, as to its pooled investments program, LTD was not the obligor in its relationship with its clients.

Because we do not view LTD as the obligor, we treat the U.S. and foreign banks as the obligors of the interest on pooled investments paid by LTD to LTD's clients. Additionally, we treat the interest as retaining its underlying character in the hands of LTD's clients as interest from such U.S. and foreign banks.

We turn next to whether LTD and INC are withholding agents liable for withholding tax on the interest derived from U.S. and foreign banks and paid by LTD/INC to LTD's clients. The Tax Reform Act of 1986 changed the statutory mechanism for exempting from tax the interest earned on "deposits with persons carrying on the banking business", effective for "payments made in a taxable year of the payor beginning after December 31, 1986." Tax Reform Act of 1986 (1986 Act), Pub. L. 99-514, sec. 1214 (c)(5) and (d)(1), 100 Stat. 2543.[23]

In the instant case, the interest from U.S. and foreign banks was paid by LTD to its clients during the calendar years 1984 through 1989. Source rules for interest are generally

---

[23]

Sec. 1012(g)(1) of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3500, retroactively provided the effective date of the Tax Reform Act of 1986 (1986 Act), Pub. L. 99-514, sec. 1214(c)(5), 100 Stat. 2543, as if included in the 1986 Act.

applied based upon the obligor's taxable year. The parties, however, did not present evidence regarding the taxable years of the U.S. and foreign banks that paid the interest in issue. Nonetheless, our holdings, infra pp. 175-181, that the exemption for interest on "deposits with persons carrying on the banking business" applies in the instant case obviate the need to inquire into the taxable years of the U.S. and foreign banks because under both pre-1986 Act law and post-1986 Act law, the result is the same: LTD and INC are not liable as withholding agents for withholding tax.

Post-1986 Act law applies to payments made in taxable years of the U.S. and foreign banks beginning after December 31, 1986. We must therefore examine both regimes of law.

### a. Pre-1986 Act Law

#### (1) Character and Source Rules for Interest

Generally, the source of interest depends on the residence of the obligor. Interest on bonds, notes, or other interest-bearing obligations of U.S. residents, corporate or otherwise, is generally treated as income from sources within the United States. Sec. 861(a)(1). The term "resident of the United States", used in section 1.861-2(a)(1), Income Tax Regs., which was promulgated pursuant to section 861(a)(1), includes, inter alia, "a foreign corporation or a foreign partnership, which at any time during its taxable year is engaged in trade or business in the United States." Sec. 1.861-2(a)(2)(iv), Income Tax Regs.

Interest that is not treated as income from sources within the United States pursuant to section 861(a)(1) is treated as income from sources without the United States. Sec. 862(a)(1). Notwithstanding section 861(a)(1) and the regulations thereunder, however, certain interest is treated as income from sources without the United States. Sec. 1.861-2(b), Income Tax Regs. One type of interest that is not treated as income from sources within the United States is interest that is received by a nonresident alien individual or a foreign corporation on amounts described in section 861(c), if such interest is not effectively connected with the conduct of trade or business within the United States. Sec. 861(a)(1)(A). The amounts described in section 861(c) include, inter alia, "deposits with persons carrying on the banking business." Sec. 861(c)(1).

The Code and the regulations do not define "deposits" for purposes of section 861(c). The Commissioner, however, has interpreted the term "deposits" to include, for purposes of section 861(c), "time certificates of deposit, open account time deposits, and multiple maturity time deposits, all of which are interest bearing." Rev. Rul. 72-104, 1972-1 C.B. 209, 209.

The regulations provide that the phrase "persons carrying on the banking business" includes, for purposes of section 861(c), citizens of the United States or alien individuals and foreign or domestic partnerships or corporations. Sec. 1.861-2(b)(1)(a),

Income Tax Regs.[24]  The regulations, however, do not define

"carrying on the banking business".  The Commissioner has applied

the section 581 definition of "bank" to interpret the phrase

"carrying on the banking business" for purposes of section

861(c).  Rev. Rul. 83-176, 1983-2 C.B. 111, 112.  Section 581

provides three requirements for an entity to be considered a

"bank" within the meaning of the statute.  The first requirement

is that the entity must be "a bank or trust company incorporated

and doing business under the laws of the U.S. (including laws

relating to the District of Columbia) or of any State".  Sec.

581.  The second requirement is that a substantial part of the

entity's business must consist of "receiving deposits and making

loans and discounts, or of exercising fiduciary powers similar to

those permitted to national banks under the authority of the

Comptroller of the Currency."  Id.  The third requirement is that

the entity must be "subject by law to supervision and examination

by State * * * or Federal authority having supervision over

banking institutions."  Id.

---

[24]

Sec. 1.861-2(b)(1), Income Tax Regs., provides that the
interest on the deposits with persons carrying on the banking
business must be "paid or credited before January 1, 1977, to a
nonresident alien individual or foreign corporation".  However,
sec. 1041 of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat.
1634, repealed the last sentence of sec. 861(c), which had read:
"Effective with respect to the amounts paid or credited after
December 31, 1976, subsection (a)(1)(A) and this subsection shall
cease to apply."  Therefore, sec. 1.861-2(b)(1), Income Tax
Regs., applies to interest paid or credited to a nonresident
alien individual or foreign corporation after Dec. 31, 1976.
Rev. Rul. 83-176, 1983-2 C.B. 111, 112.

The Commissioner has ruled that the section 1.861-2(b)(1)(i)(a), Income Tax Regs., definition of "persons" prevails over the section 581 definition (the first requirement, supra), which applies the term "bank" only to corporations.  Rev. Rul. 83-176, 1983-2 C.B. at 112.  The Commissioner, however, has ruled that the "other language in section 581 relating to banking activities can be used as an indication of the requirements necessary to be considered engaged in the banking business." Id.  In other words, the ruling requires the interest payor to meet only the second and third requirements of the section 581 definition of "bank" in order to be considered "carrying on the banking business" for purposes of section 861(c).

(2)  Taxation of Interest

Section 871(a)(1)(A) imposes on a nonresident alien individual and section 881(a)(1) imposes on a foreign corporation a tax of 30 percent of the amount of interest that is treated as income from sources within the United States, if the interest is not effectively connected income to the recipient.  Interest that is treated as income from sources without the United States is not subject to tax pursuant to either section 871(a) or section 881(a).

Section 1441(a) provides that any person "having the control, receipt, custody, disposal, or payment of any of the items of income specified in * * * [section 1441](b) (to the

extent that any of such items constitutes gross income from sources within the United States), of any nonresident alien individual" must deduct and withhold from such income a tax of 30 percent of the amount of such income. Section 1442(a) applies a withholding tax in the same manner as section 1441(a) on the items of income of foreign corporations subject to taxation pursuant to subtitle A. The income items specified in section 1441(b) include, inter alia, interest.

Section 1461 imposes liability for the tax due on every person required to deduct and to withhold the tax imposed pursuant to section 1441(a). However, interest that is treated as income from sources without the United States is not subject to withholding tax pursuant to section 1.1441-1, Income Tax Regs., or, therefore, section 1.1442-1, Income Tax Regs. Sec. 1.1441-3(a), Income Tax Regs.

> b. Post-1986 Act Law
>
> > (1) Character and Source Rules for Interest

Generally, the source of interest depends on the residence of the obligor. With exceptions not applicable in the instant cases, interest on bonds, notes, or other interest-bearing obligations of noncorporate U.S. residents or U.S. corporations is treated as income from sources within the United States. Sec. 861(a)(1). Interest that is not treated as income from sources within the United States pursuant to section 861(a)(1) is treated

as income from sources without the United States.  Sec. 862(a)(1).  Generally, interest from a foreign corporation is not treated as income from sources within the United States pursuant to section 861(a)(1)[25] and is therefore treated as income from sources without the United States.  Sec. 862(a)(1).  Section 884(f)(1)(A) provides special source rules for certain interest paid by a foreign corporation engaged in trade or business in the United States.

(2)  Taxation of Interest

Section 871(a)(1)(A) imposes on a nonresident alien individual and section 881(a)(1) imposes on a foreign corporation a tax of 30 percent of the amount of interest that is treated as income from sources within the United States, if the interest is not effectively connected income to the recipient.  Interest that is treated as income from sources without the United States is

---

[25]
    The Tax Reform Act of 1986, sec. 1241(b)(1)(A), 100 Stat. 2579, replaced the words "residents, corporate or otherwise" in sec. 861(a)(1) with the words "noncorporate residents or domestic corporations."  The current sec. 861(a)(1), therefore, does not refer to foreign corporations, which are instead covered pursuant to sec. 884(f).  Consequently, sec. 1.861-2(a)(2), Income Tax Regs., issued pursuant to former sec. 861(a)(1), which treats foreign corporations engaged in a U.S. trade or business at any time during the taxable year as a U.S. resident for purposes of the source rule, is irrelevant to years after sec. 861(a)(1) was amended.  The general rule, however, that the source of interest depends on the residence of the obligor retains its validity. The regulations do not explicitly state that a corporation's "residence" is its place of incorporation, but sec. 861(a)(1) does distinguish between "domestic" and "foreign" corporations without reference, for example, to a "principal place of business".  Consequently, we conclude that the source of interest depends on a corporation's place of incorporation.

not subject to tax pursuant to either section 871(a) or section 881(a).

Additionally, no tax is imposed pursuant to section 871(a)(1)(A) or section 881(a)(1) on any amount described in section 871(i)(2).  Secs. 871(i)(1), 881(d).  The amounts described in section 871(i)(2) include, inter alia, "Interest on deposits, if such interest is not effectively connected with the conduct of a trade or business within the United States."  Sec. 871(i)(2)(A).  Section 871(i)(3)(A) provides that, for purposes of section 871(i)(2), the term "deposit" means, inter alia, amounts that are "deposits with persons carrying on the banking business".

Section 1441(a) provides that any person "having the control, receipt, custody, disposal, or payment of any of the items of income specified in * * * [section 1441](b) (to the extent that any of such items constitutes gross income from sources within the United States), of any nonresident alien individual" must deduct and withhold from such income a tax of 30 percent of the amount of such income.  Section 1442(a) applies a withholding tax in the same manner as section 1441(a) on the items of income of foreign corporations subject to taxation pursuant to subtitle A.  The income items specified in section 1441(b) include, inter alia, interest.

Section 1461 imposes liability for the tax due on every person required to deduct and to withhold the tax imposed

pursuant to section 1441(a).  However, interest that is treated as income from sources without the United States is not subject to withholding tax pursuant to section 1.1441-1, Income Tax Regs., or, therefore, section 1.1442-1, Income Tax Regs.  Sec. 1.1441-3(a), Income Tax Regs.  Additionally, no tax is required to be deducted and withheld pursuant to section 1441(a) from any amount described in section 871(i)(2).  Secs. 1441(c)(10), 1442(a).

3.    Withholding Tax on Dividends

a.    Character and Source Rules
      for Dividends

Dividend payments made before December 31, 1986, will be treated as income from sources within the United States if the amount received as dividends is:

> from a foreign corporation unless less than 50 percent of the gross income from all sources of such foreign corporation for the 3-year period ending with the close of its taxable year preceding the declaration of such dividends (or for such part of such period as the corporation has been in existence) was effectively connected with the conduct of a trade or business within the United States; but only in an amount which bears the same ratio to such dividends as the gross income of the corporation for such period which was effectively connected with the conduct of a trade or business within the United States bears to its gross income from all sources * * *  [Sec. 861(a)(2)(B).]

b.    Taxation of Dividends

Section 871(a)(1) imposes on a nonresident alien individual a tax of 30 percent of the amount of dividends treated as income from sources within the United States, if the amount of dividends

is not effectively connected income to the recipient.  Section 1441(a) provides that any person "having the control, receipt, custody, disposal, or payment of any of the items of income specified in * * * [section 1441](b) (to the extent that any of such items constitutes gross income from sources within the United States), of any nonresident alien individual" must deduct and withhold from such income a tax of 30 percent of the amount of such income.  The income items specified in section 1441(b) include, inter alia, dividends.  Section 1461 imposes liability for the tax due on every person required to deduct and to withhold the tax imposed pursuant to section 1441(a).

Section 7701(a)(1) provides that the term "person" means and includes "an individual, a trust, estate, partnership, association, company or corporation."  Sec. 7701(a)(16) provides that the term "withholding agent" means "any person required to deduct and withhold any tax under the provisions of section 1441, 1442, 1443, or 1461."  The regulations promulgated pursuant to section 1441 provide:

> For purposes of chapter 3 of the Code, the term "withholding agent" means any person who pays or causes to be paid an item of income specified in § 1.1441-2 to (or to the agent of) a nonresident alien individual, a foreign partnership, a nonresident alien or foreign fiduciary of a trust or estate, or a foreign corporation, and who is required to withhold tax under sections 1441, 1442, 1443, or 1451 from such item of income.  Any person who meets the definition of a withholding agent is required to file the returns prescribed by § 1.1461-1.  * * *  [Sec. 1.1441-7(a)(1), Income Tax Regs.]

4.   <u>Discussion of Interest</u>

    a.   <u>Pre-1986 Act Years</u>

        (1)   Application of the Character
            <u>and Source Rules for Interest</u>

Petitioners argue that the interest received by LTD's clients is interest on deposits with persons carrying on the banking business.  Accordingly, petitioners argue that the interest is income from sources without the United States.  On the other hand, respondent argues that the interest received by LTD's clients is paid by LTD as obligor and is therefore treated as income from sources within the United States.

We have concluded <u>supra</u> p. 165, that the interest paid to LTD's clients from pooled investments retains its character in the hands of LTD's clients.  Because respondent's source argument presumes that LTD was the obligor of the interest, we find that argument to have no merit.

As to the U.S. certificates of deposit and bank deposits (the only pooled investments made by LTD during the pre-1986 Act years), we conclude that the interest from such investments is treated as income from sources without the United States.  The IFF and MMA investments consisted of certificates of deposit and bank deposits with U.S. banks and were therefore "other interest-bearing obligations of residents, corporate or otherwise" within the meaning of section 861(a)(1) and the regulations thereunder.  Consequently, the interest from such obligations is generally treated as income from sources within the United States.  Sec. 861(a)(1).

Notwithstanding section 861(a)(1) and the regulations thereunder, however, certain interest is treated as income from sources without the United States. Sec. 1.861-2(b), Income Tax Regs. Interest received by a nonresident alien individual or a foreign corporation on "deposits with persons carrying on the banking business" is not treated as income from sources within the United States, if such interest is not effectively connected with the conduct of trade or business within the United States. Sec. 861(a)(1)(A), (c)(1).

As we have stated supra p. 167, the Code and the regulations do not define "deposits" for purposes of section 861(c). The Commissioner, however, has interpreted the term "deposits" to include, for purposes of section 861(c), "time certificates of deposit, open account time deposits, and multiple maturity time deposits, all of which are interest bearing." Rev. Rul. 72-104, 1972-1 C.B. 209, 209. We agree with the reasoning of Rev. Rul. 72-104, and we apply that reasoning in our interpretation of the term "deposits" in section 861(c)(1).[26] Accordingly, we conclude

---

[26] A revenue ruling is entitled to no special deference. Higgins v. Commissioner, 312 U.S. 212, 215 (1941); Helvering v. New York Trust, 292 U.S. 455 (1934); Stark v. Commissioner, 86 T.C. 243, 250-251 (1986). The Court of Appeals for the Fifth Circuit has stated:

a [revenue] ruling is merely the opinion of a lawyer in the agency and must be accepted as such. It may be helpful in interpreting a statute, but it is not binding on the Secretary [of the Treasury] or the courts. It does not have the effect of a regulation or a Treasury Decision. * * * [Stubbs, Overbeck & Associates v. United States, 445 F.2d 1142, 1146-1147

(continued...)

that the U.S. certificates of deposit and bank deposits are "deposits" within the meaning of section 861(c).

As we have stated, supra pp. 168-169, neither the Internal Revenue Code nor the relevant regulation defines the term "carrying on the banking business" for purposes of section 861(c)(1). Rev. Rul. 83-176, 1983-2 C.B. 111, however, interprets section 861(c). We agree with the reasoning of Rev. Rul. 83-176, and we apply that reasoning in our interpretation of the phrase "persons carrying on the banking business" in section 861(c)(1).[27]

The parties did not brief the issue of whether the U.S. banks from which LTD purchased pooled investments were "persons carrying on the banking business" for purposes of section 861(c)(1). Based upon the entire record before us, however, we are convinced that the banks were "persons carrying on the banking business" within the meaning of section 861(c)(1). LTD placed its clients' funds in U.S. banks that were insured by the FDIC and FSLIC. Accordingly, we conclude that all of the banks with which LTD dealt meet the requirements that (1) a substantial part of the person's business consist of "receiving deposits and

---

[26](...continued)
(5th Cir. 1971).]

Accordingly, a ruling or other interpretation by the Commissioner is only as persuasive as the reasoning and precedents contained in such interpretation. Halliburton Co. v. Commissioner, 100 T.C. 216, 232 (1993), and the cases cited therein, affd. without published opinion 25 F.3d 1043 (5th Cir. 1994).

[27]

See supra note 26.

making loans and discounts, or of exercising fiduciary powers similar to those permitted to national banks under the authority of the Comptroller of the Currency" and (2) the person must be "subject by law to supervision and examination by State, or Federal authority having supervision over banking institutions." Rev. Rul. 83-176, 1983-2 C.B. at 112.  Consequently, we conclude that the U.S. banks that paid interest on LTD's pooled investments are "persons carrying on the banking business" within the meaning of section 861(c)(1).  Accordingly, we hold that the interest from the U.S. pooled investments is treated as income from sources without the United States.  Sec. 861(a)(1)(A), (c)(1).

### (2)  Taxation of Interest

We have held, <u>supra</u>, the interest paid to LTD's clients on the U.S. pooled investments is treated as income from sources without the United States.  Sec. 861(a)(1)(A), (c)(1).  Interest that is treated as income from sources without the United States is not subject to tax pursuant to either section 871(a) or section 881(a).  Additionally, interest that is treated as income from sources without the United States is not subject to withholding tax pursuant to either section 1.1441-1, Income Tax Regs., or, therefore, section 1.1442-1, Income Tax Regs.  Sec. 1.1441-3(a), Income Tax Regs.  Consequently, we hold that neither LTD nor INC is a withholding agent liable for withholding tax with respect to the interest paid on pooled investments during the pre-1986 Act years.

b.    Post-1986 Act Years

(1)  Application of the Character
and Source Rules for Interest

Petitioners argue that the interest received by LTD's clients retained its underlying character.  Accordingly, petitioners argue that the interest from U.S. pooled investments received by LTD's clients is income from sources within the United States and that the interest from non-U.S. pooled investments is income from sources without the United States.  On the other hand, respondent argues that the interest received by LTD's clients is paid by LTD as obligor and is therefore treated as income from sources within the United States pursuant to section 884(f)(1)(A).

We have concluded, supra p. 165, that the interest paid to LTD's clients from pooled investments retains its character in the hands of LTD's clients.  Because respondent's source argument presumes that LTD was the obligor of the interest, we find that argument to have no merit.

As to the U.S. pooled investments, we conclude that the interest from such investments is treated as income from sources within the United States.  The interest from the IFF and MMA investments derived from certificates of deposit and bank deposits with U.S. banks, which are "other interest-bearing obligations of * * * domestic corporations" within the meaning of section 861(a)(1).  Accordingly, we hold that the interest from the U.S. pooled investments is treated as income from sources within the United States.  Sec. 861(a)(1).

As to the non-U.S. pooled investments, we conclude that the interest from such investments is treated as income from sources without the United States. The Asset Management Account, Eurodeposits, InverCedes, InverCede2, Liquid Assets, Special Accounts, Term Deposits, Pace, and MMA II investments consisted of certificates of deposit and term deposits with non-U.S. banks. The interest on such investments, therefore, derived from non-U.S. obligors. Accordingly, we hold that the interest from the non-U.S. pooled investments is treated as income from sources without the United States. Sec. 862(a)(1).

### (2)  Taxation of Interest

As we have stated, supra pp. 171-172, section 871(a)(1)(A) imposes on a nonresident alien individual and section 881(a)(1) imposes on a foreign corporation a tax of 30 percent of the amount of interest that is treated as income from sources within the United States, if the interest is not effectively connected income to the recipient. No tax, however, is imposed pursuant to section 871(a)(1)(A) or section 881(a)(1) on interest on deposits with persons carrying on the banking business. Secs. 871(i)(1), 881(d).

As to the U.S. pooled investments, we apply an analysis similar to the one for the pre-1986 Act years, supra pp. 177-178, and conclude that the U.S. banks that paid interest on LTD's pooled investments are "persons carrying on the banking business" for purposes of section 871(i)(3)(A). Accordingly, we hold that

the interest from the U.S. pooled investments is interest on "deposits with persons carrying on the banking business" within the meaning of section 871(i)(2)(A) and (3)(A). Consequently, no tax is imposed on the interest from the U.S. pooled investments paid by LTD to its clients. Secs. 871(i)(1), 881(d). Additionally, no tax is required to be deducted and withheld pursuant to section 1441(a) from any amount described in section 871(i)(2). Secs. 1441(c)(10), 1442(a).

As to the non-U.S. certificates of deposit and term deposits, we have concluded, supra p. 180, that the interest from such investments is treated as income from sources without the United States. Interest that is treated as income from sources without the United States is not subject to tax pursuant to either section 871(a) or section 881(a). Additionally, interest that is treated as income from sources without the United States is not subject to withholding tax pursuant to either section 1.1441-1, Income Tax Regs., or, therefore, section 1.1442-1, Income Tax Regs. Sec. 1.1441-3(a), Income Tax Regs. Consequently, we hold that neither LTD nor INC is a withholding agent liable for withholding tax with respect to the interest paid on pooled investments during the post-1986 Act years.

5. Discussion of Dividend Income

Petitioners contend that they have shown that none of LTD's worldwide gross income was effectively connected and that, because less than 50 percent of LTD's worldwide gross income was

effectively connected, the section 861(a)(2)(B) source rule does not apply to the dividend paid by LTD to its shareholders. Alternatively, petitioners contend that, should we find that LTD had some effectively connected income during its 3 taxable years prior to the taxable year ended June 30, 1986, less than 50 percent of LTD's gross income was effectively connected, and the dividend therefore would be foreign source and not subject to withholding tax. As a final alternative, petitioners contend that, should we find that LTD's effectively connected income exceeded the 50-percent threshold of section 861(a)(2)(B), only the portion of LTD's dividend that is proportionate to LTD's percentage of effectively connected income in such years should be treated as U.S. source income.

Respondent argues that LTD is a withholding agent liable for withholding tax on the entire amount of the dividend. Respondent contends that all of LTD's income was effectively connected with its U.S. trade or business. Accordingly, respondent argues that the entire dividend paid by LTD is U.S. source income pursuant to section 861(a)(2)(B) and is therefore subject to withholding tax pursuant to section 1441(a).

In the instant case, the dividend in issue was declared on December 10, 1985. In applying section 861(a)(2)(B), we must look to LTD's worldwide gross income for the 3 taxable years that ended prior to the declaration of the dividend in issue; i.e., LTD's taxable years ended June 30, 1983 through 1985. Petitioners did not present evidence regarding LTD's taxable

years ended June 30, 1983 and 1984. We are therefore unable to apply the lookback rule in section 861(a)(2)(B) to the dividend in issue. Consequently, we consider the percentage figure in section 861(a)(2)(B) to have been conceded by petitioners. Rybak v. Commissioner, 91 T.C. 524, 566 (1988). Accordingly, we hold that 100 percent of LTD's gross income from all sources for the 3-year period ending with the close of its taxable year preceding the declaration of the dividend in issue was effectively connected with the conduct of LTD's trade or business within the United States. Sec. 861(a)(2)(B).

Because more than 50 percent of LTD's gross income was effectively connected for the applicable 3-year period, the amount of the dividend in issue that is to be treated as from sources within the United States bears the same ratio to such dividend as the amount of effectively connected income bears to gross income from all sources. Id. The ratio that LTD's effectively connected income bears to LTD's gross income from all sources is, for purposes of section 861(a)(2)(B), 100 percent. Accordingly, the amount of the dividend in issue that is to be treated as from sources within the United States is 100 percent. Id. The entire dividend paid by LTD to its shareholders is therefore subject to a 30-percent tax on nonresident alien individuals. Sec. 871(a).

The parties have not briefed the issue of whether LTD is eligible for the withholding exemption pursuant to section

1441(c), and they have not addressed whether LTD's shareholders were engaged in trade or business within the United States. Accordingly, we treat the issue as having been conceded by petitioners.  Rybak v. Commissioner, supra at 566.  Because LTD is not eligible for exemption from withholding pursuant to section 1441(c), LTD is a withholding agent pursuant to sections 1441(a) and 7701(a)(16) and therefore must pay a 30-percent tax on the dividend.

D.   Whether LTD Is Entitled to Deductions

   1.   Law

A foreign corporation engaged in trade or business within the United States during the taxable year is allowed deductions from its section 882(a) income "only if and to the extent that such deductions are connected with income which is effectively connected with the conduct of a trade or business within the United States".  Sec. 882(c)(1)(A).  The proper apportionment and allocation of such deductions are determined as provided in regulations prescribed by the Secretary.  Id.

A foreign corporation receives the benefit of such deductions "only by filing or causing to be filed with the Secretary a true and accurate return, in the manner prescribed in subtitle F, including therein all the information which the Secretary may deem necessary for the calculation of such deductions".  Sec. 882(c)(2); see also sec. 1.882-4(b)(1), Income Tax Regs.  If a true and accurate return is not filed, "the tax

shall be collected on the basis of gross income, determined in accordance with §1.882-1 but without regard to any deductions otherwise allocable."  Sec. 1.882-4(b)(2), Income Tax Regs.

2.  Discussion

Petitioners note that regulations promulgated pursuant to section 882(c)(2), as amended in 1990, requiring a "timely filed tax return" before a foreign taxpayer is allowed to offset effectively connected income with deductions allocable thereto, are effective for taxable years ended after July 31, 1990, and therefore that such regulations post-date all of the years in issue.  Additionally, petitioners contend that the prior version of such regulations did not contain similar language requiring that a tax return be timely filed as a precondition to deducting items properly allocable to effectively connected income.

However, as indicated supra, the prior version of the regulations, which is applicable here, did provide that a foreign corporation would not be allowed such deductions unless it filed a true and accurate return.  In the instant cases, LTD has filed no return at all and therefore has failed to comply with the express requirement of the applicable regulations.

Respondent, citing Blenheim Co. v. Commissioner, 125 F.2d 906, 911 (4th Cir. 1942), affg. 42 B.T.A. 1248 (1940), and Georday Enters., Ltd. v. Commissioner, 126 F.2d 384, 388 (4th Cir. 1942), affg. an unpublished opinion of the Board of Tax Appeals dated Sept. 30, 1940, contends that, because LTD filed no

returns, it is not entitled to any deductions.  Respondent contends that LTD should be denied the deduction for interest paid to clients.  Respondent argues that interest paid or accrued on indebtedness is characterized as a deduction by the Code and that a deduction for interest should therefore be denied. Respondent contends that, as the interest was recorded on LTD's corporate books as an expense, respondent's treatment of the interest is consistent with LTD's own records.  Additionally, respondent contends that LTD should be denied all other deductions.

In the instant case, we must examine four types of "deductions":  (1) the interest "deductions" included as a direct cost in LTD's "Interest Income" category, (2) the direct costs in all of LTD's income categories other than "Interest Income", (3) compensation expenses for the fees already paid by LTD to INC, and (4) additional compensation expenses potentially allocated to LTD pursuant to section 482.  As to the interest "deductions" included as a direct cost in LTD's "Interest Income" category, we have concluded, supra p. 106, that LTD should include in its income only the amounts that it retained as interest spreads from certificates of deposit and bank deposits.  Accordingly, as the interest paid by LTD to its clients on pooled investments is neither income nor a deduction to LTD, we need not address such amounts.  As to the additional compensation expenses potentially allocated to LTD pursuant to section 482, we address such

amounts, infra pp. 215-220.

We conclude that, because LTD filed no returns, it is not entitled to any deductions for the direct costs in all of LTD's income categories other than "Interest Income" or for compensation expenses for the fees already paid by LTD to INC. In Blenheim Co. v. Commissioner, supra, the taxpayer, a foreign corporation, filed a personal holding company surtax return (Form 1120H) but not an income tax return (Form 1120). The Commissioner's "Extended efforts * * * to get * * * [the taxpayer] to file a Form 1120 return voluntarily were unsuccessful", and the Commissioner was "forced by * * * [the taxpayer's] inactivity and uncooperative attitude to prepare a return for * * * [the taxpayer]". Id. at 909. In the return that the Commissioner prepared for the taxpayer, the Commissioner disallowed deductions and credits pursuant to section 233 of the Revenue Act of 1934.[28] The Commissioner then sent a notice of deficiency to the taxpayer based on that return. Id.

The taxpayer then filed an income tax return (Form 1120) that included "a breakdown of petitioner's income and claimed deductions." Id. The Board of Tax Appeals held that the circumstances of the case warranted the disallowance of the deductions. The Court of Appeals for the Fourth Circuit affirmed, stating that

---

[28] Sec. 233 of the Revenue Act was the predecessor statute to sec. 882(c)(2) of both 1954 I.R.C. and 1986 I.R.C.

Without prescribing an absolute and rigid rule that whenever the Commissioner files a return for a foreign corporation the taxpayer is completely and automatically denied the benefit of deductions or credits, we yet hold that the facts of the instant case justify a disallowance of deductions which petitioner might otherwise have been entitled to claim, had it filed a timely return in compliance with the statutory requirement. * * * [Id. at 910.]

In Georday Enters., Ltd. v. Commissioner, supra at 388, a companion case to Blenheim, the Court of Appeals for the Fourth Circuit stated that "our decision in the Blenheim case is determinative" on the issue, inter alia, of "the timeliness of Georday's federal income tax return". The court then stated:

The case for disallowance of Georday's deductions is even stronger here because Georday failed to file a return voluntarily not only after a return had been filed for it by the Commissioner and after a deficiency letter had been sent to it, but even after a petition to the Board had been filed. * * * [Id.]

The court held that "Georday, therefore, clearly failed to file its return within the reasonable terminal period prescribed in the Blenheim case and is now precluded from obtaining the benefits of any deductions it might have otherwise been entitled to claim had it filed a timely return." Id.

In the instant cases, LTD had not filed income tax returns for the taxable years in issue as of the date of trial of the instant cases. We therefore uphold respondent's disallowance of any deductions that LTD might have otherwise been entitled to claim had it filed a timely, true, and accurate return pursuant to section 882(c)(2).

E.   Whether Income Should Be Allocated
     Pursuant to Section 482

     1.   Background

By notices of deficiency, respondent determined that income should be allocated to INC and Holdings pursuant to section 482. As to INC's taxable years ended June 30, 1985 and 1986, respondent determined by notice of deficiency that INC had received other income and attached as an exhibit to the notice of deficiency a list of the balances in three bank accounts. Respondent treated the sum of the balances from the three accounts as income to INC for each taxable year. Respondent never amended the income allocations as to INC's taxable years ended June 30, 1985 and 1986.

As to Holdings' taxable years ended June 30, 1987, 1988, and 1989, respondent determined by notice of deficiency that Holdings had received other income.[29] Respondent allocated to INC all of LTD's remaining net income. Respondent calculated LTD's remaining net income by deducting LTD's "direct costs" and LTD's payment of service fees to INC from LTD's gross receipts. Respondent never amended the income allocations as to INC's taxable years ended June 30, 1987, 1988, and 1989.

---

[29] For INC's taxable years ended June 30, 1987, 1988, and 1989, INC was joined in the consolidated income tax returns filed by Holdings. Accordingly, respondent's income allocations to INC pursuant to sec. 482 affect the income tax liability of Holdings. For convenience and clarity, we make reference to INC only and include Holdings in such references.

2.  Law

     a.   Section 482 in General

Section 482[30] provides the Commissioner with broad authority
to allocate income, deductions, credits, or allowances between
commonly controlled organizations, trades, or businesses if
respondent determines that the reallocation is necessary to
prevent the evasion of taxes or clearly to reflect the income of
any of the controlled entities.

The purpose of section 482 is "to place a controlled
taxpayer on a tax parity with an uncontrolled taxpayer, by
determining, according to the standard of an uncontrolled
taxpayer, the true taxable income from the property and business
of a controlled taxpayer."  Sec. 1.482-1(b)(1), Income Tax Regs.
Stated another way, the purpose of section 482 is to prevent the
artificial shifting of the net incomes of controlled taxpayers by

---

[30]
     Sec. 482 provides as follows:

          In any case of two or more organizations, trades,
     or businesses (whether or not incorporated, whether or
     not organized in the United States and whether or not
     affiliated) owned or controlled directly or indirectly
     by the same interests, the Secretary may distribute,
     apportion, or allocate gross income, deductions,
     credits, or allowances between or among such
     organizations, trades, or businesses, if he determines
     that such distribution, apportionment, or allocation is
     necessary in order to prevent evasion of taxes or
     clearly to reflect the income of any of such
     organizations, trades, or businesses.

     The amendment to sec. 482 by 1986 Act sec. 1231(e)(1), 100
Stat 2562, regarding the transfer of intangible property does not
affect the instant case.

placing controlled taxpayers on a parity with uncontrolled,

unrelated taxpayers.  Seagate Technology, Inc. & Consol. Subs. v.

Commissioner, 102 T.C. 149, 163 (1994), and the cases cited

therein.

The regulations promulgated pursuant to section 482 provide:

The interests controlling a group of controlled
taxpayers are assumed to have complete power to cause
each controlled taxpayer so to conduct its affairs that
its transactions and accounting records truly reflect
the taxable income from the property and business of
each of the controlled taxpayers.  If however, this has
not been done, and the taxable incomes are thereby
understated, the district director shall intervene,
and, by making such distributions, apportionments, or
allocations as he may deem necessary of gross income,
deductions, credits, or allowances, or of any item or
element affecting taxable income, between or among the
controlled taxpayers constituting the group, shall
determine the true taxable income of each controlled
taxpayer.        * * *   [Sec. 1.482-1(b)(1), Income Tax
Regs.]

The term "true taxable income" means,

in the case of a controlled taxpayer, the taxable
income (or, as the case may be, any item or element
affecting taxable income) which would have resulted to
the controlled taxpayer, had it in the conduct of its
affairs (or, as the case may be, in the particular
contract, transaction, arrangement, or other act) dealt
with the other member or members of the group at arm's
length.  * * *  [Sec. 1.482-1(a)(6), Income Tax Regs.]

The true taxable income of the group as a whole, as well as

its individual members, must be accurately determined.  See

Schering Corp. & Subs. v. Commissioner, 69 T.C. 579, 600 (1978),

and the case cited therein.  Accordingly, each controlled

taxpayer will be examined independently to determine whether each

such individual taxpayer is reporting its own true taxable

income; i.e., the taxable income (or item or element affecting taxable income) that would have resulted to such taxpayer in an arm's-length transaction.  See Altama Delta Corp. v. Commissioner, 104 T.C. 424, 456 (1995); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, supra at 164; Sundstrand Corp. v. Commissioner, 96 T.C. 226, 353 (1991), affd. 17 F.3d 965 (7th Cir. 1994).  Once the true taxable income of each controlled taxpayer is determined, the Commissioner may distribute, apportion, or allocate gross income, deductions, credits, or allowances, or any item or element affecting taxable income, so that each controlled taxpayer, after such an allocation, reports its own true taxable income.

The Commissioner's determination as set forth in a notice of deficiency is presumptively correct.  The taxpayer has the burden of proof.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  Moreover, absent a showing of abuse of discretion by the Commissioner, the Commissioner's section 482 determination must be sustained.  Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525, 582 (1989), affd. 933 F.2d 1084 (2d Cir. 1991).  To succeed, therefore, a taxpayer first must show that the Commissioner's section 482 reallocations are arbitrary, capricious, or unreasonable.  Sundstrand Corp. v. Commissioner, supra; Eli Lilly & Co. v. Commissioner, 84 T.C. 996, 1131 (1985), affd. in part, revd. in part and remanded 856 F.2d 855 (7th Cir. 1988).  In

deciding whether the Commissioner's determination is reasonable, courts focus on the reasonableness of the result, not on the details of the methodology used.  Bausch & Lomb, Inc. v. Commissioner, supra at 582; see also Eli Lilly & Co. v. United States, 178 Ct. Cl. 666, 676, 372 F.2d 990, 997 (1967).

Once the taxpayer has proved that the deficiencies set forth in the notice of deficiency are arbitrary, capricious, or unreasonable, the taxpayer has the additional burden of proving satisfaction of the arm's length standard.  See Eli Lilly & Co. v. Commissioner, 856 F.2d at 860; Sundstrand Corp. v. Commissioner, supra at 354.

In the instant case, as between LTD and INC, respondent's allocations at least must be reasonable attempts to reflect arm's length transactions.  See Achiro v. Commissioner, 77 T.C. 881, 900 (1981).

### b.    The Section 482 Regulations

The term "controlled" is defined as including "any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised."  Sec. 1.482-1(a)(3), Income Tax Regs.  The term "controlled taxpayer" means "any one of two or more organizations, trades, or businesses owned or controlled directly or indirectly by the same interests."  Sec. 1.482-1(a)(4), Income Tax Regs.  The terms "group" and "group of controlled taxpayers" mean "the organizations, trades, or businesses owned or controlled by the same interests."  Sec.

1.482-1(a)(5), Income Tax Regs.

The regulations provide:

> Where one member of a group of controlled entities performs marketing, managerial, administrative, technical, or other services for the benefit of, or on behalf of another member of the group without charge or at a charge which is not equal to an arm's-length charge * * * , the district director may make appropriate allocations to reflect an arm's-length charge for such services. * * * [Sec. 1.482-2(b)(1), Income Tax Regs.]

The regulations provide a "benefit test", stating that "Allocations may be made to reflect arm's length charges with respect to services undertaken for the joint benefit of the members of a group of controlled entities, as well as with respect to services performed by one member of the group exclusively for the benefit of another member of the group." Sec. 1.482-2(b)(2)(i), Income Tax Regs. Conversely, "No allocations shall be made if the probable benefits to the other members were so indirect or remote that unrelated parties would not have charged for such services." Id.

An arm's-length charge for services rendered is "the amount which was charged or would have been charged for the same or similar services in independent transactions with or between unrelated parties under similar circumstances considering all relevant facts." Sec. 1.482-2(b)(3), Income Tax Regs. Unless the services are an integral part of the business activity of either the entity rendering the services (renderer) or the entity receiving them (recipient), or unless the taxpayer establishes a

more appropriate charge, the arm's length charge for services is deemed to equal the cost or deductions incurred with respect to the services performed by the renderer for the recipient.  Id.

For services which are an integral part of the business activity of either the renderer or the recipient, the costs or deductions incurred in rendering such services are not deemed to equal an arm's-length charge.  Sec. 1.482-2(b)(7), Income Tax Regs.  Services are considered an integral part of the business activity of a related entity in four situations.  The situation applicable to the instant case is the second situation, defined as a case in which "the renderer renders services to one or more related parties as one of its principal activities."  Sec. 1.482-2(b)(7)(ii), Income Tax Regs.  The regulations provide two tests for determining the applicability of the second situation.  The first test (the 25-percent test) is stated as follows:

> it will be presumed that the renderer does not render
> services to related parties as one of its principal
> activities if the cost of services of the renderer
> attributable to the rendition of services for the
> taxable year to related parties do not exceed 25
> percent of the total costs or deductions of the
> renderer for the taxable year.  * * *  [Sec. 1.482-
> 2(b)(7)(ii)(a), Income Tax Regs.]

Pursuant to the 25-percent test, the costs of services rendered to related parties include "all costs or deductions directly or indirectly related to the rendition of such services" but excludes "amounts properly reflected in the cost of goods sold of the renderer."  Sec. 1.482-2(b)(7)(ii)(b), Income Tax Regs.  Additionally, the regulations provide that, in a case:

Where any of the costs or deductions of the renderer do not reflect arm's length consideration and no adjustment has been made under any provision of the Internal Revenue Code to reflect arm's length consideration, the 25-percent test will not apply if, had an arm's-length charge been made, the costs or deductions attributable to the renderer's rendition of services to related entities would exceed 25 percent of the total costs or deductions of the renderer for the taxable year. * * * [Id.]

Once the 25-percent test is satisfied, the regulations provide a second test, which is a determination of whether the rendition of services to related parties is one of the principal activities of the renderer, based "on the facts and circumstances of each particular case" (the facts and circumstances test). Sec. 1.482-2(b)(7)(ii)(a), Income Tax Regs. Factors which may be considered in the facts and circumstances test include:

the time devoted to the rendition of the services, the relative cost of the services, the regularity with which the services are rendered, the amount of capital investment, the risk of loss involved, and whether the services are in the nature of supporting services or independent of the other activities of the renderer. * * * [Id.]

Pursuant to section 482:

the method of allocating, apportioning, or distributing income, deductions, credits, and allowances to be used by the district director, in any case, including the form of the adjustments and the character and source of amounts allocated, shall be determined with reference to the substance of the particular transactions or arrangements which result in the avoidance of taxes or the failure to clearly reflect income. * * * [Sec. 1.482-1(d)(1), Income Tax Regs.]

The appropriate adjustments may take the form of, inter alia, an increase or decrease in gross income, or an increase or decrease in deductions (including depreciation). Id.

Section 1.482-1(d)(2), Income Tax Regs., provides:

> Whenever the district director makes adjustments to the income of one member of a group of controlled taxpayers (such adjustments being referred to in this paragraph as "primary" adjustments) he shall also make appropriate correlative adjustments to the income of any other member of the group involved in the allocation.  The correlative adjustment shall actually be made if the United States income tax liability of the other member would be affected for any pending taxable year.  Thus, if the district director makes an allocation of income, he shall not only increase the income of one member of the group, but shall decrease the income of the other member if such adjustment would have an effect on the United States income tax liability of the other member for any pending taxable year.  * * *

A "pending taxable year" is "any taxable year with respect to which the United States income tax return of the other member has been filed by the time the allocation [the primary adjustment] is made, and with respect to which a credit or refund is not barred by the operation of any law or rule of law."  Id.  For purposes of paragraph (d) of section 1.482-1, Income Tax Regs., the regulations state that a primary adjustment:

> shall not be considered to have been made (and therefore a correlative adjustment is not required to be made) until the first occurring of the following events with respect to the primary adjustment:
>      (i)  The date of assessment of the tax following execution by the taxpayer of a Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) with respect to such adjustment,
>      (ii) Acceptance of a Form 870-AD (Offer of Waiver of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment),
>      (iii) Payment of the deficiency,
>      (iv) Stipulation in the Tax Court of the United States, or
>      (v)  Final determination of tax liability by offer-in-compromise, closing agreement, or court action.  * * * [Id.]

3. <u>Discussion</u>

Petitioners contend that an arm's-length fee was charged by INC for its investment management services rendered to LTD. Petitioners contend that the fee was arm's length because petitioners used a "cost-plus [profit]" calculation in the early years. During 1986, INC began charging a fee based on "an assets under management percentage." As support for the contention that the fee was arm's length, petitioners emphasize that representatives from both INC and LTD negotiated the fee in consultation with outside counsel and that the fee was reviewed and accepted each year by the companies' outside auditor.

Petitioners contend that INC's fees were comparable to the fees that United States Trust charged LTD before the creation of INC. Petitioners contend that United States Trust is "an independent service provider" which charged an arm's-length fee for its services.

Finally, petitioners contend that respondent's section 482 allocations are arbitrary, capricious, and unreasonable on the following additional grounds. Petitioners assert that respondent's expert report is flawed. Petitioners contend that conclusions of respondent's experts about INC's operations had no relation to the facts. Furthermore, petitioners complain that respondent has allocated all of LTD's remaining net income to INC. Petitioners contend that, for respondent's allocations to prevail, all of the income LTD earned in the taxable years ended 1985 through 1989 must have "originated exclusively through INC

personnel working in San Antonio."  Petitioners assert that there were only a handful of management-level employees working in INC's office in San Antonio, and that there was a relatively low level of activity in that office, as evidenced by the low number of telephone calls from that office to Mexico.  Petitioners contend that the income received by LTD from structuring and executing currency transactions and from the TVA underwriting was not generated from San Antonio by INC personnel.

Respondent contends that INC provided LTD with much more than "back office services".  Respondent argues that numerous services were provided to LTD by INC:  (1) INC provided all of the services that LTD was obligated to provide to the third party clients, (2) INC generated the spreads from U.S. and foreign pooled investments by obtaining higher interest rates on investments than those paid to clients, (3) account executives at INC were the primary point of contact and information source for financial transactions involving clients and promoters, (4) account executives at INC maintained Account Cards on which they recorded instructions that they received directly from clients over the telephone and in person in the San Antonio office, (5) INC employees implemented the clients' investment decisions, monitored the clients' investments, acted as an interface between clients and other financial institutions concerning currency exchanges, money transfers, loans, and securities, and provided current information to clients and promoters concerning various investment products, (6) INC made all investment decisions on

behalf of LTD, (7) INC's Operations Department researched and chose investment vehicles for the omnibus IFF and MMA funds, and (8) INC's personnel tracked exchange rates for the currency futures and brokerage services LTD offered.

Respondent contends that LTD's service agreements with its clients (the discretionary authorizations) were, for the most part, independent transactions between unrelated parties. Respondent argues that, because INC performed all of its services on behalf of LTD, the revenues of LTD are the best indicators of what INC's arm's length charges to LTD should have been, which is the reason respondent allocated all of the remaining net revenues earned by LTD to INC.  Accordingly, respondent argues that the arm's length charge for investment management services INC provided to LTD was the net amount of revenues LTD derived in servicing its clients.  Accordingly, respondent argues that allocations should be made to INC pursuant to section 482 as follows:

| Year | INC's Reported Revenues from LTD | Respondent's Allocations |
|------|----------------------------------|--------------------------|
| 1985 | $582,000 | $444,345 |
| 1986 | 945,000 | 960,206 |
| 1987 | 1,281,000 | 916,865 |
| 1988 | 1,440,000 | 1,027,586 |
| 1989 | 1,830,000 | 4,217,333 |

Finally, respondent contends that LTD is not entitled to the deduction correlating to respondent's section 482 allocation to INC.

We first examine whether INC is a controlled taxpayer within the meaning of section 1.482-1(a)(4), Income Tax Regs. INC was a wholly owned subsidiary of LTD, directly, during the taxable years ended June 30, 1985 and 1986, and indirectly, through the insertion of a holding company, Holdings, during the subsequent taxable years in issue. Consequently, we conclude that LTD controlled INC within the meaning of section 1.482-1(a)(3), Income Tax Regs., and that INC is a controlled taxpayer within the meaning of section 1.482-1(a)(4), Income Tax Regs. Additionally, because the same interests that own LTD also own INC, we conclude that LTD and INC constitute a "group of controlled taxpayers" within the meaning of section 1.482-1(a)(5), Income Tax Regs.

We turn next to whether INC provides the required services pursuant to section 1.482-2(b)(1), Income Tax Regs. INC provides administrative services to LTD. INC handles the daily operations of LTD's pooled investments program and its funds, performs research and bookkeeping, and produces the monthly client statements. INC and LTD are each members of a group of controlled entities. Consequently, INC provides administrative or other services for the benefit of another member of the group of controlled entities within the meaning of section 1.482-2(b)(1), Income Tax Regs.[31]

---

[31] We have previously noted that "sec. 1.482-2(b)(1), Income Tax Regs., applies to a group of controlled 'entities' while sec.
(continued...)

We turn next to whether INC passes the benefit test of section 1.482-2(b)(2)(i), Income Tax Regs.  The regulations provide that allocations may be made to reflect arm's length charges "with respect to services performed by one member of the group exclusively for the benefit of another member of the group."  Sec. 1.482-2(b)(2)(i), Income Tax Regs.  INC rendered services exclusively for the benefit of LTD, which constituted, in actuality, rendering services to LTD's clients.  The benefits to LTD were not so indirect or remote that unrelated parties would not have charged for such services.  Id.  LTD paid INC an annual fee for the services that INC rendered for LTD's benefit.  Accordingly, we hold that INC passes the benefit test of section 1.482-2(b)(2)(i), Income Tax Regs.

We must next ascertain whether the services are an integral part of the business activity of either the entity rendering the services (renderer) or the entity receiving them (recipient) pursuant to section 1.482-2(b)(3), Income Tax Regs., in order to decide which regime to apply in determining INC's arm's length charge for its services.  In their briefs, the parties did not apply the two tests of section 1.482-2(b)(7)(ii), Income Tax

[31](...continued)
1.482-1(b)(1), Income Tax Regs., describing the scope and purpose of sec. 482, refers to a group of controlled 'taxpayers.'  We believe that the difference in language is insignificant."  Haag v. Commissioner, 88 T.C. 604, 622 n.13 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988).  LTD and INC are thus both "controlled entities" and "controlled taxpayers", and income may properly be allocated to INC to reflect arm's length dealing pursuant to sec. 482.

Regs. As to the 25-percent test, the cost of services of INC attributable to its rendition of services to LTD can be extrapolated from the proportion of INC's revenues earned from LTD to INC's total revenues. In the taxable year ended 1985, with gross revenues of $618,190, INC reported $582,000 of revenue from LTD, or 94.1 percent of its gross revenues from LTD. In the taxable year ended 1986, with gross revenues of $953,583, INC reported $945,000 of revenue from LTD, or 99.1 percent of its revenue from LTD. In the taxable year ended 1987, with gross revenues of $1,395,545, INC reported $1,281,000 of revenue from LTD, or 91.8 percent of its gross revenues from LTD. In the taxable year ended 1988, with gross revenues of $1,532,579, INC reported $1,440,000 of revenue from LTD, or 94.0 percent of its gross revenues from LTD. In the taxable year ended 1989, with gross revenues of $1,909,563, INC reported $1,830,000 of revenue from LTD, or 95.8 percent of its gross revenues from LTD. Assuming that INC's revenues attributable to its rendition of services for the taxable year to LTD, when expressed as a percentage of INC's gross revenues, are commensurate with the costs of services INC provides for LTD, we conclude that INC meets the 25-percent floor in each taxable year ended 1985 through 1989.

Once the 25-percent test is satisfied, the regulations provide a second test, which is a determination of whether the rendition of services to related parties is one of the principal activities of the renderer based on a facts and circumstances

test.  Sec. 1.482-2(b)(7)(ii)(a), Income Tax Regs.  Factors which may be considered in such determination include:

> the time devoted to the rendition of the services     *
> * *  [to related parties], the relative cost of the
> services, the regularity with which the services are
> rendered, the amount of capital investment, the risk of
> loss involved, and whether the services are in the
> nature of supporting services or independent of the
> other activities of the renderer.  * * * [Id.]

The regulations do not define a "related party" for purposes of section 1.482-2(b)(7)(ii)(a), Income Tax Regs.  INC and LTD, however, are members of a group of controlled entities within the meaning of section 1.482-2(b)(1), Income Tax Regs., and INC is a wholly owned subsidiary of LTD.  Consequently, we believe that INC and LTD are "related parties" within the meaning of section 1.482-2(b)(7)(ii)(a), Income Tax Regs.

In the instant cases, nearly all of INC's activities were devoted to the rendition of services to a related party, LTD. INC rendered services to LTD, which constituted, in reality, the rendering of services to LTD's clients.  INC researched the financial institutions and interest rates for the certificate of deposit operation.  Additionally, INC regularly rendered services to LTD.  INC performed the day-to-day functions for the certificate of deposit operation, which included placing the funds as directed by the clients and collecting interest and dividends at the proper maturity, depositing such items into the client's account or LTD's accounts, and reinvesting funds if necessary.

The relative cost of the services that INC provided to LTD is unknown, but, based upon the fact that greater than 90 percent of INC's gross revenues came from LTD, see supra pp. 202-203, the cost of services INC provided to LTD similarly must be relatively large in amount. The exact amount of capital investment made by INC with regard to rendering services to LTD is unknown. INC did, however, establish an office in San Antonio to perform its duties. INC's tax returns for the years in issue show that INC purchased an office copier, computer equipment and software, and office equipment and furniture. In sum, INC's capital investment with regard to rendering services to LTD appears to have been relatively large in amount.

The risk of loss involved in the rendition of services by INC to LTD appears to have been relatively low. After the end of each of the taxable years ended June 30, 1985, 1986, and 1987, INC finalized with LTD the total amount of payments to be paid by LTD to INC for services rendered during the preceding taxable year. INC had a relatively low risk of loss in the rendition of services to LTD.

The services that INC rendered to LTD were in the nature of supporting services. INC provided administrative services that supported LTD's investment management business. INC's rendition of services did not constitute a manufacturing, production, extraction, or construction activity. The regulations analyze the type of services rendered--i.e., whether or not they are

supporting services--to determine whether the 25-percent test applies.  Sec. 1.482-2(b)(7)(v), Example (8), Income Tax Regs. We find that the services that INC rendered were in the nature of supporting services for purposes of section 1.482-2(b)(7)(ii), Income Tax Regs.

The factor of whether the services that INC rendered to LTD were independent of the other activities of INC is not applicable to the instant case.  INC performed very few, if any, "other" activities that were not for LTD.  Consequently, the services that INC rendered to LTD cannot be viewed as "independent" of the "other activities" of INC because INC had few "other activities". Accordingly, we believe that the factor of "independent" services is not relevant to the instant cases.

Based on the foregoing, we conclude that, pursuant to the facts and circumstances test, INC renders services to a related party as one of its principal activities within the meaning of section 1.482-2(b)(7)(ii)(a), Income Tax Regs.  Consequently, we hold that the services are an integral part of the business activity of INC within the meaning of section 1.482-2(b)(7), Income Tax Regs.  Because services are an integral part of INC's business activity, an arm's-length charge for INC's services rendered to LTD is "the amount which was charged or would have been charged for the same or similar services in independent transactions with or between unrelated parties under similar circumstances considering all relevant facts."  Sec. 1.482-2(b)(3), Income Tax Regs.

In deciding whether the Commissioner's determination is reasonable, courts focus on the reasonableness of the result and not on the details of the methodology used. Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525 (1989); see also Eli Lilly & Co. v. United States, 178 Ct. Cl. at 676, 372 F.2d at 997. In the instant cases, we hold that respondent's determinations are unreasonable because of the lack of reasonableness in the results. That is, we conclude that (1) as to INC's taxable years ended June 30, 1985 and 1986, the allocation of the sum of three bank accounts as income to INC is arbitrary, and (2) as to INC's taxable years ended June 30, 1987, 1988, and 1989, the allocation of the remaining amount of LTD's net income to INC (thereby effecting an allocation, when added to the amount of service fees already paid by LTD to INC, of all of LTD's net income to INC) is arbitrary. See Achiro v. Commissioner, 77 T.C. at 990. We reach this conclusion because respondent, in the notices of deficiency, failed to trace which activities of INC earned what revenue and failed to distinguish income earned by LTD from income earned by INC.

Nonetheless, once petitioners prove that the deficiencies set forth in the notice of deficiency are arbitrary, capricious, or unreasonable, they still have the burden of proving that their own allocation satisfies the arm's length standard. If they fail to carry the latter burden, the court must determine the proper allocation of items based upon the record. See Eli Lilly & Co.

v. Commissioner, 856 F.2d at 860; Sundstrand Corp. v.
Commissioner, 96 T.C. at 354.

Petitioners argue that, in the instant case, arm's-length
charges are:  (1) The amounts charged by INC to LTD, (2) the
amounts charged by United States Trust to LTD, or (3) the amounts
petitioners' expert has concluded would have been charged for
similar services under similar circumstances.  Respondent argues
that arm's-length charges are:  (1) The amounts charged by LTD to
its clients, or (2) LTD's net revenues, determined by
respondent's experts to approximate what would have been charged
for similar services under similar circumstances.

In the instant cases, we conclude that the amounts which
were charged in independent transactions for the same services
are arm's length charges.  The record in the instant cases
provides arm's length charges for the services in issue because
LTD charged its unrelated clients for the services LTD paid INC
to perform.[32]  Both parties' experts provided their opinions as
to an arm's-length charge.  We, however, conclude that such
estimates are not useful in light of the facts and circumstances
of the instant cases.  Additionally, we conclude that the amounts
charged by INC to LTD are not, by definition, arm's-length
charges because they do not derive from independent transactions

---

[32]
    We note that the record reveals instances in which LTD dealt
with "related" or favored clients who were charged lower or no
fees.  For unrelated clients, however, LTD charged a standard
amount for the transactions it effectuated.

between unrelated parties.  Finally, we conclude that the amounts
charged by United States Trust are not useful because they derive
from years prior to those in issue and do not address, by
definition, the pooled investments and funds LTD arranged for its
clients.

The services in issue were marketed by LTD to the public.
LTD, however, did not actually perform the services but instead
paid INC to perform them.  In other words, the services
"rendered" by LTD were the same services INC performed for LTD's
clients on behalf of LTD.  Consequently, because the fees that
LTD charged its unrelated clients were an "amount which was
charged or would have been charged for the same or similar
services in independent transactions with or between unrelated
parties under similar circumstances considering all relevant
factors", we conclude that such fees represent an arm's-length
charge within the meaning of section 1.482-2(b)(3), Income Tax
Regs.

We turn now to our calculation of the arm's length charges
for the services that LTD paid INC to perform.  The parties did
not specifically brief what services were to be considered in the
section 482 allocation.  In deciding INC's true taxable income
from service fees, we limit our examination and holding to the
same investment products that we have discussed, supra pp. 29-56,
with regard to LTD's income and expenses.  We note that, in such
discussion, the "Direct Costs" for each category of income did

not include LTD's payment of service fees to INC.  Consequently, we held, <u>supra</u> pp. 206-207, that respondent's allocation of the remaining amount of LTD's net income to INC (thereby effecting an allocation, when added to the amount of service fees already paid by LTD to INC, of all of LTD's net income to INC) is arbitrary.

Because we use the fees that LTD charged its unrelated clients as the arm's length charge for INC's services, we calculate INC's arm's length charge in the same manner as LTD calculated its service charges to its clients; to wit:  we multiply the net value of assets placed with LTD by a percentage factor, depending upon the category of investment.  As to the total amounts of client assets placed with LTD, we use the figures in respondent's expert report, which are rounded from figures in the audited annual reports of LTD and its subsidiaries for 1985 through 1989.  As to the percentage factors, which for some products include an initial placement cost and an asset management fee, we use the figures in the discretionary authorizations or the Deloitte workpapers.

LTD paid INC to handle LTD's certificates of deposit and pooled investments operation, cash and investment funds, and Treasury bill transactions.  LTD charged its clients 0.50 percent of the net assets placed with LTD in the certificate of deposit operation, cash and investment funds, or Treasury bill transactions.  Accordingly, the arm's length charge for INC's services for such operations is the amount of net assets received from clients times 0.50 percent.

LTD paid INC to maintain investments placed in the Currency Fund. LTD charged its clients a 3-percent placement cost plus an annual management fee, starting with the second year, of 1.00 percent of the value of the assets under management. Accordingly, the arm's length charge for INC's services for that operation is the amount of clients' newly placed net assets times 3 percent plus the amount of clients' already placed net assets times 1.00 percent.

LTD paid INC to maintain investments placed in the FEIM Fund. LTD charged its clients a placement cost based on a sliding scale of 4.00 percent to 0.25 percent, depending upon the amount of the investment. LTD also charged an annual management fee, starting with the second year, of 1.00 percent of the value of the assets under management. Petitioners did not present evidence on and the record does not reveal the precise amounts of clients' funds at each level of the graduated placement costs. Consequently, we are unable to calculate LTD's FEIM Fund commission on a sliding scale. We note that Deloitte used in its audit a figure of 3.00 percent, and we apply that amount in the instant case. Accordingly, the arm's length charge for INC's services for that operation is the amount of clients' newly placed net assets times 3.00 percent plus the amount of clients' already placed net assets times 1.00 percent.

LTD paid INC to maintain investments placed in the Inversat Fund. LTD charged its clients a placement cost based on a sliding scale of 3.50 percent to 0.25 percent, depending upon the

amount of the investment. LTD also charged an annual management fee, starting with the second year, of 1.00 percent of the value of the assets under management. Petitioners did not present evidence on and the record does not reveal the precise amounts of clients' funds at each level of the graduated placement costs. Consequently, we are unable to calculate LTD's Inversat Fund commission on a sliding scale. We note that Deloitte used in its audit a figure of 3.00 percent, and we apply that amount in the instant case. Accordingly, the arm's length charge for INC's services for such operation is the amount of clients' newly placed net assets times 3.00 percent plus the amount of clients' already placed net assets times 1.00 percent.

LTD paid INC to maintain investments placed in the Matric Fund. LTD charged its client, Matric Corp., a consulting fee of $47,500 to maintain the Matric Fund. Accordingly, the arm's length charge for INC's services for that operation is $47,500.

LTD paid INC to maintain investments placed in TVA. LTD charged its client, TVA, Inc., an administration fee of $5,000 per month. Accordingly, the arm's length charge for INC's services for that operation is $5,000 per month.

LTD paid INC to effect currency transactions. The amount that LTD earned is the amount that LTD charged its clients. Some of LTD's income, however, was generated by LTD's Guadalajara office and not by INC. Consequently, INC will not be allocated that income. Accordingly, the arm's length charge for INC's

services for those operations is the amount of LTD's revenues minus the amounts earned by the Guadalajara office.[33]

LTD paid INC to perform services for other funds, operations, and transactions. The amount that LTD earned is the amount that LTD charged its clients. Accordingly, the arm's length charge for INC's services for such operations is the amount of LTD's revenues.

We calculate the arm's length charges for INC's services as follows:

### TYE June 30, 1985

| | | |
|---|---|---|
| Certificates of deposit | 70,175,000 x 0.50%= | $350,875 |
| Cash & investment funds | 10,274,000 x 0.50%= | 51,370 |
| Treasury bills | 1,482,000 x 0.50%= | 7,410 |
| Currency transactions | LTD's revenues= | 531,003 |
| Currency swaps | LTD's revenues= | 54,386 |
| | Total | 995,044 |

### TYE June 30, 1986

| | | |
|---|---|---|
| Certificates of deposit | 100,180,000 x 0.50%= | 500,900 |
| Cash & investment funds | 19,199,000 x 0.50%= | 95,995 |
| Treasury bills | 3,355,000 x 0.50%= | 16,775 |

---

[33] For LTD's taxable year ended June 30, 1987, its revenues from currency transactions totaled $434,867, of which $11,361 was earned by the Guadalajara office. Accordingly, we calculate INC's arm's length charge for the services that it rendered as $423,506.

For LTD's taxable year ended June 30, 1988, its revenues from currency transactions totaled $232,426, of which $16,426 was earned by the Guadalajara office. Accordingly, we calculate INC's arm's length charge for the services that it rendered as $216,000.

Currency fund commissions
    Placement cost          4,090,000 x 3.00%=      122,700

FEIM fund commissions
    Placement cost          5,872,000 x 3.00%=      176,160

Currency transactions        LTD's revenues=      745,001

Client incorporation and
    trust creation fees       LTD's revenues=      169,263

                           Total      1,826,794

### TYE June 30, 1987

Certificates of deposit    106,468,000 x 0.50%=    532,340

Cash & investment funds    17,284,000 x 0.50%=     86,420

Treasury bills          1,887,000 x 0.50%=       9,435

Currency fund commissions
    Placement cost          8,608,000 x 3.00%=     258,240

    Management fee          4,090,000 x 1.00%=      40,900

FEIM fund commissions
    Placement cost          2,152,000 x 3.00%=      64,560

    Management fee          5,872,000 x 1.00%=      58,720

Inversat fund commissions
    Placement cost          2,780,000 x 3.00%=      83,400

TVA administration fees       LTD's revenues=       15,000

Currency transactions income   LTD's revenues=      423,506

Client incorporation and
    trust creation fees       LTD's revenues=      363,014

Letters of credit fees       LTD's revenues=        6,866

                           Total      1,942,401

### TYE June 30, 1988

Certificates of deposit    152,671,000 x 0.50%=    763,355

Cash & investment funds    99,590,000 x 0.50%=    497,950

Currency fund commissions

| | | |
|---|---|---|
| Placement cost | 0 x 3.00%= | - 0 - |
| Management fee | 11,404,000 x 1.00%= | 114,040 |

FEIM fund commissions

| | | |
|---|---|---|
| Placement cost | 0 x 3.00%= | - 0 - |
| Management fee | 6,400,000 x 1.00%= | 64,000 |

Inversat fund commissions

| | | |
|---|---|---|
| Placement cost | 0 x 3.00%= | - 0 - |
| Management fee | 2,729,000 x 1.00%= | 27,290 |
| Wire and check fees | LTD's revenues= | 13,274 |
| Currency transactions income | LTD's revenues= | 216,000 |
| Client incorporation and trust creation fees | LTD's revenues= | 290,518 |
| TVA administration fees | LTD's revenues= | 60,000 |
| Gold and silver fees | LTD's revenues= | 14,110 |
| Letters of credit fees | LTD's revenues= | 91,556 |
| | Total | 2,152,093 |

## 1989

| | | |
|---|---|---|
| Certificates of deposit and term deposits | 111,268,000 x 0.50%= | 556,340 |
| Cash & investment funds | 110,966,000 x 0.50%= | 554,830 |

Currency fund commissions

| | | |
|---|---|---|
| Placement cost | 0 x 3.00%= | - 0 - |
| Management fee | 4,927,000 x 1.00%= | 49,270 |

FEIM fund commissions

| | | |
|---|---|---|
| Placement cost | 1,278,000 x 3.00%= | 38,340 |
| Management fee | 6,400,000 x 1.00%= | 64,000 |

Inversat fund commissions

| | | |
|---|---|---|
| Placement cost | 0 x 3.00%= | - 0 - |
| Management fee | 2,729,000 x 1.00%= | 27,290 |
| Matric fund commissions | LTD's revenues= | 47,500 |

| | | |
|---|---|---|
| Wire and check fees | LTD's revenues= | 26,360 |
| Client incorporation and trust creation fees | LTD's revenues= | 404,286 |
| TVA administration fees | LTD's revenues= | 60,000 |
| Gold and silver fees | LTD's revenues= | 60,112 |
| Letters of credit fees | LTD's revenues= | 53,047 |
| | Total | 1,941,375 |

As LTD paid service fees to INC during the years in issue, the amount of income to be allocated to INC is the difference between (1) the arm's-length charges calculated supra and (2) the amounts of service fees already paid. Accordingly, we hold that income is to be allocated to INC from LTD pursuant to section 482 for INC's taxable years ended June 30, 1985 through 1989.

Once a primary adjustment is made to INC's income, the district director is required to make a correlative adjustment to the income of LTD pursuant to section 1.482-1(d)(2), Income Tax Regs. The parties have briefed the issue of whether LTD is entitled to such correlative adjustment.[34]

The primary adjustment to INC's income is not considered to have been made until the occurrence of the first of any of the five events set forth in section 1.482-1(d)(2), Income Tax Regs. The event relevant to the instant case is a final determination

---

[34] As we have stated supra note 3, LTD's deficiencies in income tax for its taxable years ended June 30, 1985 and 1986, are not at issue in the instant case. Accordingly, we decide whether LTD is entitled to a correlative adjustment for each of its taxable years ended June 30, 1987, 1988, and 1989.

of tax liability by court action. A correlative adjustment is not required to be made until a primary adjustment is made. Sec. 1.482-1(d)(2), Income Tax Regs. As the primary adjustment is not considered to have been made until a final determination of tax liability by court action, a correlative adjustment is also not required to be made until that time. Accordingly, as a final determination of tax liability by court action will not occur until after the issuance of this opinion, the correlative adjustment is not required to be made until after issuance of this opinion. The record, however, contains all facts necessary to decide, at this point, whether LTD is entitled to a correlative adjustment.

Petitioners contend that "As a matter of law, if not simple logic, should the * * * [Tax] Court reallocate any amount of LTD's income to INC, then LTD's taxable income should be reduced in equal amount." Petitioners cite the correlative adjustment provisions of section 1.482-1(d)(2), Income Tax Regs., as support for the treatment of any section 482 allocation of income to INC as a deduction to LTD. Petitioners note that denying the deduction of the section 482 correlative adjustment to LTD results in taxing the same dollar twice: once in the hands of LTD and once in the hands of INC.

Respondent agrees that LTD would ordinarily be entitled to a correlative adjustment equal to the primary adjustment to INC. Respondent notes, however, that deductions are a matter of legislative grace and not a matter of right. Gladstone Co. v.

Commissioner, 35 B.T.A. 764, 768 (1937).  Respondent contends
that section 882(c)(2) protects respondent from having to perform
the almost impossible task of properly apportioning and
allocating deductions for an uncooperative foreign taxpayer.

In the instant cases, at this time, there exist two paths
for deciding whether LTD is entitled to a correlative adjustment,
but pursuant to either one, the result is the same:  LTD is not
entitled to a correlative adjustment to its income.  Following
the first path, if LTD does not file a U.S. income tax return by
the time the primary adjustment is made, LTD will fall out of the
section 482 regime entirely and will therefore be ineligible to
receive a correlative adjustment to its income.

A correlative adjustment is made to the income of a taxpayer
only if such adjustment would have an effect on the U.S. income
tax liability of the taxpayer for any pending taxable year.  Sec.
1.482-1(d)(2), Income Tax Regs.  A "pending taxable year" is "any
taxable year with respect to which the United States income tax
return of the other member has been filed by the time the
allocation [the primary adjustment] is made, and with respect to
which a credit or refund is not barred by the operation of any
law or rule of law."  Id.  If LTD fails to file a U.S. income tax
return by the time the primary adjustment is made, LTD will have
no "pending taxable year" within the meaning of section 1.482-
1(d)(2), Income Tax Regs., and will therefore be ineligible for a
correlative adjustment to its income.

Following the second path, if LTD files a U.S. income tax return by the time the primary adjustment is made, LTD will be precluded from taking its correlative adjustment, which would be in the form of a section 882(c)(1)(A) deduction.  The form of a section 482 allocation, including the character and source of amounts allocated, follows the substance of the particular transaction that results in the avoidance of taxes or the failure to reflect income clearly.  Sec. 1.482-1(d)(1), Income Tax Regs. Appropriate adjustments may include, inter alia, an increase or decrease in gross income, or an increase or decrease in deductions.  Id.

In the instant case, the substance of the particular transaction that results in the avoidance of taxes was an underpayment by LTD to INC of fees for the performance of personal services.  The form of the section 482 allocations to INC and LTD follows the substance of such transaction and therefore consists of additional compensation for services for INC and additional compensation expenses for LTD.  Accordingly, the character and source of the amounts allocated are:  For INC, personal services income from sources within the United States includable in INC's gross income pursuant to section 61(a)(2), and, for LTD, additional compensation expenses includable in LTD's trade or business deductions pursuant to section 882(c)(1)(A).  The form of the correlative adjustment to LTD's income is, therefore, an increase in the amount LTD is entitled

to deduct pursuant to section 882(c).  Pursuant to <u>Blenheim Co. v. Commissioner</u>, 125 F.2d 906 (4th Cir. 1942), and <u>Georday Enters., Ltd. v. Commissioner</u>, 126 F.2d 384 (4th Cir. 1942), discussed <u>supra</u> pp. 185-188, however, we hold that LTD is precluded from receiving the benefits of any deductions it might have otherwise been entitled to claim had it filed a timely, true, and accurate return pursuant to section 882(c)(2).  In the instant case, the correlative adjustment to LTD's income is in the form of a deduction pursuant to section 882(c)(1)(A).  Accordingly, LTD will not be entitled to a correlative adjustment to its income.

We have previously addressed the issue of double taxation with regard to a section 482 correlative adjustment.  In <u>Collins Electrical Co. v. Commissioner</u>, 67 T.C. 911 (1977), we made a primary adjustment against the taxpayer without addressing the issue whether the related party, not a party to the action then before us, would ultimately receive its correlative adjustment.  We cautioned, however:

> We do not intend our holding on this issue to be read to sanction a double tax on the same income--a tax as a result of the primary adjustment without an accompanying correlative adjustment.  Section 482 indeed contemplates that when the Commissioner allocates income to one commonly controlled organization he will make a correlative adjustment in the income of the other.  * * *  [<u>Id.</u> at 922-923; fn. ref. omitted; citations omitted.]

In <u>Collins Electrical Co.</u> and the cases cited therein, however, we were not confronted with the additional factor of a foreign corporation's failure to file an income tax return.

Where, as in the instant case, a foreign corporation fails to file an income tax return, the interplay of section 882(c)(2) and section 482 requires the denial of a correlative adjustment, if such correlative adjustment is in the form of deductions the taxpayer might have otherwise been entitled to claim had it filed a timely, true, and accurate return. We note that allowing LTD in the instant case to deduct its section 482 correlative adjustment would produce an anomalous result with regard to LTD's section 882(c)(1)(A) deductions: The additional compensation expenses allocated to LTD pursuant to section 482 would be allowed but the compensation expenses already paid by LTD to INC and the other business expenses (e.g., commissions to promoters, etc.) would be disallowed pursuant to section 882(c)(2). As we have discussed, supra pp. 185-188, LTD filed no return at all and therefore failed to comply with the express requirement of section 1.882-4(b)(1), Income Tax Regs. Consequently, we uphold respondent's disallowance of the deduction for LTD's correlative adjustment that LTD might have otherwise been entitled to claim had it filed a timely, true, and accurate return pursuant to section 882(c)(2).

F.   Remaining Issues

   1.   Positions of the Parties

Petitioners make no argument on brief concerning the remaining issues set forth below in this paragraph F. Consequently, we consider such issues to have been conceded.

Rybak v. Commissioner, 91 T.C. at 566. Accordingly, we decide the issues set forth below.

2. Issues With Respect to LTD

a. We hold that LTD is liable for the branch profits tax imposed pursuant to section 884 for its taxable years ended 1988 and 1989;[35]

b. we hold that LTD is liable for the environmental tax imposed pursuant to section 59A.

3. Issues With Respect to INC

a. We hold that INC is not entitled to deductions claimed for legal and audit expenses for its taxable year ended 1986;

b. we hold that the net operating loss deduction claimed by INC should not be increased for its taxable year ended 1985 and should not be decreased for the taxable year ended 1986;

c. we hold that the investment credit claimed by INC should not be increased for its taxable year ended 1985 and should not be decreased for its taxable year ended 1986.

4. Issues With Respect to Holdings

a. We hold that Holdings is not entitled to deductions claimed for legal and audit fees for its taxable year ended 1987;

---

[35] Petitioners state that the branch profits tax is "to a large extent, a computational issue which will depend on whether LTD was engaged in a U.S. trade or business and to what extent, if any, its income was effectively connected to such a business." Petitioners make no argument concerning the issue, and we consider it to have been conceded. Rybak v. Commissioner, 91 T.C. 524, 566 (1988).

b.   we hold that Holdings is not entitled to claimed deductions for professional and legal fees for its taxable years ended 1988 and 1989;

c.   we hold that Holdings is not entitled to deductions claimed for employee training and recruiting for its taxable year ended 1989;

d.   we hold that Holdings is liable for the environmental tax pursuant to section 59A.

## G.   Additions to Tax

Respondent determined in notices of deficiency that petitioners are liable for (1) the additions to tax imposed by section 6651(a)(1) for failure to file timely income or withholding tax returns, (2) the additions to tax imposed by section 6653(a) for negligence or disregard of rules or regulations, (3) the additions to tax imposed by section 6655(a) for failure to pay estimated tax, (4) the additions to tax imposed by section 6656(a) for failure to make timely deposits of taxes, and (5) the additions to tax imposed by section 6661(a) for substantial understatement of income tax.  We shall examine the additions to tax separately.

### 1.   Section 6651(a)(1)

Section 6651(a)(1) imposes an addition to tax for failure to file timely a tax return unless it is shown that such failure is due to reasonable cause and not willful neglect.  A taxpayer can establish reasonable cause by showing that, despite the exercise of ordinary business care and prudence, the taxpayer was unable

to file the required tax return within the prescribed time. United States v. Boyle, 469 U.S. 241, 246 (1985); Crocker v. Commissioner, 92 T.C. 899, 913 (1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Alternatively, a taxpayer can establish reasonable cause by showing reasonable reliance on an accountant's or attorney's advice that filing a return was not necessary, even when such advice turned out to have been mistaken. United States v. Boyle, supra at 250. Willful neglect has been defined as a conscious, intentional failure or reckless indifference to timely filing a return. Id. The questions of whether petitioners have acted with "reasonable cause" and not "willful neglect" are questions of fact, and petitioners have the burden of proof. Rule 142(a); Lee v. Commissioner, 227 F.2d 181, 184 (5th Cir. 1955), affg. a Memorandum Opinion of this Court.

It is undisputed that (1) LTD did not file corporate income tax returns for taxable years ended June 30, 1987 through 1989, (2) LTD did not file withholding tax returns for calendar years 1984 through 1989, and (3) INC did not file withholding tax returns for calendar years 1987 through 1989. We have held that LTD is liable for corporate income tax for taxable years ended June 30, 1987 through 1989, that LTD is liable as a withholding agent for withholding tax on the dividend it paid to its shareholders in calendar years 1985 and 1986, and that INC is not liable as a withholding agent for withholding tax. Consequently, we must decide whether LTD's failure to file corporate income tax returns for taxable years ended June 30, 1987 through 1989 and

LTD's failure to file withholding tax returns for calendar years 1985 and 1986 were due to reasonable cause and not due to willful neglect.

Petitioners seek to establish reasonable cause by showing their reliance on the opinion of their tax counsel. Petitioners cite Haywood Lumber & Mining Co. v. Commissioner, 178 F.2d 769, 771 (2d Cir. 1950), modifying 12 T.C. 735 (1949) in which the court stated that "When a corporate taxpayer selects a competent tax expert, supplies him with all necessary information, and requests him to prepare proper tax returns, we think the taxpayer has done all that ordinary business care and prudence can reasonably demand." Petitioners contend that LTD and INC provided full disclosure of all relevant facts to their accountants and tax lawyers, and the returns prepared by such professionals in accordance with such facts constitute tax advice upon which LTD and INC may, in good faith, reasonably rely and not be subjected to additions to tax for failure to file a return.

We conclude that petitioners have not met their burden of proof. Petitioners have presented no evidence of receiving advice from either an accountant or an attorney that filing a return was unnecessary. The record contains one letter, dated December 18, 1984, in which Mr. Bricker writes "in response" to Deloitte's questions as to whether LTD "is subject to United States income tax." Mr. Bricker concludes that LTD "is not subject to United States tax other than on any 'fixed or

determinable annual or periodical' United States source income that it may receive."  In his letter, Mr. Bricker does not address the issue of whether LTD must file a U.S. income tax return.

Similarly, Deloitte's workpapers do not address the issue of whether LTD must file a U.S. income tax return.  In its workpapers for taxable years ended June 30, 1984, 1985, 1986, 1987, and 1989,[36] Deloitte refers to section 8 of petitioners' permanent file to support its conclusion that petitioners have no U.S. tax liability.  That section of the permanent file contained Mr. Bricker's letter to Deloitte dated December 18, 1984, and a Deloitte internal memorandum dated August 28, 1985, from R.V. Valdez to Floyde W. Burnside, Jr., and Glen I. Robinson.  R.V. Valdez writes that Deloitte's tax analysis of LTD in the 1984 and 1985 financial statements is "appropriate" based on a discussion with Burnside and Robinson and Valdez's own analysis.  Deloitte's financial statements for petitioners conclude that LTD "is not subject to U.S. federal or state taxes on income as it has no offices in the United States, no U.S. source income, and no income effectively connected with the conduct of a U.S. trade or business."

We are not persuaded that petitioners relied upon Deloitte for advice as to whether to file a U.S. income tax return.  Mr.

---

[36]

The workpapers for the audit of the taxable year ended June 30, 1988, do not mention the tax obligations of LTD.

Bricker was secretary and tax counsel of LTD, and he provided legal advice to petitioners. Deloitte itself sought Mr. Bricker's opinion on the issue of whether LTD is subject to U.S. income tax. Petitioners do not contend that, implicit in the advice of their attorney concluding that LTD was not engaged in a U.S. trade or business, there was the additional counsel that filing an income tax return was unnecessary. Mr. Bricker's letter to Deloitte, in fact, states that LTD is still subject to tax on any "fixed or determinable annual or periodical" U.S. source income that it may receive. Petitioners have not persuaded us that they received advice to the effect that filing an income tax return was unnecessary. Consequently, we hold that petitioners have not established reasonable cause and are therefore subject to the section 6651(a)(1) addition to tax relating to LTD's income tax liability for taxable years ended June 30, 1987 through 1989, and LTD's withholding tax liability for calendar years 1985 and 1986.

2. <u>Sections 6653(a)(1) and 6653(a)(1)(A)</u>

The Code imposes an addition to tax that is equal to 5 percent of the entire underpayment if any part of it was due to negligence or disregard of rules or regulations. Sec. 6653(a)(1) (for petitioners' taxable year ended June 30, 1985), sec. 6653(a)(1)(A) (for petitioners' taxable years ended June 30, 1986 through June 30, 1988), sec. 6653(a)(1) (for petitioners' taxable year ended June 30, 1989). If the addition to tax applies, the Code imposes a further addition to tax in an amount that is equal

to 50 percent of the interest payable with respect to the portion of the underpayment that is attributable to negligence or disregard of rules or regulations. Sec. 6653(a)(2) (for petitioners' taxable year ended June 30, 1985), sec. 6653(a)(1)(B) (for petitioners' taxable years ended June 30, 1986 through June 30, 1988), sec. 6653(a)(2) (for petitioners' taxable year ended June 30, 1989).

Respondent's determination that petitioners were negligent is presumed correct, and petitioners bear the burden of proving that they were not negligent. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-92 (1972). Pursuant to section 6653(a), negligence is defined as a failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances. Antonides v. Commissioner, 91 T.C. 686, 699 (1988) (citing Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964)), affd. 893 F.2d 656 (4th Cir. 1990); Neely v. Commissioner, 85 T.C. 934, 947 (1985). A taxpayer's failure to file a timely tax return is a prima facie case of negligence. Emmons v. Commissioner, 92 T.C. 342, 349 (1989), affd. 898 F.2d 50 (5th Cir. 1990).

Reliance on a return preparer, however, may relieve a taxpayer from the addition to tax for negligence where the taxpayer's reliance is reasonable. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). A taxpayer, however, is not relieved from

liability for the addition to tax for negligence merely by shifting the responsibility to a tax professional. Enoch v. Commissioner, 57 T.C. 781, 802-803 (1972). Reliance on an expert is not an absolute defense but is a factor to be considered. Freytag v. Commissioner, supra at 888. A taxpayer's reliance must be in good faith and demonstrably reasonable. Ewing v. Commissioner, 91 T.C. 396, 423 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Freytag v. Commissioner, supra at 888-889. In such a case, a taxpayer will be entitled to rely upon an expert's advice, even if the advice should prove to be erroneous. Jackson v. Commissioner, 86 T.C. 492, 539 (1986), affd. on other issues 864 F.2d 1521 (10th Cir. 1989); Brown v. Commissioner, 47 T.C. 399, 410 (1967), affd. 398 F.2d 832 (6th Cir. 1968).

The ultimate responsibility for a correct return lies with the taxpayer, who must furnish the necessary information to the agent who prepared the return. Enoch v. Commissioner, supra at 802. In other words, reliance upon expert advice will not exculpate a taxpayer who supplies the return preparer with incomplete or inaccurate information. Lester Lumber Co. v. Commissioner, 14 T.C. 255, 263 (1950).

Turning to the facts of the instant cases, we note that LTD did not file any income tax returns or withholding tax returns and that INC did not file any withholding tax returns. We have held that LTD is liable for corporate income tax for taxable

years ended 1987 through 1989, that LTD is liable as a withholding agent for withholding tax on the dividend it paid to its shareholders in calendar years 1985 and 1986, and that INC is not liable as a withholding agent for withholding tax. Pursuant to Emmons v. Commissioner, supra, we hold that LTD's failure to file timely income tax returns for taxable years ended June 30, 1987 through 1989 and LTD's failure to file withholding tax returns for calendar years 1985 and 1986 are prima facie cases of negligence. Petitioners have not come forward with sufficient evidence; i.e., they have not "overcome" or "put in equilibrium" such a prima facie case. Id. at 349, and the cases cited therein. As to LTD, petitioners did not proffer evidence tending to meet or to rebut respondent's prima facie cases of negligence. Consequently, we sustain respondent's determinations that LTD, as to its corporate income tax returns for taxable years ended June 30, 1987 through 1989, and its withholding tax returns for calendar years 1985 and 1986, was negligent.

As to INC's income tax returns and Holdings' income tax returns, petitioners contend that reliance upon experienced advisers relieves them from the addition to tax for negligence. Petitioners, however, have not provided sufficient evidence to prove that such reliance was reasonable. Ewing v. Commissioner, supra; Freytag v. Commissioner, supra. Consequently, we sustain respondent's determination of section 6653 additions to tax for INC and Holdings.

3.  Section 6655(a)

Section 6655(a) imposes an addition to tax for failure to pay estimated income tax.  Petitioners bear the burden of disproving respondent's determination of an addition to tax pursuant to section 6655(a).  Rule 142(a).

As petitioners paid no estimated tax and offered no evidence to explain their failure to do so, we sustain respondent's determination.  Id.

4.  Section 6656(a)

Section 6656(a) imposes an addition to tax for failure to deposit timely a tax in a Government depositary.  The addition to tax is equal to 10 percent of the underpayment.[37]  The addition to tax does not apply if the failure to deposit timely is due to reasonable cause and not to willful neglect.  Sec. 6656(a).

As with the section 6651(a)(1) additions to tax, petitioners seek to establish reasonable cause by showing their reliance on the opinion of their tax adviser and accountants.  We apply the standard for "reasonable cause" in section 6651(a)(1) to section 6656(a).  We have held that LTD is liable for corporate income tax for taxable years ended June 30, 1987 through 1989, that LTD is liable as a withholding agent for withholding tax on the

---

[37]

     Sec. 8001(a) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1951, sets the amount of such addition to tax at 10 percent of the amount of the underpayment, effective for amounts assessed after Oct. 21, 1986, the date of the enactment of the amendment.

dividend it paid to its shareholders in calendar years 1985 and 1986, and that INC is not liable as a withholding agent for withholding tax.  Applying the same reasoning as we applied, supra pp. 223-226, for section 6651(a)(1), we conclude that petitioners have not met their burden of proof as to their income tax liability for taxable years ended June 30, 1987 through 1989, and as to their withholding tax liability for calendar years 1985 and 1986.  Petitioners have presented no evidence of receiving advice from either an accountant or an attorney that depositing timely a tax in a Government depositary was unnecessary.  Mr. Bricker's letter "in response" to Deloitte's questions as to whether LTD "is subject to United States income tax" does not address the issue of whether LTD must deposit timely a tax in a Government depositary.

We are not persuaded that petitioners relied upon Deloitte for advice as to whether to deposit timely a tax in a Government depositary.  Mr. Bricker was secretary and tax counsel of LTD, and he provided legal advice to petitioners.  Deloitte itself sought Mr. Bricker's opinion on the issue of whether LTD is subject to U.S. income tax.  Petitioners do not contend that, implicit in the advice of their attorney concluding that LTD was not engaged in a U.S. trade or business, there was the additional counsel that depositing timely a tax in a Government depositary was unnecessary.  Mr. Bricker's letter to Deloitte, in fact, states that LTD is subject to tax on any "fixed or determinable

annual or periodical" U.S. source income that it may receive.
Petitioners have presented no evidence of receiving advice that
depositing timely a tax in a Government depositary was
unnecessary. Consequently, we hold that petitioners have not
established reasonable cause and are therefore subject to the
section 6656(a) additions to tax relating to LTD's income tax
liability for taxable years ended June 30, 1987 through 1989, and
LTD's withholding tax liability for calendar years 1985 and 1986.

    5.    Section 6661(a)

Section 6661(a) imposes an addition to tax on a substantial
understatement of income tax. For corporations, an
understatement is substantial where it exceeds the greater of 10
percent of the tax required to be shown on the return or $10,000.
Sec. 6661(b)(1)(A) and (B). The section 6661 addition to tax is
not applicable, however, if there was substantial authority for
the taxpayer's treatment of the items in issue or if relevant
facts relating to the tax treatment were disclosed on the return.
Sec. 6661(b)(2)(B)(i) and (ii). Petitioners bear the burden of
disproving respondent's determination of an addition to tax
pursuant to section 6661. Rule 142(a).

Petitioners have not presented any authority to support
their treatment of the items at issue other than the cases that
we have distinguished, supra pp. 85-92. There was no disclosure
of the relevant facts on a return. Consequently, we sustain
respondent's determination of an addition to tax pursuant to

section 6661.  Antonides v. Commissioner, 91 T.C. at 700-704.

All other arguments made by petitioners have been considered and found to be without merit.

To reflect the above,

Decisions will be entered under Rule 155.